```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                         ---

 3   DECUS, INC. and DECUS        :   CIVIL ACTION

 4   CONSTRUCTION, INC.           :

 5

 6
         vs.                      :
 7                                :
     MARK HEENAN and HEENAN       :   NO. 16-CV-5849
 8   HOLDINGS, LLC

 9

10
             PHILADELPHIA, PENNSYLVANIA
11                January 26, 2018
          BEFORE HONORABLE MARK A. KEARNEY, J.
12                   JURY TRIAL

13
     APPEARANCES:
14

15   FOR THE PLAINTIFF: OFFIT KURMAN, P.A.
                         BY:  KEVIN B. WATSON, ESQUIRE
16                       KATHRYN E. PETTIT, ESQUIRE
                         450 Sentry Parkway, Suite 200
17                       Blue Bell, Pennsylvania 19422

18

19
     FOR THE DEFENDANT:  LAVAN LAW
20                       JULIE A. LaVAN, ESQUIRE
                         271 West Main Street
21                       Moorestown, New Jersey 08057

22

23

24            GREGG B. WOLFE, RPR, CM
           601 Market Street, Room 1234
25        Philadelphia, Pennsylvania 19106
                 (215) 460-1511

            Gregg B. Wolfe, RPR, CM
                 215-460-1511
```

1       (The Court began the proceedings

2   at 9:00 a.m.)

3           THE COURT:  Yesterday at a conference

4   concerning the ability of the defendant to bring in

5   Third-Party Defendants, we correctly stated that they

6   could not be brought in under Rule 4 because you have to

7   file.  They did accept service so to file that service.

8           More significantly, today, I also want to

9   confirm that because in the Federal Rules you have to

10  get a summons for a Third-Party Complaint.  There's no

11  summons issued from the Court.  The filing of the

12  third-party claim here was brought as part of an Answer

13  in Counterclaim filed electronically, which is not

14  permitted in this district, and thus no summons was

15  issued.

16          Even if we were to find counsel's acceptance of

17  it, he could not have accepted a summons, which is what

18  you need to have to begin a lawsuit.  So our decision

19  yesterday is absolutely correct, but there's a precursor

20  to it and that is that the claim itself is a nullity

21  against the two individual third-party defendants

22  because this Court lacks jurisdiction over them as there

23  was no summons issued to them.  Absent a summons in

24  federal court, you cannot proceed against them.

25          I wanted to amplify the ruling from yesterday.

Gregg B. Wolfe, RPR, CM
215-460-1511

```
 1              Secondly, I have had a chance to review the

 2    records that Mr. Heenan found, and I'll ask Mr. Watson

 3    very briefly as to his position on those records.  There

 4    are several categories of them that I've broken down.

 5              But I'll hear from you, Mr. Watson.

 6              MR. WATSON:  Good morning, Your Honor.

 7              THE COURT:  Good morning.

 8              MR. WATSON:  You are much more studious

 9    than I.  I did not have a chance to break it down into

10    categories.  What I did notice, though, was that

11    documents that originate from third-parties examples

12    right on the top, Ron Contracting, that we have not had

13    the opportunity to depose and that we would want to

14    depose.  These aren't documents that were sent to my

15    client.  They were sent to Mark Heenan.  We've never

16    seen these, admittedly, and, you know, E-mails to and

17    from individuals like Gary Heenan.  I don't even know

18    who Gary Heenan is.

19              There's information in here on a stolen truck.

20    I think I know what it's about, but I don't know what

21    the relevance is.  Admittedly, there are documents in

22    here that my clients have and my clients did produce.

23    There were literally over thousands of documents.  I

24    wanted to say 10,000 documents, but we have given them a

25    flash drive, and we were able to confirm that some of
```

4

1   these E-mails were, in fact, produced.  They weren't

2   marked as exhibits.  We didn't want to use them as

3   exhibits, but apparently she didn't either.  So the

4   notion that we withheld documents is not accurate.

5        So I would object because I have not had the

6   opportunity to look at these.  I have not had the

7   opportunity to depose these individuals, to vet them,

8   and I think for that reason they should not be admitted.

9   It would cause prejudice to my client.

10        THE COURT:  Okay.  Ms. Lavan, I'll hear

11   from you both as to documents that involve parties,

12   which would be impeachment, and documents that are

13   addressed and they're sent from non-parties.

14        MS. LAVAN:  Your Honor, I agree with

15   Mr. Watson about the third parties.  However, there are

16   E-mail correspondences in this set of documents that

17   were not produced by their client.  There are only a few

18   of them, but they still exist.

19        THE COURT:  So let's forget about whether

20   they are produced or not.  Let's assume you were on the

21   subway today and you found this on the street, you could

22   use it.  It's impeachment.

23        MS. LAVAN:  Right.

24        THE COURT:  Okay.  But my question is a

25   little more significant; and that is a lot of them are

Gregg B. Wolfe, RPR, CM
215-460-1511

5

1    communications written by your client.  So you know, for

2    example, an E-mail from your client to one of the

3    principals at Decus is different than a communication

4    written the other way.

5              You understand that?

6              MS. LAVAN:  Yes, I do.

7              THE COURT:  Okay.  Then I think we're okay.

8              MS. LAVAN:  Yes, I do.

9         The other thing, Your Honor, is addressing the

10   individuals.  My office is writing a motion today on

11   that issue.  We believe that we do have the summons, and

12   we do have a waiver from Mr. Watson.  And it was our

13   understanding --

14             THE COURT:  Where did you get a summons?

15             MS. LAVAN:  I had sent it to Mr. Watson.

16   Don't quote me on it.  My office is working on it.

17             THE COURT:  No, you didn't.  I'll tell you

18   why.  Go down to the second floor, and you'll see they

19   never issued a summons.  It's still there.  You have to

20   create one, and you can't create your own summons.

21             MS. LAVAN:  Okay.  I want to just verify my

22   office is doing that.

23             THE COURT:  Okay.  Well, check it out.

24             MS. LAVAN:  I appreciate that.

25             THE COURT:  We checked that out.

                    Gregg B. Wolfe, RPR, CM
                       215-460-1511

6

 1                 MS. LAVAN:  Okay.

 2                 THE COURT:  Here's why, Ms. Lavan, I want

 3      the record to be clear.  When you file an Answer to

 4      defenses and some other type of pleading in this Court

 5      and you don't call it Third-Party Complaint, nobody

 6      catches it.  Had you called it a Third-Party Complaint,

 7      both my deputy and downstairs would have caught it and

 8      then told the Clerk's Office to issue a summons.

 9           When you file electronically, that does not

10      happen.  The Federal Rules are claims, which are

11      starting against somebody, and always requires a

12      summons.  In fact, it goes so far as -- this is curious.

13      I'm just wasting one minute.  I'll just give you one

14      highlight of that.  Oftentimes, lawyers don't know this,

15      and I didn't know it in practice, that an Amended

16      Complaint that includes a party that still has not been

17      served results in all new summonses.  It's interesting.

18           So even assuming that you had amended a couple

19      times to add these people as Third-Party Defendants, you

20      would still have to have a summons.  We have no summons

21      issued down below in the Clerk's Office.  You can

22      certainly check and if I'm wrong and you have something,

23      I am certainly willing to consider your motion.  We

24      checked, and we had nothing.

25           So other than that, Mr. Watson, are you ready

                      Gregg B. Wolfe, RPR, CM
                         215-460-1511

 1    to continue with your witness?

 2                    MR. WATSON:  I am, Your Honor.

 3                    THE COURT:  All right.

 4            Sir, did you follow my instructions from

 5    yesterday concerning not speaking to anyone regarding

 6    this case?

 7                    THE WITNESS:  I did.

 8            THOMAS ALOIA, was duly sworn.

 9            (The jury entered the courtroom at

10    9:05 a.m.)

11                    THE COURT:  You may remember, ladies and

12    gentlemen, that we are back to the plaintiff's case.

13    The plaintiff, of course, being Decus, Inc. and Decus

14    Construction.  We are in the direct examination of one

15    of its members.

16            I'm not characterizing what your role was, sir,

17    but you certainly were involved in Decus Construction.

18            Mr. Watson, you may proceed.

19                    MR. WATSON:  Thank you, Your Honor.  Two

20    seconds, please.

21                    DIRECT EXAMINATION CONTINUED

22    BY MR. WATSON:

23    Q.      Good morning, Mr. Aloia.

24            I wanted to just revisit some of the issues

25    that we had touched upon yesterday.  This is Exhibit 41.

                    Gregg B. Wolfe, RPR, CM
                        215-460-1511

Case 2:16-cv-05849-MAK   Document 97   Filed 04/19/18   Page 8 of 156

1    BY MR. WATSON:

2    Q.      Can you turn to Exhibit 41?  Can you identify

3    this for the record, sir?  Have you ever seen this

4    before?

5    A.      I have seen this document.

6    Q.      In what context did you see this?

7    A.      This appears to be one of the documents that

8    Mark had supplied us with during this litigation.

9    Q.      So you did not see it when you were dealing

10   with Mark, but you saw it after you were dealing with

11   Mark, correct?

12   A.      Correct.

13   Q.      What is this document apparently in your

14   estimation?

15   A.      This is a Partial Release of Liens, which is a

16   document that is used in construction.  Usually, prior

17   to a payment a contractor signs a Release of Liens for

18   the owner, so that they are not going to place a lien

19   against the property.  It's usually conditional upon

20   payment, and that's what this is.

21           This is a Partial Release of Liens for the

22   Gloucester Data Center in the amount of $7,058.  It's

23   signed by Mark Heenan, listed as a principal, and it has

24   the Decus mark on it.

25   Q.      All right.  That's what I want to focus on,

                    Gregg B. Wolfe, RPR, CM
                         215-460-1511

1    the Decus mark.

2            Is that the design that you had created?

3    A.      Correct, with Speakeasy and Avery Blue.

4    Q.      The date of this is January 31st, 2016.

5            Was he still employed with you at this point?

6    A.      Yes.

7    Q.      Was he authorized then to provide this payout

8    to a third party?  Was he authorized to provide this?

9    A.      Well, this is interesting.  It's a Partial

10   Release of Liens from Decus Construction.  It's dated

11   1-31-16 on a project with an owner that Decus

12   Construction did not contract with.  Decus, Inc.

13   contracted with this owner, and then it's signed on

14   4-8-16.

15           The difference in the dates is actually

16   interesting as well because in January of '16, Mark did

17   not own the dba, Decus Construction.  It wasn't until

18   March 11th that he filed that paperwork with the State

19   of New Jersey, and then this is signed a month after

20   that.

21   Q.      Okay.  Go to 56, if you will, sir.  Flip back

22   very quickly to 41.

23           Is that Mark Heenan's signature on that?

24           MR. WATSON:  I apologize to everybody.

25           THE WITNESS:  That is Mark Heenan's

                    Gregg B. Wolfe, RPR, CM
                        215-460-1511

T. ALOIA - CONT. DIRECT

10

1    signature.

2    BY MR. WATSON:

3    Q.      All right.  Thank you so much, sir.  Let's go

4    to 56.

5            Just identify that for the record, if you will.

6    A.      This is another partial Release of Liens.  It's

7    for the period of 3-30-16.  It's for $965.  It's

8    undersigned on 6-1-16.  The issue with these beyond the

9    fact that he signed it, used Decus mark, has the wrong

10   entity as the contractor, these amounts don't line up to

11   any of the payment applications.

12   Q.      Is this Mr. Heenan's signature?

13   A.      It is, yes.

14   Q.      Go to Exhibit 73.  I want you to turn to

15   Page 15.

16           What is this document, sir?

17   A.      This is a contract for Decus, South Jersey CML.

18   This is a subcontract agreement with Neco Construction.

19   Q.      When did you first see this?

20   A.      I'm just seeing this.  I believe this is the

21   first time I've actually seen this contract.

22   Q.      It has your company on it?

23   A.      It does.

24   Q.      That's your trademark?

25   A.      That is, and that's my office address.

                    Gregg B. Wolfe, RPR, CM
                        215-460-1511

```
 1                    THE COURT:  So when you say "your," be
 2      careful.
 3              Is it your trademark?
 4                    MR. WATSON:  I apologize.
 5                    THE WITNESS:  It's the company's trademark.
 6                    THE COURT:  Which company?
 7                    THE WITNESS:  The mark for Decus, Inc. and
 8      Decus Construction, Inc.
 9      BY MR. WATSON:
10      Q.      Page 819 of 22.
11              Whose name is on this?
12      A.      Mark Heenan.
13      Q.      Okay.
14      A.      It's listed as a principal.
15      Q.      Was that accurate?  Was he a principal in
16      Decus Construction?
17      A.      No.
18      Q.      The date on this is August 2nd, 2016,
19      correct?
20      A.      Correct.
21      Q.      So he was working for your company, correct?
22      A.      Yes.
23      Q.      But you only saw this today?
24      A.      Correct.
25      Q.      Was that something that you would have seen
```

T.   ALOIA - CONT.   DIRECT                                    12

1    in your position as an officer for Decus?

2    A.       These were documents in our meeting, and I

3    memorialized it all in an E-mail in late August where

4    John and I had growing concerns of who the

5    subcontractors were and what liabilities would exist

6    with our company because we weren't getting

7    documentation from Mark.  He kept promising that he

8    would send it to us, but he did not.

9    Q.       All right.  Now, we don't need to show the

10   jury, but I'm just going to flip through and make

11   sure this exhibit is noted for the record.

12             Page 826, are you there?

13   A.       I am, yes.

14   Q.       That's another subcontract between South

15   Jersey CML?  That's the right company, correct, not

16   the fake one that he set up?

17   A.       That's South Jersey.  That's the owner.  It's

18   not listing him as the owner.  It's listing it as the

19   project.

20   Q.       The project.

21   A.       Yes.

22   Q.       Okay, you're right.  I apologize.

23             And that is dated August 2nd, 2016, again,

24   Decus mark is on that.

25             Have you seen that before today?

                    Gregg B. Wolfe, RPR, CM
                        215-460-1511

1   A.       I don't believe I have.

2   Q.       Mr. Heenan signs that on Page 830, at least

3   there's a spot for his signature.  834, in the same

4   Exhibit, Page 834, contract with Decus and Four

5   Quarters.

6            Have you seen this before today?

7   A.       I have actually gotten invoices from these

8   individuals, but I did not have a contract to back it up

9   with.  Four Quarters, when we contacted them, they may

10  have sent us a copy of the contract.  So I may have seen

11  a copy of this unsigned contract.

12  Q.       Decus 884.  We're still on the same exhibit.

13  It's 881.  The Bates label is DECUS84.

14           What is this document, sir?

15  A.       This is a Request for a Bid Proposal for the

16  Sommerdale Dunkin' Donuts.

17  Q.       Had you ever seen this before?

18  A.       Actually, this document was posted on our

19  website.  We pulled this down after we had met with Mark

20  mainly not because we had a signed contract on this

21  project, but when we looked at it, all the information

22  is correct as far as our mark, it has the project, it

23  has the dates, architect, building size.

24           The interesting thing here was that underneath

25  our Decus office address and our website is Mark's phone

14

1    number listed as the telephone number and Mark's fax

2    number listed as the fax number.

3    Q.      Was that authorized?

4    A.      That was not.

5    Q.      Why did you take it down?

6    A.      Because it was an inaccurate document.  When we

7    asked Mark about it, he said he had set it up as the

8    estimating department, and he was just doing it to help

9    create estimates.  But the issue there is that John does

10   the estimates and oversees all estimates and oversees

11   proposals.  When we asked where the proposals were for

12   this job, he didn't have any.

13   Q.      Go to 78, sir.  I apologize for jumping back

14   and forth.

15               THE COURT:  Page 78 or Exhibit 78?

16               MR. WATSON:  Exhibit 78.  I apologize.

17   BY MR. WATSON:

18   Q.      What is this document, Mr. Aloia?

19   A.      This is an E-mail correspondence from

20   Mark Heenan to Dan Geiger, which is from Rome

21   Technology.  Rome Technology is the website designer

22   that we contracted with.

23   Q.      Okay.  It looks like here Mr. Heenan is

24   writing to Dan Geiger.  He's your website master?

25   A.      He's a website designer.

                    Gregg B. Wolfe, RPR, CM
                       215-460-1511

1    Q.      The designer.

2            Was Mark authorized to communicate with

3    Mr. Geiger?

4    A.      He was.  I mean, Mark had helped him design the

5    Decus website, which included content.  Dan just

6    designed it, the overall different color schemes, the

7    pantone colors from our logo and duplicates it to create

8    an overall, I guess, appealing design to the viewers.

9            The content and pictures we have to give them,

10   and that's what Mark was doing.  He was giving them the

11   content and the pictures.

12   Q.      This E-mail, what is this dated?

13   A.      August 18th.

14   Q.      Okay.  August 18th of 2016, and he's still

15   working for you obviously.

16           He writes to Dan and says, "From what I've

17   read, it's fairly simple to clone the Decus, Inc. site

18   and to another domain name.  I have purchased

19   DecusConstruction.com."

20           Mr. Heenan has purchased it, correct?

21   A.      Correct.

22   Q.      "And was wondering if you could clone the

23   existing site and content to that site.  I think it

24   would be best if we do that, then have Decus, Inc.

25   point to it, right?  Decus, Inc.'s website to point

1    to the clone, right?  From what I've read, it's the

2    same process as backing up the existing site or

3    downloading to edit and then repossessing.  Take a

4    look when you have a moment and let me know."

5            What did you take from that?  Well, let's start

6    with this.

7            Did you receive this E-mail?

8    A.      I did not.

9    Q.      How did you find this E-mail?

10   A.      Actually, the way we got the E-mails from Mark

11   is after we had completely severed ties with him, we

12   logged on to his company E-mail address and everything

13   had been deleted, every E-mail, every correspondence.

14           We contacted Microsoft, and it took probably

15   two days to retrieve whatever E-mails they could

16   possibly retrieve that weren't permanently deleted

17   beyond -- I think it was like a 60-day period.  We were

18   able to retrieve almost 2,200 E-mails, and this was one

19   of them that we found.

20   Q.      Would you have expected this E-mail to at

21   least be copied to you or authorized by you before it

22   went out?

23   A.      Yes.  I actually went back to Dan Geiger and

24   questioned him about it.  Again, I don't know Thomas.  I

25   just didn't think anything of it until this was going

1    on.  I explained it to him, and that's when we had to

2    cut Mark's access off to the website as well.

3    Q.      This is Dan's response.  "It's not difficult,

4    but you have E-mail going through DecusInc.com, so I

5    assume you want to maintain the account.  Can you

6    give me access to DecusConstruction.com, so I can

7    point to our servers and set up the account?"

8            Was Dan Geiger allowed access to Decus

9    Construction -- well, DecusInc.com?

10   A.      Yes, Decus, Inc., yes.

11   Q.      But this is Mark's website, so he was asking

12   for access to Mark's website?

13   A.      He was, yes.

14   Q.      Okay.  Thank you.

15   A.      I just need to correct it.  It's a domain name.

16   Q.      Domain name.  I apologize.

17           What is BuildZoom.com?

18   A.      BuildZoom is a service.  I think it's similar to

19   Angie's List.  It's more oriented toward commercial

20   construction.  It gives the company bio.  It rates the

21   contractor.  It allows you to post some pictures,

22   includes some basic information.

23           It also has a service where it picks up

24   building permits, and it just lists them in the bottom

25   portion of it, though, of what the company is doing and

```
 1   if it's active and if their license is current.
 2   Q.      A marketing website?
 3   A.      It's a marketing website.
 4   Q.      A site that directs business to you, correct,
 5   to mine business?
 6   A.      It doesn't direct it to us.  It's just another
 7   outlet for interested clients to gather information on
 8   us.
 9   Q.      Was Mark Heenan authorized to work with
10   BuildZoom?
11   A.      We would have permitted Mark to work with
12   BuildZoom for company business and with company
13   information.
14   Q.      What document is this?
15   A.      This is 106.
16   Q.      Can you turn to 106, sir?
17           THE COURT:  That's Exhibit 106 as opposed
18   to Page 106?
19           MR. WATSON:  Yes, Exhibit 106.
20           THE COURT:  Thank you.
21   BY MR. WATSON:
22   Q.      What is this document, sir?
23           MS. LAVAN:  What Exhibit, I'm sorry?
24           MR. WATSON:  We're at Exhibit 106.
25           THE WITNESS:  This is a printout of the
```

1    BuildZoom site on August 19th, 2016 for Decus, Inc.

2    BY MR. WATSON:

3    Q.    Is it October or August, sir?

4    A.    The printout was October 19th.  It's on the top

5    of the page.

6    Q.    Where are you getting the August?

7    A.    October?

8    Q.    Oh, it is October.  Okay.  I thought you said

9    August.

10       Who printed this out?

11    A.    I believe I did.

12    Q.    And why?

13    A.    At this point we were trying to figure out what

14    was out there, what our liabilities were and we were

15    kind of combing the Web to see what information we could

16    find out that Mark had attached himself to our company.

17    Q.    This is after the August 26th Café meeting,

18    after things essentially hit the wall, correct?

19    A.    Correct.

20    Q.    Okay.  What did you find?

21    A.    Well, this printout has our Decus, Inc.

22    information.

23    Q.    If you go to Page 1324 in the upper

24    right-hand corner, I think you'll see what you're

25    looking for.

```
 1              Do you see that, Mr. Aloia?  I gave you the
 2    page number, 1324, upper right-hand corner.
 3    A.        1325 has Mark Heenan.
 4    Q.        Let's start on 1324.
 5              Do you see it says "Decus, Inc. team"?
 6    A.        Oh, yes.
 7    Q.        So the website, as you're scrolling down,
 8    identifies the Decus, Inc. team.  Then the next page
 9    in that is the next scroll.
10              What does it say?
11    A.        Mark Heenan is the only team member, and he's
12    the owner.
13    Q.        Right.  "Mark Heenan, owner."
14              Was he the owner?
15    A.        He was not.
16    Q.        Was he authorized to post that?
17    A.        He was not.
18    Q.        Did you confront him about that?
19    A.        At this point, we had very limited
20    correspondence with Mark.
21    Q.        Turn to Exhibit 38.  Disregard that.  I
22    apologize, Joint Trial Exhibit 40.
23              MR. WATSON:  I promise to get one more cup
24    of coffee at the break, Your Honor.
25
```

1   BY MR. WATSON:

2   Q.      Can you identify Exhibit 40 for the record,

3   please?

4   A.      This is an Application for Payment, Gloucester

5   Data Center LLC.

6   Q.      Explain to the jury what an Application for

7   Payment is.

8   A.      Application for Payment.  It's a standard form.

9   It's through the AA documents.  It's virtually an

10  invoice.  It's specific to construction projects.

11  Q.      Who would give it to whom?

12  A.      It could come from a subcontractor to a

13  contractor, contractor to owner.  There are actually a

14  couple checklists on it.  It could be from virtually

15  anyone to be paid.

16  Q.      Essentially, an invoice signed by the

17  contractors to the owners saying, "I want payment"?

18  A.      Correct.

19  Q.      Have you seen this payout before today?

20  A.      I have.

21  Q.      In what context did you see this payout

22  application?

23  A.      I've seen this multiple times.

24  Q.      Okay.  When did you first see it, what

25  context?

                Gregg B. Wolfe, RPR, CM
                     215-460-1511

1    A.       I believe we first saw this in April.

2    Q.       Okay.  Of 2016?

3    A.       Of 2016.

4    Q.       At this point, he's signing a pay application

5    on your behalf?

6    A.       He is.

7    Q.       Was he authorized?

8    A.       He was not.

9    Q.       When you saw that his signature was on it and

10   he was not authorized, what did you do?

11   A.       The problem with this is, I mean, all he's

12   certifying is to the best of his knowledge that the work

13   is complete.

14   Q.       Right.

15   A.       The issue we have is we haven't reviewed it.

16   The worst thing you can do to an owner is overbill them.

17   The worse thing you can do to a company is underbill

18   them.  So we would have liked to have had a chance to

19   review it prior to sending it out.

20   Q.       Well, all right.  That's one of them.

21            Let's turn to the page after that, Page 625.

22   If you could go to that.

23            Is this another Pay Application?

24   A.       It is, yes.

25   Q.       How much money is he asking to be paid to

1    Decus at this point?

2    A.      The current payment due is $8,023.

3    Q.      Okay.  I just want to point this out to the

4    jury, so they can see.

5            This line here, it's Line 7, and the payout --

6    well, I'm sorry, what payout?  Yes, payment?

7    A.      Number 8.

8    Q.      Yes, thanks.

9            Line 8 is $7,058, correct?

10   A.      No.

11   Q.      Line 8 is $8,023, correct?

12   A.      Correct.

13   Q.      So that's the amount due?

14   A.      That's the amount due.  But again, the issue

15   with this Payment Application and the previous one, the

16   contracting agency is Decus, Inc. not Decus Construction

17   or Decus Construction, Inc.

18   Q.      He's got Decus Construction, correct?

19   A.      Correct.

20   Q.      What is the concern with that?

21   A.      Well, our legal entity is Decus Construction,

22   Inc., and prior to all this litigation I don't think we

23   would have thought anything of it as Decus Construction,

24   but for this contract it was Decus Construction, Inc. so

25   the payment should have been going to the contracting

                    Gregg B. Wolfe, RPR, CM
                        215-460-1511

1    party, which is Decus, Inc.

2    Q.      Okay.  Are the rest of the documents in that

3    exhibit also Pay Applications signed by Mr. Heenan

4    for payment on that project to Decus Construction?

5    A.      Yes.

6    Q.      Okay.  You saw those for the first time after

7    they were submitted to the owner, correct?

8    A.      Correct.

9    Q.      You confronted him and said what?

10   A.      "Where's the money?"

11   Q.      "Where's the money?"

12   A.      Yes.

13   Q.      What was his answer?

14   A.      That Alex was a little slow on payments, but he

15   was working on it.

16   Q.      Go to Exhibit 80, sir.

17           Can you identify this document for the record?

18   A.      This is a Project Status Report for the Camden

19   Diocese Phase I Project.  It was updated on August 29th,

20   2016.

21   Q.      And within this one, from Page 1145 to

22   Page 1150, there's a series of Project Status

23   Reports, correct?

24   A.      Correct.

25   Q.      Can you just explain to the jury what these

1   documents are?

2   A.      This was following our August 26th meeting with

3   Mark Heenan.  One of the issues we had was we had no

4   information on the projects that we were supposed to be

5   contracted with.  Mark said he'd gather all that

6   information and give us reports.  These are the

7   reports --

8   Q.      Give me the time frame.

9   A.      This is following our 8-26-16 meeting.

10  Q.      Following the August 26th meeting in the Café

11  when everything broke?

12  A.      Correct.  So he updated it apparently on 8-29.

13  I believe he handed it to us several days later.  This

14  report was to give us the summary on the overall

15  project, give us the estimated amount, the cost.  Mark

16  also included a note summarizing what we would have been

17  paid on these projects.  Some were walk-away figures.

18          This was sort of a last-ditch effort for Mark

19  to stay with us and to show us that he had some

20  profitable projects coming in for us, and that we could

21  move forward on these projects at any time.

22  Q.      Was it his estimation of what the actual

23  profit was on these projects?

24  A.      He had a note attached to this that summarized

25  that.

1   Q.      Okay.  We'll get to that.  Let's talk about

2   this particular project.

3            This is the Camden Diocese project, right?

4   A.      Phase I, correct.

5   Q.      Phase I.

6            What did you know about this?

7   A.      We would get bits and pieces from Mark.  Mostly,

8   he would tell us that he was going in for permits, that

9   we were going to start moving on these projects.  Really

10  not much.

11  Q.      Okay.

12  A.      This is the first time that we actually got

13  something of substance, and we had a better idea of what

14  these projects actually were.

15  Q.      Let's go to the next project report, Camden

16  Diocese Phase II.

17           Again, another job that Mark was to bring to

18  you, and you were to receive money for that, correct?

19  A.      Correct.

20  Q.      Estimated contract amount, estimated direct

21  cost, correct?

22  A.      Correct.  It has a date start of November.

23  Q.      November of 2016?

24  A.      I would assume so.  It doesn't identify it, but

25  I assume it is.

1    Q.      It says, "PPAs in progress with owners."

2            What does that mean?  Power Project Agreements?

3    A.      Probably.  He sent us some of those agreements

4    earlier on, but they were just blank.

5    Q.      Next project, Project Status Report,

6    Washington Township Solar, Update.  This update date

7    is August 29th, 2016.

8            Again, what did you know about this project?

9    A.      This project originally was -- I don't believe

10   was under Alex Lemus, but Alex Lemus is the owner of

11   Gloucester.  At this point, we hadn't been paid much of

12   anything from Alex.  We were not very certain that Alex

13   was going to get the funding.

14           This project, Mark had identified that it was

15   going on since 2011, but he claimed that the contract

16   was executed with a $300,000 termination.  It was a

17   walk-away figure, and that two things:  One, we don't

18   have a copy of the executed contract.  That's our

19   biggest issue with this.

20   Q.      Why not?

21   A.      Because if Mark signed another contract and it

22   has terms and conditions that we didn't agree to, we

23   would want to know.  There's also a $300,000

24   termination-for-convenience clause, which it's a large

25   sum of money for just a walk-away figure.

T. ALOIA - CONT. DIRECT

28

1    Q.      You need to baby step that for the jury.

2            What is a termination for convenience, and what

3    is a walk-away figure?

4    A.      Termination for convenience in construction is

5    typically where an owner doesn't terminate for cause.

6    They terminate for convenience.  When they terminate for

7    convenience, there's recovery.

8            In this case, it's identified that that will be

9    maxed out at $300,000.  So if this owner is unable to

10   fulfill the contract on an executed contract, they would

11   pay $300,000 at a minimum.

12   Q.      Next project.

13   A.      The $300,000 was a question that John and I had

14   because we wanted to know who was the payee.

15   Q.      Right.  It could have been?

16   A.      Mark Heenan, Decus Construction of New Jersey.

17   Q.      Next project, please.

18           This is the Gloucester Solar, I believe

19   Mr. Heenan testified to; do you recall that?

20   A.      Yes.

21   Q.      What did you know about this project?

22   A.      We had some more information on this project

23   just because it's an adjacent property to the Gloucester

24   Data Center.  There were some preliminary designs done

25   on it, but it was an open contract.  It was much like

1    the data center.  There was no financing.

2    Q.       When you received these project status

3    reports -- South Jersey CML, Phase III.  We talked

4    about a South Jersey CML, I guess, Phase I and II?

5    A.       Correct.

6    Q.       Walk us through the phases, just so we

7    understand.

8    A.       Well, the first phase is the phase that Decus

9    Construction, Inc. had a contract with Southern New

10   Jersey, who was not the owner.  It's South Jersey.

11   Q.       Right.  We talked about that yesterday.  That

12   was the --

13   A.       It's just an expansion of their existing

14   facility.

15   Q.       We talked about the difference between South

16   Jersey and southern Jersey.

17   A.       We did, yes.  South Jersey is the actual owner

18   of the entity, and Southern Jersey, CML is just another

19   company that Mark Heenan had created.

20   Q.       Go ahead.  So the difference between the

21   three phases?

22   A.       There's one phase that we had drawings for.  We

23   did not receive the drawings for Phase II or Phase III.

24   Q.       Explain what the three phases were.

25   A.       I couldn't tell you without seeing the scope of

1    work.

2    Q.      Was one design one construction?

3    A.      No, they are three separate construction

4    projects.

5    Q.      I see.  Next project, please.  Trenton CML.

6    Mr. Heenan had talked about this in his testimony.

7            What did you know about this project?

8    A.      Trenton CML was the larger project that we were

9    looking at for that same group.  It was in Trenton.  It

10   was probably going to be at the prevailing rate.  They

11   were working on some grants.  It was estimated to be, I

12   think, originally five or 6 million.

13           At this point, it's now looking like it's

14   grown.  No contract in place, just proposal only.

15   There's not a lot of detail here.

16   Q.      Next one, please.  Turn to Exhibit 20, if you

17   will, sir.  The very last page, which is 504.  We've

18   flipped this, just so that we can read it.

19           Do you know what this document is, or what this

20   photograph is, I should say?  What is this?

21   A.      That's a picture of the Post-it note that Mark

22   had attached to the front of those status reports.

23   Q.      That we've just talked about.

24   A.      And he gave us a summary of what each project's

25   profits were going to be.

Gregg B. Wolfe, RPR, CM
215-460-1511

1   Q.      This is his handwriting?

2   A.      That is.

3   Q.      And so CP1 was what?

4   A.      Assuming that's Camden Phase I, Camden Phase II.

5   Q.      Okay.  He anticipated a gross profit of what?

6   A.      $401,000.

7   Q.      CP2, anticipated a gross profit by Mr. Heenan

8   of what?

9   A.      About 1.19 million.

10  Q.      Is that a 9 or a 4?

11  A.      Hard to tell.

12  Q.      Okay.  Next project?

13  A.      Washington Townshjp.  That's 1.5 million.

14  Q.      Next project?

15  A.      Gloucester Solar, 700,000.

16  Q.      Next project?

17  A.      CNL Trenton, 695,000.

18  Q.      Next project?

19  A.      South Jersey Phase III, 50,000.

20  Q.      For a grand total of?

21  A.      $4.486 million.

22  Q.      Of gross profit?

23  A.      Gross profit.

24  Q.      Do you know what these two numbers are?

25  A.      Those are the walk-away figures, but they are

1    slightly changed.  It looks like $680,000 total, I

2    think.

3    Q.      So again, the termination for convenience, if

4    we just walked away from all these jobs, that's the

5    check you would have gotten, 680,000?

6    A.      Correct.

7    Q.      Did you become aware of Mr. Heenan

8    communicating to third parties about your company?

9    And just answer that question.

10   A.      We did, yes.

11   Q.      What did you understand those communications

12   to be?  Give me a time frame.

13   A.      Time frame, Mark had communications with some of

14   these owners almost from the onset of the projects.

15              MS. LAVAN:  Objection to the extent this is

16   going to lead to hearsay, Your Honor.

17              THE COURT:  Well, the question itself is

18   not yet.

19         Sir, obviously, you don't tell us what somebody

20   else told you.

21              THE WITNESS:  Right.

22   BY MR. WATSON:

23   Q.      We're concerned about what Mark was telling

24   the owners, okay?  You can testify to that.

25              THE COURT:  As long as Mark told you.

Gregg B. Wolfe, RPR, CM
215-460-1511

T. ALOIA - CONT. DIRECT

33

```
 1                    THE WITNESS:  Yes.
 2                    MR. WATSON:  Yes.
 3                    THE WITNESS:  Mark had started off by
 4    saying that he was joining a new company, and he had
 5    left Hessert.  He had talked up the company to his
 6    clients.  As things progressed, Mark tried to turn the
 7    tables, although he basically was riding the coattails
 8    of Decus and actually wrote an E-mail to all the
 9    clients.  He also CC'd some other people that I'm not
10    sure who they are, and he claimed that Decus was
11    insolvent, couldn't build anything.
12                    MS. LAVAN:  Objection.  Is this hearsay?
13                    THE WITNESS:  No, it's in writing.
14                    THE COURT:  That doesn't matter.  It has to
15    do with what Mark told you, not that somebody told him
16    that.
17                    THE WITNESS:  He wrote me the E-mail.
18                    THE COURT:  Counsel, you need get to get
19    statement.
20    BY MR. WATSON:
21    Q.    Did you receive an E-mail from Mark Heenan?
22    A.    Yes.
23    Q.    When did you receive that E-mail?
24    A.    I believe that was in October of 2016.
25    Q.    What did the E-mail say to you?
```

1          THE COURT:  From Mark?

2    BY MR. WATSON:

3    Q.      From Mark.

4    A.      That the company was insolvent.  He identified

5    my personal bankruptcy, and he went through a whole slew

6    of different things.  I think one pertains to your firm.

7    He stated that we wouldn't build anything, stated that

8    we were riding his coattails, not the other way around.

9            And without seeing the E-mail in front of me --

10   Q.      Well, let's start with was your company

11   insolvent?

12   A.      No.

13   Q.      Was it ever insolvent?

14   A.      No.

15   Q.      Is it insolvent today?

16   A.      No.

17   Q.      What impact did that have on your business?

18   A.      There were a number of things happening at that

19   point.  That impact with that group of people, it was

20   devastating.  Everyone banks and they have friends

21   and --

22   Q.      "At that point," being what period, the

23   calendar time?

24   A.      October, November.

25   Q.      Okay.  Go ahead.  Of '16?

                    Gregg B. Wolfe, RPR, CM
                        215-460-1511

1    A.        Of '16.  Everybody talks.  The construction

2    industry is a large industry, and everybody hears it.

3    Now, coupled with subcontractors that are contacting our

4    office saying that they haven't been paid.

5                   MS. LAVAN:  Objection, hearsay.

6                   THE COURT:  Well, sir, rephrase it so you

7    can get it as possibly an exception.

8    BY MR. WATSON:

9    Q.        Have you received communications from

10   subcontractors or invoices from subcontractors

11   seeking payment for work that Mark Heenan authorized?

12   A.        Yes.

13   Q.        And do you have the money to pay them?

14   A.        We never received it.

15   Q.        So the impact on your company, other than

16   what you testified to?

17   A.        So the impact now is that there's a story that

18   Mark is spreading.  There are subcontractors coming to

19   us looking for payment.  It's kind of putting a story

20   together that we don't pay our bills for entities that

21   Mark contracted with on our behalf and then took the

22   money and ran away.  So he's creating a cloud over our

23   company.

24   Q.        Do you think that was an oversight on his

25   part, or was it intentional?

T. ALOIA - CONT. DIRECT

36

1    A.      It was intentional.

2    Q.      Has Mark Heenan damaged your company?

3    A.      Yes.

4    Q.      Have you had a chance to quantify those

5    damages?

6    A.      We put a damage summary together, yes.

7    Q.      Is this that summary?

8    A.      Yes.

9    Q.      Let's walk through this.

10           Funds misappropriated for the Gloucester

11   project, what is this number?  It says $128,137.

12           Where do you get that from?

13   A.      That's the balance of the contract.

14   Q.      Meaning?

15   A.      The balance of the contract that Decus, Inc.

16   helped with the owner.

17   Q.      Okay.  Money that Mark received that didn't

18   pay you?

19   A.      We haven't seen any documentation that Mark

20   received that money, nor did we receive any information

21   that he paid it out.  So we filed a lien against the

22   property.

23   Q.      Has the work been performed 100 percent?

24   A.      Yes.

25   Q.      Who performed the work?

1    A.      Mark was involved in it.

2    Q.      Which company?

3    A.      Decus, Inc.

4    Q.      Your company?

5    A.      Correct.

6    Q.      Is your company entitled to that money?

7    A.      We are.

8    Q.      Why are you not being paid that by the owner?

9    A.      We had correspondence with him, and we have not

10   gotten an answer.

11   Q.      Do you think Mark is the reason why you are

12   not being paid?

13   A.      He had stated that he paid Mark already, and

14   this was a situation that he had been in once before

15   with Mark.

16   Q.      Funds misappropriated for the CML Project,

17   134,570; is that correct?

18   A.      That's the balance.  We deducted from the base

19   contract 187,000, the 53 that Mark had paid.

20   Q.      So 187,000 was the total that was paid to

21   Mark?

22   A.      Correct.

23   Q.      We heard him talk about that yesterday.

24           He admitted that, do you remember that?

25   A.      Yes.

1    Q.      He said he had actually been paid more,

2    correct?

3    A.      Correct.

4    Q.      Then you deducted the 53 that he pulled out

5    of his pocket on August 26th, and that's the number,

6    correct?

7    A.      Correct.

8    Q.      Okay.  Anticipated profit on the Camden

9    Diocese Phase I, that's the $401,000 number.

10            Can you explain that?

11   A.      The left column for all of those projects are

12   the numbers that Mark identified as gross profits, and

13   the right is 20 percent.

14            MR. WATSON:  I'm sorry, Your Honor.  That

15   had some things on there that probably the jury

16   shouldn't see.

17            MS. LAVAN:  Your Honor, the problem with

18   that is that's not one of our joint exhibits.

19            THE COURT:  Well, it's a summary, but it

20   has to be taken down.  It's taken down, and you have

21   objections waived as being untimely.  It can't go back

22   up.  If you see it go back up, tell me next time.

23            MR. WATSON:  All right.  May I approach the

24   witness, Your Honor?

25            THE COURT:  Yes.

Gregg B. Wolfe, RPR, CM
215-460-1511

T - ALOIA - CONT - DIRECT

39

```
1              MS. LAVAN:  I'm going to place an objection
2    to this, Your Honor.  I had specifically asked --
3              THE COURT:  He's not doing anything yet.
4    He's just showing it to the witness.  You can only
5    object to a question.
6          Let's hear the question.
7              MR. WATSON:  Your Honor, I have a copy for
8    you.
9              THE COURT:  Thank you.
10   BY MR. WATSON:
11   Q.     Those were the profits that we had talked
12   about on the Post-it, correct?
13   A.     Correct.
14   Q.     That total, did you take out anything to
15   credit Mark for that?
16   A.     We set aside out of those gross profits
17   20 percent.
18              MS. LAVAN:  Your Honor, I have to object to
19   this.  This document was not produced as a Joint
20   Exhibit.
21              THE COURT:  It's not an exhibit.
22              MS. LAVAN:  But he's referencing it.
23              THE COURT:  Yes.  It's a summary of what
24   his Post-it note says.
25          Overruled.
```

Gregg B. Wolfe, RPR, CM
215-460-1511

1           MS. LAVAN:  Can't he refer to the Post-it

2    note instead?

3           THE COURT:  This jury is not going to see

4    this document, ma'am.  It's not an exhibit.  Fair

5    question, but this is not an Exhibit.  This is to help

6    the witness, I guess, and Mr. Watson understand the

7    testimony, but it's not going to go to the jury.

8           MR. WATSON:  We'll go back to the Post-it

9    note.

10          THE COURT:  Thank you.

11   BY MR. WATSON:

12   Q.     So you think your company is entitled to this

13   $4.486 million profit on these jobs, correct?

14   A.     Anticipated gross profits for projects that we

15   were receiving from Mark Heenan, yes.

16   Q.     Explain that.

17           By the way, this was under the consulting

18   agreement, correct?

19   A.     Correct.

20   Q.     Would he be entitled to a commission?

21   A.     20 percent.

22   Q.     Okay.  So 20 percent of this 4.86 29

23   $3 million number should go to Mark, right,

24   20 percent?  And then you get the rest.

25           So the net-net would be this less 20 percent,

1    correct?

2    A.      Correct.

3    Q.      Why are you entitled to that money?

4    A.      Mark was our business development consultant,

5    and he was using our name and our work to get this,

6    these projects.  It wasn't until the very end where Mark

7    was able to create a story and take all that work and

8    basically leave John and I in a bad light with these

9    clients, similar to what he tried to do with his uncle

10   and take the contracts for himself.

11              MS. LAVAN:  Objection.  Objection, hearsay.

12              THE COURT:  Sir, only speak about what you

13   know from what Mark told you from your own knowledge.

14   You can't tell us what somebody else told you.

15              THE WITNESS:  Okay.

16              THE COURT:  Sustained to that extent.

17   BY MR. WATSON:

18   Q.      Do you believe this is an accurate

19   representation of what Mark Heenan owes you for what

20   he has done to your company?

21   A.      Lost profits, yes.

22   Q.      How has this impacted your company in

23   general, his actions?

24   A.      It was a significant amount of work that we were

25   relying on, and that was our focus for business

1    development, these projects.  Mark was our business

2    development leads, and those were the leads we were

3    going after.  As he stated yesterday on testimony, John

4    and I weren't doing business development.  We were

5    relying on him.

6                  MR. WATSON:  No further questions, Your

7    Honor.

8                  THE COURT:  Thank you, counsel.

9             Ms. Lavan, do you wish to cross-examine?

10                 MS. LAVAN:  Yes, Your Honor.

11                 THE COURT:  Please.

12                     CROSS-EXAMINATION

13   BY MS. LAVAN:

14   Q.      Mr. Aloia, you testified yesterday that John

15   Sciotto started Decus, Inc. in approximately 2013; is

16   that correct?

17   A.      Correct.

18   Q.      And that you had joined Decus in 2015,

19   correct?

20   A.      Yes.

21   Q.      But prior to joining Decus, Inc., you

22   testified that you vetted John Sciotto and Decus

23   prior to joining that business; is that correct?

24   A.      Correct.

25   Q.      Part of that vetting was you had consulted

1    with a judge or a former judge and asked his advice,

2    correct?

3    A.        A mentor.

4    Q.        A mentor who was a judge, right?

5    A.        He was acting not in a judge role.  He was

6    acting as a mentor.

7    Q.        But you had to tell the jury how it was a

8    judge yesterday, correct?

9    A.        I used the term "judge" because he is a judge.

10   Q.        And --

11   A.        Retired judge.

12   Q.        -- did you consult with that retired judge

13   when you filed your bankruptcy?

14   A.        I did not.  He can't advise me legally.

15   Q.        So it was important before you joined Decus,

16   but it wasn't important to consult with him when you

17   were filing for personal bankruptcy because you

18   couldn't pay all the suppliers and vendors that you

19   owed; is that correct?

20   A.        It wasn't his place for me to involve him.  I

21   had an attorney.

22   Q.        But it was his place to advise you before you

23   joined Decus, correct?

24   A.        I asked him if he would evaluate it as a mentor.

25   He has been a great help to me.

1   Q.      He did evaluate it, correct?

2   A.      He didn't evaluate the company.  He evaluated

3   what he had seen and what he had heard from John

4   Sciotto.

5   Q.      And so did he talk to John Sciotto?

6   A.      He did.

7   Q.      I think you testified yesterday that you also

8   talked to some of John's previous business partners;

9   is that correct?

10  A.      I did not at that point.

11  Q.      Maybe you testified you called some

12  references?

13  A.      No.

14  Q.      But somebody was out asking about John

15  Sciotto in some capacity?

16          MR. WATSON:  Excuse me, John Sciotto?

17          THE WITNESS:  Not that I recall.

18  BY MS. LAVAN:

19  Q.      You vetted John Sciotto and Decus before you

20  joined the company to the extent that you advised

21  with a judge, but prior to Mr. Heenan joining Decus,

22  you never even met with him; is that correct?

23  A.      That is not correct.

24  Q.      In October of 2015, you had never met with

25  Mark Heenan.

1    A.       In October, I did not meet him.  I did not meet

2    Mark until -- well, it could have been late October when

3    I met him, but I believe it was early November.

4    Q.       This was after Mark was already involved in

5    consulting for your company at Brewerytown.

6    A.       I'd have to look at the records to see if that's

7    true.

8    Q.       Let's do that.  We'll get there.

9             In fact, it was so unimportant for you to vet

10   Mr. Heenan that you didn't even ask yourself personally

11   for his resumé; is that correct?

12   A.       Incorrect.

13   Q.       And you didn't ask either for his project

14   history at that time, did you?

15   A.       I was handed the information for Mark Heenan,

16   and he also had a LinkedIn profile.

17   Q.       Who handed you that information?

18   A.       I believe I received it from John Sciotto.

19   Q.       Isn't it true that John Sciotto only sent you

20   via E-mail Mr. Heenan's two-page resumé?

21   A.       I don't recall.

22   Q.       But you claim to this jury that you were

23   relied on Mr. Heenan's resumé, his project history

24   before you hired him, didn't you?

25   A.       Correct.

Gregg B. Wolfe, RPR, CM
215-460-1511

1    Q.      But that's not true.  You didn't even vet

2    Mr. Heenan prior to allowing him to work with you at

3    Decus, Inc.; isn't that correct?

4    A.      Incorrect.

5    Q.      You also testified that you received that

6    project list with his resumé, but that's not true, is

7    it, either, Mr. Aloia?

8    A.      No.  His project list is attached to his

9    LinkedIn page.

10   Q.      But it's not attached to the resumé that John

11   Sciotto provided to you; is that true?

12   A.      That paperwork that I was provided has a project

13   list to it.

14   Q.      Mr. Heenan did not provide that project list

15   to you, did he?

16   A.      Mr. Heenan didn't hand me anything.

17   Q.      Mr. Sciotto didn't either, did he?

18   A.      He did.

19   Q.      The resumé only, correct?

20   A.      The three pages that I have and only the project

21   list is what I received.

22   Q.      Okay.  That's your testimony, and you're

23   sticking to it.

24           What did you do to vet out those projects at

25   the time you received that project list?

```
 1   A.       I discussed them with Mark Heenan.
 2   Q.       What did you discuss with Mark Heenan?
 3   A.       We picked a couple of projects that we
 4   discussed.  They were also on his LinkedIn page.  He
 5   explained to me what happened on those projects, who
 6   some of the owners were and contract sizes and how the
 7   projects went.
 8   Q.       And he did work on those projects, didn't he?
 9   A.       I can't say that he worked in the role that he
10   claimed he worked on them.  The information provided by
11   Bill Hessert states that he was a laborer on some.
12            He gave us some financials of what Mark got
13   paid on each and every one of those projects, and it
14   doesn't line up with that of an owner of a company.
15   Q.       You found that information after you started
16   colluding with Mr. Hessert to destroy Mark Heenan,
17   correct?
18   A.       That's incorrect.  I didn't collude or try to
19   destroy Mark Heenan with Bill Hessert.
20   Q.       I want you to look the jury in the face and
21   tell them that you didn't try to collude with
22   Mr. Hessert because you didn't reach out to
23   Mr. Hessert to vet Mr. Heenan, did you?
24   A.       Mr. Hessert reached out to me and contacted me
25   and somehow received my phone number from one of his
```

```
 1   employees.
 2   Q.      Answer the question, sir.
 3           MR. WATSON:  Objection.
 4           THE COURT:  No.
 5   BY MS. LAVAN:
 6   Q.      Did you contact Mr. Hessert to vet --
 7   A.      I received his phone call.
 8   Q.      -- to vet Mr. Heenan?  This is what you do.
 9   You vet before you go into a partnership.
10           Did you contact Mr. Hessert at the beginning of
11   the arrangement?  I'm not talking about after you
12   colluded with him.
13           At the beginning of the relationship, did you
14   contact Mr. Hessert to ask him whether or not Mark did,
15   in fact, work on all those projects?
16   A.      I did not.
17   Q.      You didn't do that because it didn't matter
18   to you at that point because you did not rely on
19   those projects before working with Mark Heenan.
20           You relied on John Sciotto's opinion of
21   Mr. Heenan; isn't that correct?
22   A.      That's incorrect.  Mark Heenan represented --
23   Q.      Yes or no?
24   A.      Mark Heenan represented --
25   Q.      Yes or no?  You relied on John Sciotto's
```

1    opinion because John Sciotto had worked with

2    Mr. Heenan previously at Hessert; isn't that true?

3    A.       In part.

4    Q.       But you stand up here today in this

5    litigation, and you make the claim that you relied on

6    projects that Mr. Heenan apparently told you that he

7    worked on all of them in a conversation that you had

8    in the beginning of the partnership.

9            That's not true, is it?

10   A.       That's incorrect.

11   Q.       Am I correct when I say Mr. Sciotto had

12   worked with Mark Heenan at Hessert?

13   A.       Yes.

14   Q.       Am I correct when I say that at Mr. Hessert's

15   re-deposition the other day that Mr. Hessert did

16   testify that Mark Heenan did work on all of those

17   projects or at least most of them?

18   A.       I didn't see his deposition.

19   Q.       Did you read it?

20   A.       I did not.

21   Q.       It wasn't that important to you, was it?

22   A.       It wasn't necessary.

23   Q.       Prior to Mark partnering with Decus, you

24   didn't use the Decus Construction logo, did you?

25   A.       We did.

T - ALOIA - CROSS
50

1    Q.      You used the old logo, correct?

2    A.      Incorrect.

3    Q.      What work was Decus Construction doing, Decus

4    Construction, not Decus, Inc., that you needed to use

5    that logo for?

6    A.      The Decus Construction logo or Decus mark is

7    used interchangeably with Decus, Inc. and Decus

8    Construction.

9    Q.      And this comes from a gentleman that

10   testified yesterday that he didn't want to create

11   confusion between Decus, Inc. and Decus Construction

12   and, therefore, that's why he formed the two

13   entities, wasn't that your testimony yesterday?

14   A.      We were trying to market construction.  At the

15   time Decus, Inc. was performing construction.

16   Q.      So Decus Construction was only a marketing

17   company, correct?

18   A.      No.

19   Q.      I asked you what project Decus Construction

20   did prior to partnering with Mark that you used the

21   new Decus logo.  Let's just say any Decus logo.

22           What projects was Decus Construction performing

23   prior to Mark joining?  It's an easy question.

24   A.      So you're stating it was Mark partnering with

25   us.  We didn't partner with Mark.

Gregg B. Wolfe, RPR, CM
215-460-1511

1    Q.      Answer the question.  Call it partnering.

2    Call it whatever you want.

3    A.      While we were working with Mark, we were working

4    on Brewerytown, Lopresti Foods.  We were working on

5    Marriott, and I think we were finishing up several

6    smaller markets.

7    Q.      Did you produce any of those documents during

8    this litigation regarding doing work for Marriott?

9    A.      I don't see the relevance.  Those weren't

10    produced.

11    Q.      You don't see the relevance in the fact that

12    whether or not you were using the Decus Construction

13    logo prior to partnering with Mark?  You don't see

14    that being relevant, do you, Mr. Aloia?

15    A.      I think if you put it in those terms, I would

16    see the relevance, but it's on all of our documentation.

17    Q.      Isn't it true that you cherry-picked the

18    evidence you wanted to produce during this litigation

19    to what you thought was relevant so much so that

20    that's what you told me in your deposition?

21    A.      No.

22    Q.      Is it true that you never produced until much

23    later an agreement between you and John Sciotto for

24    Decus Construction?

25    A.      You had asked for the documentation.  If I

1    remember correctly in my deposition, you claim that you

2    had asked for it.  My attorney said he would produce

3    that document if you are requesting it at that time.

4    Q.      It wasn't produced, was it?

5    A.      I believe it was produced.

6    Q.      It wasn't produced prior to any time that

7    your attorney handed it over because it didn't exist,

8    did it?

9    A.      I know it existed.

10   Q.      You made that document up for purposes of

11   this litigation?

12   A.      No.

13   Q.      Then why didn't you produce it at the very

14   beginning of production when you knew that Decus

15   Construction is the biggest party in this litigation?

16   A.      That document is notarized.  Are you claiming

17   that that's a forgery as well?

18   Q.      I'm claiming that you knew that that document

19   was important, and it didn't exist prior to you

20   forging it pursuant to this litigation.

21           For a gentleman that claims that documentation

22   is so important, you didn't produce that document until

23   much later, did you?

24   A.      I'd have to look at the document production.  It

25   was produced and if it wasn't produced in the beginning,

1    when you requested it, it was produced.

2                  MR. WATSON:  Your Honor, maybe a reference

3    to the Exhibit number for that.

4                  THE COURT:  You'll get that on redirect,

5    sir.

6                  MS. LAVAN:  I'll get that.

7    BY MS. LAVAN:

8    Q.      You knew exactly what you were doing, didn't

9    you, Mr. Aloia, when you strung Mark along making him

10   believe that he was going to be a partner at Decus

11   Construction.  You knew exactly what you were doing.

12   A.      As far as?

13   Q.      You sit up there and you look so coy, but you

14   and I both know and in your deposition you knew

15   exactly what you were doing.  You were stringing

16   Mr. Heenan along so you could get something for

17   nothing.  You wanted money on projects that you

18   testified a minute ago you know nothing about.

19                  MR. WATSON:  Your Honor, objection.

20                  THE COURT:  Counsel, you cannot

21   characterize the looks of a witness.  That part is

22   stricken.

23                  MS. LAVAN:  Sure.

24                  THE COURT:  That's improper, ladies and

25   gentlemen.

Tesalona - CROSS
54

1          Take out the reference to anything about what

2     somebody looks like.

3          Ask the questions on the facts, ma'am.

4     BY MS. LAVAN:

5     Q.     South Jersey CML, what was that job?  What

6     was that project?  More importantly, what did you do

7     on that project?

8     A.     That project was an expansion of their existing

9     bakery.  There were interior walls that were erected.

10    Q.     What did you do on that job?  Did you put the

11    interior walls up?

12    A.     No.

13    Q.     I am asking you, and I want it to be clear

14    for the jury and the judge.  I want to know what you

15    did on that job, not what was done.

16         What did you do?

17    A.     What I personally did on that project was I went

18    down to the project several times.  I went to several

19    meetings with that owner.  I picked up the fencing for

20    the front of the building.  There was a pad that was

21    just poured, and Mark was going to pick that fencing up,

22    which he did not.  So --

23    Q.     Did you pick the fence up?

24    A.     I personally picked the fence up in my pickup

25    truck.

1    Q.      So you picked the fence up?

2    A.      Can I answer your question?

3    Q.      Yes.

4    A.      I loaded the materials into my truck.  I got

5    everything the contractor needed to install it,

6    delivered it on a Saturday.  I also stayed there for the

7    entire weekend while those guys worked, because Mark was

8    not able to oversee that work.  After that, I contacted

9    the owners several times to try to get payment, which

10   they claim that Mark had collected.

11   Q.      How much payment did you try to get for that

12   work that you did?  What was that amount?

13   A.      We were trying to collect on the payment

14   applications.

15   Q.      What amount?

16   A.      Payment applications.

17   Q.      $187,000?

18   A.      The overall contract was $187,000.

19   Q.      Okay.  So you wanted $187,000 because you

20   picked up a fence and worked all weekend?  That is

21   what you did that you wanted $187,000 for?  Again,

22   you wanted something for nothing, Mr. Aloia; isn't

23   that correct?

24   A.      In construction, if somebody is paying you --

25   Q.      Answer the question.

Gregg B. Wolfe, RPR, CM
215-460-1511

1    MR. WATSON:  He's trying to answer it.

2    THE COURT:  It's a yes or no, and then you

3  can answer it.  So it's a yes or no.

4    Is that correct?

5    THE WITNESS:  That is incorrect.

6    THE COURT:  Okay.  You may answer.

7    THE WITNESS:  In construction, if a client

8  is going to pay you $187,000 for a scope of work,

9  whether you're going to make money or not, that's the

10  project you do.

11    On this particular project Mark was down there,

12  and he was dealing with subcontractors.  The issue John

13  and I had was that we weren't receiving the information

14  on these subcontractors.

15    The limited scope of work that I did personally

16  is not the entire project.  The entire project

17  encompasses plumbing, HVAC, some electrical work.  There

18  was a new door going to the side of the building, which

19  was a change order.  There was concrete ramp.  There was

20  a loading dock that --

21  BY MS. LAVAN:

22  Q.    It sounds so amazing --

23    MR. WATSON:  Objection.

24    THE COURT:  Ma'am, you have to let him

25  answer the question.  It's not an argument.

1          THE WITNESS:  There were two loading docks

2     that were torn out and formed up and poured, which I was

3     there for.  So our job is general contracting,

4     construction management.  So we manage things.  We don't

5     always physically do the work.  We subcontract that work

6     out.

7     BY MS. LAVAN:

8     Q.     But you wanted $187,000 --

9          MR. WATSON:  Your Honor, objection.  He

10    wasn't finished with the answer.

11         THE COURT:  Overruled.  He answered the

12    question that was asked.  He may have wanted to talk to

13    more, but he answered the question.

14         Next question.

15    BY MS. LAVAN:

16    Q.     You wanted $187,000 for work that you claimed

17    you did for the weekend and for picking up a fence,

18    correct?  Do I have that right?

19    A.     Incorrect.

20    Q.     As you sit here today, I still asked, and you

21    still haven't answered, what work did you do on this

22    job, not the beautiful detailed intelligent answer

23    you're trying to give the jury about work that other

24    people did.  I'm asking what you did.

25         You filed a lien for $187,000 on this

Gregg B. Wolfe, RPR, CM
215-460-1511

```
 1   particular project, didn't you?

 2   A.      We did not for 187.

 3   Q.      How much was the lien?

 4   A.      134.

 5   Q.      Okay.  $134,000.

 6           What other work did you do?

 7              THE COURT:  When you say "you," I think the

 8   confusion we're all having is "you," him, or "you," the

 9   company?

10              MR. WATSON:  Mr. Aloia.

11              THE WITNESS:  Personally.

12   BY MS. LAVAN:

13   Q.      What work did you do?  You gave your work,

14   right?

15   A.      I'm not a sole proprietor.

16   Q.      It sounds so studious.

17              MR. WATSON:  Objection.

18              THE COURT:  Ma'am, you can't characterize

19   witness testimony.

20   BY MS. LAVAN:

21   Q.      What work did Decus do?

22   A.      Decus has received invoices from subcontractors

23   that Mark Heenan subcontracted with, our company, that

24   haven't been paid.  So Decus, Inc. or Decus

25   Construction, Inc. has a liability, and until that is
```

Gregg B. Wolfe, RPR, CM
215-460-1511

1    satisfied we're still at risk and I believe a breach of

2    contract action is four years in the state of

3    Pennsylvania.

4           So at any point, until there's satisfaction of

5    those payments we're still liable for that.  We're

6    liable --

7    Q.    You didn't answer the question.  I asked --

8    A.    I answered the question.

9    Q.    No, you didn't answer the question.  I asked

10   what work Decus did, and you can't answer it and

11   you're giving some response that isn't answering the

12   question.  It's important because you lien this

13   property for, your testimony, 130,000-some dollars.

14          It's also important because are you aware that

15   the subcontractors you're referring to, most of them, if

16   not all of them, were actually paid by Mr. Heenan?

17   A.    I've heard that claim.  Not all of them have

18   been paid.

19   Q.    But you know most of them have been paid?

20   A.    I can't say that's correct.

21   Q.    And you don't know because you haven't even

22   done your due diligence, correct?

23   A.    We've spoken with the subcontractors.

24   Q.    Has any subcontractor filed a complaint

25   against you or your company for non-payment?

1    A.      No, because we told them that we're in

2    litigation over it.

3    Q.      No, because they have all been paid, correct?

4    A.      Incorrect.  The paperwork that I have, that's

5    incorrect.

6    Q.      You testified a minute ago that you never saw

7    that Decus Construction paperwork.

8            Do you realize that at the bottom right-hand

9    corner we have something called Bates labels?

10   A.      I understand that.

11   Q.      You're aware of that, right?

12   A.      Yes.

13   Q.      Do you know that you produced that document

14   to my client?

15   A.      That's possible.

16   Q.      It's possible.  It is.  It says "Decus" at

17   the bottom of it in the Bates label.

18           So your testimony that you never saw it and you

19   were so surprised when it came up on the screen, that's

20   not true, is it?

21   A.      I didn't review every last document.  What we

22   did to collect these documents is we took --

23   Q.      Answer the question.

24           MR. WATSON:  Your Honor, he's trying to.

25           MS. LAVAN:  No, it was a Decus --

```
 1                  THE COURT:  Ma'am, don't argue with the
 2   witness.
 3                  MR. WATSON:  Objection.
 4                  THE COURT:  It's a yes or no question, and
 5   then you may answer it, sir.  Go ahead.
 6   BY MS. LAVAN:
 7   Q.      Was it a Decus Bates-labeled document?
 8                  THE COURT:  Do you know, sir, yes or no?
 9                  THE WITNESS:  I don't know.  If I could
10   look at it, I could tell you.
11                  THE COURT:  Next question.
12   BY MS. LAVAN:
13   Q.      So it's safe to say at the time up until
14   today, which your testimony is it's the first time
15   you saw it, you had that document in your production
16   and in your possession, correct?
17   A.      If it's a Decus-based label, yes.
18                  THE COURT:  Ladies and gentlemen, Bates
19   label is a document.  They are talking about inside
20   baseball about litigation.  A Bates number is a number
21   that goes on the bottom of documents so lawyers can keep
22   track of the documents.  If there are 20 documents, it's
23   labeled one, two, three, four, five, six, seven.
24                  Continue.  It was Bates stamped by Decus, you
25   may have seen it.
```

1          Next question.

2    BY MS. LAVAN:

3    Q.      You're aware that South Jersey CML had more

4    phases; is that correct?

5    A.      Yes.

6    Q.      And you're also aware that those phases never

7    came to fruition, correct?

8    A.      I don't know that they haven't.  Mark claimed

9    that Phase II actually did happen.

10   Q.      Well, you had the opportunity to ask the

11   owner of South Jersey CML in his deposition, which is

12   testimony under oath, whether or not those phases

13   went to completion, didn't you?

14   A.      I didn't depose the South Jersey --

15   Q.      Your attorney did, correct?

16   A.      Correct.

17   Q.      As we sit here today, you're aware that the

18   South Jersey CML additional Phases II and III or at

19   least III never went to fruition because you

20   interfered with the contract and filed a lien on the

21   owner's property; isn't that correct?

22   A.      We filed a lien, but I had seen no documentation

23   that those phases didn't move forward with another

24   contractor.  I hadn't seen any documentation that

25   Mr. Heenan didn't do those projects.

Gregg B. Wolfe, RPR, CM
215-460-1511

1    Q.      But you don't have any documentation or

2    evidence from the owner who your attorney deposed and

3    asked to bring all the documentation with him

4    regarding this lawsuit that the project did go

5    through, do you?

6    A.      I'm not aware of any, no.

7    Q.      So is it safe to say that the South Jersey

8    CML Project was probably just a mere hope?

9    A.      I can't answer that.

10   Q.      And that mere hope was destroyed by your

11   filing the lien on the project?

12   A.      Again, I can't answer that.  That's your

13   characterization of it.

14   Q.      That lien was overstated?

15   A.      I don't believe that loan was overstated.

16   Q.      Are you aware that SJCMR's attorney filed and

17   made an event of an improper lien?

18   A.      I'm aware of that, yes, because it was Southern

19   Jersey CML who we contracted with, not South Jersey CML.

20   Q.      Right.  So you're aware that the lien was

21   improper, correct?

22   A.      The legal characterization of it, I can't

23   comment.  I have to go to my attorney on it.

24   Q.      Let's talk about the Gloucester project.

25           What work did you individually do on the

Gregg B. Wolfe, RPR, CM
215-460-1511

T. ALOIA - CROSS

64

1    Gloucester project?

2    A.      On the Gloucester project, I prepared a

3    schedule.  My side of the construction is really on the

4    operations.  This was preconstruction.  John Sciotto

5    handled most of the work on that.

6    Q.      So you did a schedule; is that right?

7    A.      I did a projected schedule for the project.

8    Q.      Do you know about how long that schedule took

9    you to make?

10   A.      I don't.

11   Q.      Are you aware that Mr. Hessert has been in

12   construction for over 40 years?

13   A.      I don't know Mr. Hessert's resumé.

14   Q.      You did a schedule on Gloucester, correct,

15   and that's it?

16   A.      I went to meetings with Mark, with the owner.  I

17   attended some meetings with Chris Pappano.  I was on

18   several conference calls as well.

19   Q.      So it's safe to say, though, that that

20   schedule took you what, a few hours to make?

21   A.      No.

22   Q.      The meetings you went to in Gloucester, those

23   were with Mark Heenan, correct?

24   A.      Correct.

25   Q.      And that's because these were Mark Heenan's

1  contacts?

2  A.      That's correct.

3  Q.      And this was Mark Heenan's project.

4  A.      Well, in actuality, I believe it was a Hessert

5  project that we found out in this litigation.

6  Q.      Are you aware that Mr. Hessert testified that

7  this was given to Mr. Heenan?

8  A.      I'm not.

9  Q.      You also filed a lien on that property,

10  correct?

11  A.      Correct.

12  Q.      And what was that lien amount for?

13  A.      I don't recall.

14  Q.      As you sit here today as the Operations

15  manager of Decus, what did John Sciotto do for the

16  Gloucester project?

17  A.      There was a whole drop box file on the documents

18  that we put together and that John worked on.  He could

19  probably go through them for you.

20  Q.      But you're the Operations manager, correct?

21  A.      I'm the Chief Operating Officer of the company.

22  Q.      Okay.  But you don't know what your single

23  partner did on that particular job?

24  A.      He worked on fiber studies.  He's worked on

25  several estimates for the project.  He worked on some

1    designs with a local architect, wire architects for

2    that.  He had done some reporting for Brian Honish.  I

3    reviewed those reports.  He worked with trying to get a

4    client for that site.  Those are a couple things, off

5    the top of my head, that I can remember.

6    Q.      How much time do you think that took?

7    A.      I have no idea.  I would say in the hundreds of

8    hours.

9    Q.      You filed a lien on that project for about

10   $128,000, correct?

11   A.      If the lien states 128, that would be the

12   correct amount.

13   Q.      But prior to filing the lien, you as the

14   owner or you as the contractor, the prime, whatever,

15   you actually need to detail the work you do, don't

16   you?

17   A.      I'm not aware of the legal basis for a lien.  We

18   provided the documentation that our attorneys needed, so

19   they could file the lien.  I believe that lien has

20   survived preliminary objections and still sits on the

21   property today.  It's in foreclosure.

22   Q.      When you do that, you need to certify the

23   last time you did work on that Gloucester project,

24   correct?

25   A.      Yes, that's one of the stipulations for a lien.

Gregg B. Wolfe, RPR, CM
215-460-1511

1   Q.      So you do know what needs to be done before

2   you file a lien?

3   A.      Not everything, no.

4   Q.      But you have a pretty good understanding,

5   correct?

6   A.      No, I don't.  I'm not an attorney.

7   Q.      You do realize that you're pretty good at

8   giving legal terms, preliminary objections.

9           You're smarter than you think you are when it

10  comes to law, correct?

11  A.      That's a basis that you're making.

12              MR. WATSON:  Objection.

13              THE COURT:  Sustained.

14  BY MS. LAVAN:

15  Q.      You filed an improper lien on Gloucester.

16  A.      I disagree with you.

17  Q.      You filed a lien for $128,000 on work that

18  you didn't do and that you claimed Decus did that

19  amounted to $128,000 when the estimate that was done

20  was actually for incorrect information, so it was

21  wrong.

22          Are you aware of that?

23  A.      I heard Mr. Heenan's testimony, but I don't

24  think you're aware that several estimates have been done

25  on that project, and the last one was the last estimate

1    that Mr. Lemus requested, which was sent to him which

2    was several months past that date.

3    Q.      An estimate like that probably takes several

4    hours, correct?

5    A.      An estimate for a multimillion-dollar building

6    would not take several hours, no.

7    Q.      Are you aware if you take $128,000 and you

8    divide it by time, because that's all you did on this

9    job was time, correct?

10   A.      I believe it was a lump sum with a unit pricing

11   for different tasks and traits.

12   Q.      But you didn't bill anything, did you?

13   A.      No.  It's preconstruction services.  We're not

14   building anything.  It's preconstruction services.

15   Q.      So you didn't billed anything.

16           You did an estimate, correct?  The estimate was

17   inaccurate, correct?

18   A.      Incorrect.

19   Q.      Well, John could probably testify to that.

20           And you billed Gloucester $128,000, correct?

21   A.      Incorrect.

22   Q.      You billed them $128,000?

23   A.      We billed them more than that.

24   Q.      More than that.  More than that.

25           You're right, the lien was for $128,000,

1    correct?

2    A.      Correct.

3    Q.      So you did bill more than that.  The lien is

4    for $128,000.

5            Are you aware that the owner of Gloucester has

6    come back and said that that lien is improper?

7    A.      I would assume that he's upset, but I haven't

8    seen any legal paperwork on that.

9    Q.      Are you aware that the Gloucester project

10   failed to go to fruition because of your improper

11   lien?

12   A.      I don't know that.

13   Q.      Were you at Trish Pappano's deposition when

14   we had it?

15   A.      I was not.

16   Q.      Did you read her transcript?

17   A.      I did not.

18   Q.      You're also aware that that job that you're

19   claiming anticipated profits on never happened,

20   correct?

21   A.      I'm aware that the project has been lingering, I

22   believe, for five years.

23   Q.      So, again, the anticipated profits that your

24   attorney put up on the screen, they are only

25   anticipated, correct?

1  A.       They are anticipated, but if the client would

2  have paid his bill, I think he would have avoided a lien

3  against the project.

4  Q.       I'm talking about the sheet that was put up

5  here that I can put up again, if you'd like me to, so

6  we can go through it.

7            THE COURT:  Let's do this, Ms. LaVan.

8  Let's take a mid-morning break for the jury, ten or 15

9  minutes or so.

10            Ladies and gentlemen, we'll be back with you,

11  grab you in about ten minutes or so.  Again, we take

12  lunch at 12:15, so come back and we'll go to 12:15.

13            Thank you very much.

14            (The jury exited the courtroom at 10:30 a.m.)

15            THE COURT:  Sir, same directions to you.

16  Don't speak to anyone.

17            All counsel, it is error.  It's not reversible

18  error, but it's error to characterize your -- you cannot

19  provide in any way, shape or form your opinion about a

20  witness.  Your opinion doesn't matter.  It just doesn't

21  matter.

22            If you do that, next time it happens with any

23  counsel I'm going to say to you in front of the jury

24  simply that.  Whatever you say doesn't matter, counsel.

25  So please do not characterize a witness.

1      Thank you very.

2      (Recess was held at 10:30 a.m.)

3      (The Court resumed the proceedings at

4  10:50 a.m.)

5           MS. LAVAN:  I've been made aware that

6  Mr. Aloia was talking to his attorney out in the hallway

7  about his testimony.  I wanted to make you aware of

8  that.

9           THE COURT:  Thank you.

10           MR. WATSON:  That's not true.

11           THE COURT:  I asked you whether you follow

12  my direction in speaking to your attorney about your

13  testimony.  There's been a statement made by counsel for

14  the defense that you have done so.

15      What conversations did you with your counsel in

16  the hallway?

17           THE WITNESS:  I didn't have any

18  conversations with my attorney.  I walked down the

19  hallway.  He asked John a question regarding two

20  witnesses.  At that point, Ms. LaVan made a comment that

21  we were discussing testimony.  Mr. Watson said that is

22  untrue.  And I left.  I walked back into the courtroom.

23           THE COURT:  You had a conversation about

24  two witnesses about to come?

25           THE WITNESS:  He asked about calling two

1    witnesses.

2              MR. WATSON:  Your Honor, we were trying to

3    decide whether to call Pappano and Patel and we're not

4    going to call them today.

5              THE COURT:  Ms. LaVan, what credibility do

6    you have?

7              MS. LAVAN:  We were made to believe -- not

8    me, because I didn't hear it -- that he was talking to

9    his attorney about Gloucester, which was the topic of

10   our conversation before we --

11             THE COURT:  You were talking about people,

12   Pappano, that was related to Gloucester?  I don't know.

13             THE WITNESS:  Yes.

14             THE COURT:  Did you talk about the

15   testimony about Gloucester?

16             THE WITNESS:  No.

17             THE COURT:  Okay.  I will let it go.  You

18   are under direction, though.  I'm not disagreeing that I

19   should hear about it.  If you hear it, tell me, but it

20   should be strictly enforced and not to be spoken about.

21             THE WITNESS:  All right.

22        (The jury entered the courtroom at 10:50 a.m.)

23             THE COURT:  You recall we are in the

24   cross-examination.

25             Ms. LaVan, you may continue.

                    Gregg B. Wolfe, RPR, CM
                        215-460-1511

```
 1              MS. LAVAN:  Thank you.

 2              I'm going to bring up Exhibit 20, which was on

 3     the screen previously, so the jury can see it.

 4     BY MS. LAVAN:

 5     Q.       Mr. Aloia, are you familiar with this

 6     document?  You referenced it earlier.

 7     A.       Yes.  This is a text message between John

 8     Sciotto and, I believe, Mark Heenan.

 9     Q.       You were not involved on this particular

10     text; is that correct?

11     A.       Correct.

12     Q.       You're claiming in this action lost profits

13     and damages in that amount; is that correct?

14     A.       That's correct.

15     Q.       Let's go through the first one.  CP1.

16              Are you aware that -- strike that.

17              The top, it says "Anticipated GP."

18              What does that mean?

19     A.       Anticipated gross profits.

20     Q.       So the word "anticipated" is highly relevant,

21     correct?

22     A.       "Anticipated" would be the expected gross

23     profits on those projects.

24     Q.       And that's what they were, expected and

25     anticipated, correct?
```

1    A.      Correct.

2    Q.      So CP1, you're aware never happened.  That

3    project was never performed.

4    A.      I'm not aware of that.

5    Q.      Do you have any evidence that it was

6    performed?

7    A.      I'd have to look through all the documentation,

8    but I believe the documents were produced for the Camden

9    Diocese of that work being performed.

10   Q.      During this litigation, did your attorney

11   ever depose or get the testimony of the owner of that

12   project?

13   A.      I believe there are multiple owners of that

14   project.

15   Q.      Of any of them.

16   A.      I don't believe they have.

17   Q.      As you sit here today, you really don't know

18   whether or not CP1, which is Camden, actually

19   happened, correct?

20   A.      I can't affirm that they've all been completed,

21   no.

22   Q.      But you were sitting here yesterday.  I think

23   it was yesterday when Mark Heenan testified that that

24   project, that anticipated GP never happened, correct?

25   A.      Anticipated GP didn't happen?

Gregg B. Wolfe, RPR, CM
215-460-1511

1    Q.      That anticipated gross profit for CP1 never

2    occurred?  It doesn't exist.

3    A.      I don't doubt that I heard his testimony on

4    anticipated profits and what they were or weren't.

5    Q.      Well, he did testify, did he not, that that

6    job never happened?

7    A.      Well, specifically, he talked about Washington

8    Townshjp, Gloucester Solar, CML.  If he talked about the

9    Camden Diocese, I don't know that he went through all 27

10   locations.

11   Q.      But again, there's no documentation of any

12   anticipated gross profit that you can show today that

13   is in the amount that's listed there on that

14   document, on that text message?

15   A.      I don't have any documentation, no.

16   Q.      Do you have any documentation today on CP2

17   that there was anticipated or gross profit -- forget

18   about anticipation -- that it actually happened, CP2,

19   that job for 1.1 million, actually occurred?  Do you

20   have any documentation surrounding that?

21   A.      I don't have any documentation, no.

22   Q.      "WTS," is that Washington Townshjp?

23   A.      Solar, yes.

24   Q.      Are you aware that that job never occurred?

25   A.      I don't have any documentation on it, no.

1  Mr. Heenan's testimony is that it was the same owner,

2  and that they weren't able to secure financing because

3  of the lien is what he said.

4  Q.      Right.  But so, therefore, as you sit here

5  today, you don't have any documentation that

6  Washington Townshjp, WTS, actually occurred?

7  A.      I don't.

8  Q.      Yesterday, you heard Mr. Heenan's testimony

9  that Washington Township was, in fact, the same owner

10  as the Gloucester Township project?

11  A.      Yes.

12  Q.      And that because of the Gloucester Township

13  lien, those projects were not able to go to fruition.

14  They did not occur.

15  A.      That was his testimony.  I didn't see any

16  documentation regarding that.

17  Q.      But they did not happen, correct?

18  A.      They have not.

19  Q.      And CML, I don't know what's in parenthesis.

20  I don't know if it's a question mark or a 9.  It

21  might be a 3.

22        CML for 695, do you have any documentation that

23  that particular project actually occurred?

24  A.      That project is still pending.  I believe that's

25  a Trenton project where Mark's testimony was that he was

1    able to secure $11 million in grants.  Sounds like that

2    project is underway in preconstruction, and probably

3    will happen.  I don't know if Mark will get that project

4    or not.

5    Q.      But that particular number, right there,

6    695,000, that's just anticipated, and that has not

7    anticipated yet, correct?

8    A.      Correct.  It could go up.  It could go down.

9    Q.      South Jersey CML3, do you believe that to be

10   Phase III of that project?

11   A.      Yes.

12   Q.      As you sit here today, do you have any

13   documentation of evidence that that project actually

14   occurred?

15   A.      No.

16   Q.      So it's safe to say that all of these jobs

17   that are listed, all they are were anticipated,

18   correct?

19   A.      They could still be in preconstruction.

20   Q.      But you have no evidence of that today?

21   A.      I don't, no.

22   Q.      So if we really broke this down, it's safe to

23   say that the numbers listed there really should be a

24   zero because CP1 never happened, zero dollars,

25   correct?

1   A.      I don't agree with you.

2   Q.      Well, if it never happened, how could there

3   be a gross profit on it?

4   A.      There's nothing that says that it's not going to

5   happen.

6   Q.      But there's nothing that says that it is

7   going to happen, correct?

8   A.      I don't have any documentation on it, no.

9   Q.      Your attorney put a document up there that

10  claims $5 million in damages; is that correct?  He

11  immediately took it down.  Do you remember that

12  document?

13  A.      I still have a copy of it.

14  Q.      Where are you getting $5 million in damages

15  from when most of the jobs that are on that sheet are

16  here, listed here in this text, and they haven't even

17  happened yet?

18  A.      To answer your question, there are those

19  projects with the anticipated profits, as you've just

20  identified.  There are also the misappropriated funds,

21  mostly the Gloucester project and the CML Project.

22  There are damages for a trademark infringement and

23  cyberpiracy under an Act.

24         There are legal fees that we've already

25  incurred, and the only thing missing is the legal fees

1  that we're incurring for this trial.

2  Q.     That's about $5 million in damages, correct,

3  minus the ones that you're incurring in this trial;

4  is that true?

5  A.     5.2 million.

6  Q.     Okay.  So if I have this right, you're

7  claiming and you want the jury to award you

8  $5.2 million for doing virtually nothing on any of

9  these jobs, correct?

10  A.     Virtually nothing?  I don't agree with that.

11  Q.     Well, did you do anything, you, Decus, on

12  CP-1?

13  A.     We had conference calls on it regarding those

14  projects and the grouping solar routes involved with

15  those.  It's limited, so I can't say it's nothing.

16  Q.     A conference call, correct?

17  A.     I had meetings with Mark.  We met Mark almost

18  every Monday to discuss these projects.

19  Q.     Those were because Mark brought them to you,

20  correct?

21  A.     Yes.

22  Q.     So again, you want the jury to award you

23  $5.2 million on anticipated profits on jobs that

24  never actually occurred?

25  A.     That's a portion of it.

1  Q.      And it's safe to say then, as earlier, that

2  you want something for nothing, Mr. Aloia.

3  A.      I disagree with you.

4  Q.      We're going to go to Exhibit 25.  It would be

5  Page 13.

6  A.      My 25 is an H2 Construction.

7  Q.      I'm sorry, 26, Page 13.

8              MS. LAVAN:  You can blow up the bottom

9  portion of that.

10 BY MS. LAVAN:

11 Q.      Are you familiar with this document?

12 A.      It's text messages between Mark and myself.

13 Q.      Awhile ago you testified, and correct me if

14 I'm wrong, or maybe you can explain it, Mark was

15 doing business in the name of Decus Construction,

16 correct?

17 A.      Incorrect.

18 Q.      And that he was actually doing business in

19 the name of Decus, Inc.; is that correct?

20 A.      Yes, he was doing it in Decus, Inc.

21 Q.      And you testified that he didn't have the

22 authority to do that, correct?  He didn't have --

23 A.      Give me what you mean by "authority"?

24 Q.      Well, you had testified and, again, correct

25 me if I'm wrong, there was a proposal up on the

Gregg B. Wolfe, RPR, CM
215-460-1511

1     screen that said Decus, Inc., and Mr. Heenan had his

2     name on it.

3              And you had stated again, correct me if I'm

4     wrong, that Mark was doing business under the Decus,

5     Inc. name, correct?

6     A.      Yes, Mark was doing work under Decus, Inc. and

7     Mark sent out proposals and I sent out correspondences,

8     E-mails and everything else.

9     Q.      But when you testified earlier, you said he

10    wasn't authorized, or he was not supposed to be doing

11    business under Decus, Inc.

12             He was supposed to be doing business under

13    Decus Construction, correct?

14    A.      I disagree with that.  He did work under both,

15    and he had authority to do work under both.

16    Q.      So it's your testimony today that Mark did

17    have authority to do business under both Decus, Inc.

18    and Decus Construction, then, correct?

19    A.      Mark had the ability to do marketing for Decus,

20    Inc. or Decus Construction.  What he didn't have

21    authority for was to steal our name and hide it under an

22    LLC in New Jersey.

23    Q.      But he had authority to use the name Decus,

24    Inc. and Decus Construction on proposals, correct?

25    A.      Our letterhead, yes.

1    Q.      Okay.  And he had the authority to work on

2    the Decus, Inc. and Decus Construction website,

3    correct?

4    A.      Yes.  He was building it for us.

5    Q.      All right.  You had also provided Mr. Heenan

6    with the Decus logo content, the templates via

7    E-mail, correct?

8    A.      Sure.  If he was drafting a letter, he should

9    have the letterhead.  If he was sending out something

10   that was going in the mail, he should have the envelope.

11          He worked on our business cards.

12   Unfortunately, he didn't send me the proofs so they

13   didn't have our address on them.  And the logo he needed

14   for his E-mail, so he could attach it and it would come

15   up under his signature line.

16   Q.      He did in fact do that, correct?

17   A.      He did.  Yes, but unfortunately, he also used it

18   for his LLC, Heenan Holdings, dba Decus Construction.

19   We didn't authorize him for that.

20   Q.      But in your testimony there was no real

21   partnership agreement in place, was there?

22   A.      There was no partnership agreement.

23   Q.      Okay.  So how did Mr. Heenan really know what

24   he had the authority to do and what he didn't have

25   the authority to do, if it wasn't spelled out in some

1    form of an agreement?

2    A.      I'm having difficulty understanding you.  What

3    you're saying is that if I went to my bank today,

4    Citizens Bank --

5    Q.      Just answer the question.  I'm sure your

6    attorney will ask you to clarify, if you don't think

7    that I'm asking an appropriate question.

8            So my question to you is, there was no actual

9    writing of a partnership agreement or a shareholder's

10   agreement, correct?

11   A.      Correct.

12   Q.      But there were drafts going back and forth,

13   correct?

14   A.      There were drafts, yes.

15   Q.      But without a writing, how is Mr. Heenan to

16   know he has the authority to use the logo at the

17   bottom of the E-mail?  No.  Yes.  Right?  How was he

18   going to know that?

19   A.      No, I think you're confusing the issue.  The

20   issue here is Mark was supposed to be using our mark for

21   Decus, Inc. and Decus Construction.  Common sense tells

22   you that you don't steal someone else's mark and use it

23   for your own company.

24   Q.      See, here's the thing about stealing it,

25   Mr. Aloia.  He didn't steal it, did he?  Because he

1  believed and you led him to believe that he was a

2  partner in Decus Construction.

3  A.      I did not.

4  Q.      So let's talk about that.

5        Do you recall several E-mail correspondence

6  going back and forth where you discussed partnership

7  with Mr. Heenan?

8  A.      Yes.  There's no denying that there were

9  discussions about partnerships and shares and buy-ins

10 and evaluating the cost of a share, but at the end of

11 the day nothing was signed, not even the business

12 understanding letter that was drafted and sent to

13 Mr. Heenan did he sign anything.

14 Q.      So you're really concerned about all these

15 legal terms and legal contracts, correct?

16 A.      In what context?

17 Q.      Well, for someone that's so concerned, why

18 didn't you actually have and finalize the

19 shareholders agreement and the partnership agreement

20 that you had drafted, or he had drafted and gone back

21 and forth, why didn't you finalize it?

22 A.      That was simple.  When we went to go and

23 finalize it, Mark was unable to write the check for what

24 we had all agreed to for a buy-in, and the agreement

25 quickly changed to a zero share.  He was no longer to be

1    an equity partner.  He was going to go back to the

2    original agreement of 20 percent, and that's what we

3    were trying to finalize, an agreement for him getting

4    20 percent net profits.

5         The problem was that we went back and forth,

6    all the delay tactics are on Mark's side, and nothing

7    got signed.  At the end of the day, nothing got signed.

8    Q.     That is true, Mr. Aloia, correct?

9         But how is he going to sign an agreement when

10   you kept changing the terms?  Did you not agree that you

11   were going to be equal partners in Decus Construction?

12   A.     I didn't agree with anything beyond the 750 a

13   week and 20-percent net profits.  That is still to this

14   day the only agreement that we have.  That was an oral

15   agreement that we reduced to paper, and it never got

16   signed.

17   Q.     Are you saying that later on you didn't

18   change your terms, and then all of a sudden ask that

19   Mr. Heenan actually pay you to join Decus

20   Construction?

21   A.     As we stated before and discussed, there was a

22   draft partnership agreement and, yes, the terms did

23   change, but, again, nothing was signed.  Nothing got

24   executed.

25   Q.     You're right, nothing was signed, Mr. Aloia.

1              But what happened was you led Mr. Heenan to

2    believe that he was a partner of Decus Construction by

3    way of draft partnership agreements, shareholder

4    agreements, correct?

5    A.        Incorrect.

6    Q.        Referring to him as a partner in E-mails?

7    A.        He was not a partner until we had a signed

8    document.

9    Q.        But how is he going to sign a document,

10   again?  I'm going to ask you that you kept changing.

11   First he was an equal partner.  Then you said, no, he

12   only gets 20 percent of the profits.

13              Then you even went further to say, no, guess

14   what, "You did all the work for the last six to eight

15   months, Mr. Heenan, but now you need to pay us to be an

16   owner" in a company that he already thinks he's an owner

17   of, correct?

18   A.        Incorrect.

19   Q.        To the point of which, when you did the legal

20   thing and you registered Decus Construction, you

21   listed yourself as the only owner, correct?

22   A.        Incorrect.  I hired a company to do that.  The

23   documents we provided you --

24              MR. WATSON:  Your Honor, objection.

25              THE COURT:  Overruled.  It doesn't need to

Gregg B. Wolfe, RPR, CM
215-460-1511

1    be argumentative.

2              MR. WATSON:  The body language, Your Honor.

3              THE COURT:  It's cross-examination.

4         Sir, you've answered.

5         Next question.

6    BY MS. LAVAN:

7    Q.    You had somebody else do it, but you told

8    that somebody else what to include, correct?

9    A.    Correct.

10   Q.    Who did you hire to do that?

11   A.    I hired a company called Turnkey Business

12   Solutions.

13   Q.    And you gave them the information?

14   A.    I sent them an E-mail with the information for

15   the two partners of the corporation, John Sciotto and

16   Thomas Aloia.

17   Q.    And you didn't produce that, did you?

18   A.    I produced the S Selection.

19   Q.    No, you didn't produce the E-mail --

20             THE COURT:  You have to let the court

21   reporter get it all down, other than you and I.  I'm

22   talking to the jurors.  But make sure the court reporter

23   gets it all down.

24        Go ahead.

25             THE WITNESS:  The S Selection, which is the

1    IRS form --

2    BY MS. LAVAN:

3    Q.        No, I asked you whether you produced the

4    E-mails with the company that formed the legal entity

5    because that should have been produced.

6    A.        We produced all documents that you requested.

7    Q.        Mr. Aloia, you registered Decus Construction

8    on November 27th, 2015, correct?

9    A.        Correct.

10   Q.        And that was just a few days after you had

11   corresponded with Mr. Heenan about being a partner in

12   the business.

13   A.        I believe the correspondence came from

14   Mr. Heenan, and he had labeled it as a high-level idea

15   for what were the next steps.

16   Q.        Whether you hired somebody or provided the

17   information to them, that document only had your name

18   on it, correct?

19   A.        Which document?

20   Q.        The registering of Decus Construction.

21   A.        Can you show me the document?

22   Q.        Sure.  We're going to pop it up on the

23   screen.

24             We can go through this, but you're also aware

25   that not only did you not include Mark Heenan's name,

1    that you didn't even include your actual other partner,

2    who actually you had stated your partner is John

3    Sciotto, in that document, correct?

4    A.      I didn't file that document.  As I stated, I

5    hired a corporation to do it.

6               MS. LAVAN:  Go to the top.

7    BY MS. LAVAN:

8    Q.      This date, Mr. Aloia, first of all, are you

9    familiar with this document?

10   A.      Yes, is the document filed by Dana Lopardo with

11   turnkey.

12   Q.      Okay.  The date on it is what, 11-27-2015; is

13   that correct?

14   A.      Correct.

15   Q.      So is it safe to say Decus Construction,

16   Inc., this particular name, wasn't even registered

17   until 11-22-2005 because it wasn't even an entity

18   until that date, correct?

19   A.      Correct.

20   Q.      This is about the time, 11-27-2005, when you

21   had been discussing partnership with Mr. Heenan,

22   correct?

23   A.      We were discussing business opportunities, not a

24   partnership.

25   Q.      Okay.

                    Gregg B. Wolfe, RPR, CM
                         215-460-1511

1           MS. LAVAN:  Go down.

2    BY MS. LAVAN:

3    Q.      This is a legal document; is that correct?

4    A.      I'm sure it's a legal document.  It's filed with

5    the State.

6    Q.      You provided the information, you had said,

7    to the person who filed this for you; is that

8    correct?

9    A.      I did.

10   Q.      Why don't you explain a little bit, those

11   companies, how they work?  What did you do?

12   A.      I spoke to Dana Lopardo.  She asked me who the

13   members were going to be or partners.  She asked me what

14   documents I needed.  I told her I needed the IRS forms,

15   the State form.  She gave me a fee.  I gave her the

16   information.  I gave her John's Social Security number.

17   I gave her my Social Security number and our home

18   addresses.  That was it.

19   Q.      Prior to this date, you and John Sciotto

20   already had an agreement between the two of you about

21   the ownership of Decus Construction; isn't that

22   correct?

23   A.      We had an agreement for Decus, Inc. prior to

24   this.

25   Q.      So you didn't have an agreement between you

1    for Decus Construction prior to?

2    A.      No, no.  Our first agreement that we signed was,

3    I believe, May of 2015.

4    Q.      You provided this information to the company.

5            Did you review it before it was filed?

6    A.      I did not.

7    Q.      But it is an important legal document, isn't

8    it?

9    A.      Yes.  I didn't get a copy of this until --

10   actually, I got a copy of this when Mark gave us a copy

11   of it.

12   Q.      But this is your document, so why would you

13   only get a copy of it when Mark gave it to you?

14   A.      We have a binder that we received as a

15   corporation binder, but this was not attached to it.  I

16   had spoken to Dana since, and she had sent me these

17   documents.

18   Q.      Right here at the very bottom of this legal

19   document it says, "In testimony whereof, the

20   incorporators has have signed these Articles of

21   Incorporation this 27th day of November, 2015."

22           And your signature is on it?

23   A.      My name is typed there.  It's not my signature.

24   Q.      Do you realize what that box says, "In

25   testimony whereof"?  It says that you signed it,

1    whether it be a written signature or an electronic

2    signature, doesn't it, Mr. Aloia?

3    A.      Or I gave someone authority to file the

4    paperwork for me.

5    Q.      You do realize that that doesn't prevent you

6    from being able to review this document and have it

7    be accurate, correct?

8    A.      Nothing would prevent me from reviewing the

9    document unless I, for some reason, couldn't get ahold

10   of it.

11   Q.      So it's your testimony that you couldn't get

12   ahold of him now?

13   A.      I couldn't get ahold of the document?  I did not

14   state that, no.

15              MS. LAVAN:  I want to refer to Exhibit 27,

16   please.  Go to the top first.

17   BY MS. LAVAN:

18   Q.      This is an E-mail -- and, Mr. Aloia, can you

19   see this in your binder?

20   A.      I can.

21              MS. LAVAN:  Your Honor, we're on 27.

22              THE COURT:  Thank you.

23   BY MS. LAVAN:

24   Q.      This is from Mark Heenan to John Sciotto and

25   Thomas Aloia, "Proposed Profit Sharing Structures";

Gregg B. Wolfe, RPR, CM
215-460-1511

1    is that correct?

2    A.      Yes.

3    Q.      The date of that is November 24th, 2015; is

4    that correct?

5    A.      Correct.

6    Q.      So this E-mail was three days before that

7    article was testified and your signature was on the

8    bottom of it and it was registered with the State,

9    correct?

10   A.      I'll agree that it was filed on the 27th, and

11   that my name was typed there.  It's not my signature.

12   Q.      Would you agree --

13          MR. WATSON:  Your Honor, objection.  He's

14   trying to answer the question.

15          THE COURT:  No, overruled.  You'll get to

16   redirect.

17          MR. WATSON:  No, she's interrupting him.

18          THE COURT:  Don't interrupt.

19          MS. LAVAN:  I'm sorry.  I thought he was

20   done.

21          THE COURT:  I thought he was finished, too.

22       Go ahead, sir, finish your answer.

23          THE WITNESS:  That's fine.  I've lost my

24   train of thought.

25

Gregg B. Wolfe, RPR, CM
215-460-1511

1    BY MS. LAVAN:

2    Q.       You would agree, though, that you provided

3    Dana the information, correct?

4    A.       I don't recall what day I gave her the

5    information.

6    Q.       I didn't ask the day, Mr. Aloia.  I said, you

7    would agree that you provided her the information

8    that was supposed to go into that legal document?

9    A.       Yes, I provided her with the information for

10   that document, and I gave her authority to file it.

11             THE COURT:  This is the same information

12   that you talked about a few minutes ago, correct?

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.  Just making sure we are

15   doing the same thing.

16             MS. LAVAN:  Yes.

17   BY MS. LAVAN:

18   Q.       Again, three days prior, Mr. Heenan wrote an

19   E-mail to you.

20             Are you familiar with this document?

21   A.       I am, yes.

22   Q.       Okay.  It says in here --

23             MS. LAVAN:  Go down a little bit.  Thank

24   you.  Wait.  Second paragraph.

25

1    BY MS. LAVAN:

2    Q.      It says, "I'd like to explore a partnership

3    in further depth"; is that correct?

4    A.      That's what he is stating, yes.

5    Q.      Would that lead somebody to believe that you

6    had been discussing partnership?

7    A.      What it states is that, "I'd like to explore a

8    partnership in further depth."

9    Q.      Right.

10   A.      And then as we previously discussed, he starts

11   to talk about his issues.

12   Q.      He did.  He told you about the Hessert

13   issues, correct?

14           MR. WATSON:  Objection, Your Honor.  He's

15   trying to answer.

16           THE COURT:  Overruled.  I've heard the

17   answer.  He's trying to explain it, but you can come

18   back to it.  He answers the question.  He goes on.

19        Go ahead.

20   BY MS. LAVAN:

21   Q.      I agree with you.  He did tell you about the

22   old Hessert affairs, correct?

23   A.      No.  He just said that he was wrapping things up

24   with his uncle.  He didn't go into that he was in

25   litigation with his uncle.

1  Q.      But you never contacted Mr. Hessert to find

2  out while you were vetting Mr. Heenan out about any

3  partnership issues that he had, correct?

4  A.      I did not.

5  Q.      He says, "I'd like to perfect on the

6  following goals by the year end."  Number one is, he

7  says, "Company profile generally complete (website,

8  LinkedIn, et cetera up and uniform.)

9          Two, he says, "Booked backlog with profits

10  exceeding anticipated 2016 G&A expense.

11          And, Three, "Establish a bid schedule for

12  January and pipeline of two to three projects a month

13  for February and March."

14          Then he gives a list; is that correct?  Do I

15  have that right?

16  A.      That's what he wrote.

17  Q.      And then he says, among other things, "I

18  propose the following structure for us as partners,"

19  and he gives a whole host of information there about

20  how to structure this partnership; is that right?

21  A.      He was looking for $1,500 a week, and there were

22  a couple of other profit-sharing ideas.  He's talking

23  about partners will be guaranteed salaries of $100,000.

24  It flip-flops back and forth between partners and I

25  think what he's looking for.  It talks about profit

1    sharing.  It talks about a lot of things, but none of

2    them were agreed to.

3    Q.      But it took him a lot of time and effort

4    because he's engaging in the partnership idea; is

5    that correct?  Would you agree that this proposal

6    probably took quite some time?

7    A.      I don't know how long it would take Mark to

8    write an E-mail.

9    Q.      Okay.  And then if you continue down, he

10   says, "This is just a first stab high level based on

11   my thoughts."

12          And he signs, correct?

13   A.      Yes.

14   Q.      Did you ever respond back to this E-mail

15   saying anything at all?

16   A.      I don't recall seeing a response to it.  This

17   actually also states that he's talking about some other

18   company, but for now it's going to be Decus.

19   Q.      But he did state:  I'd like to explore the

20   partnership in more depth."

21   A.      Which we did.  We passed some partnership

22   agreements back and forth.  We talked about buy-ins and,

23   again, nothing was solidified.

24   Q.      Right, and you talked about just what you

25   said, you talked about buy-ins, correct?

1    A.      Correct.

2    Q.      You had talked about 20-percent profit,

3    correct?

4    A.      Correct.

5    Q.      You had also talked about being equal

6    partners, correct?

7    A.      With the appropriate buy-in.  But, again,

8    nothing got signed so we stuck with the 750 percent,

9    plus 20 percent net profit.

10   Q.      Speaking of that agreement, you didn't even

11   pay him what he was due under the consulting

12   agreement, did you?

13   A.      We paid him for his time.

14   Q.      But you still owe him upwards of $9,000; is

15   that correct?

16   A.      I disagree with that.

17   Q.      I'll just show you another Exhibit.

18          MS. LAVAN:  Can you pull up Exhibit 53?  Go

19   to the very top.

20   BY MS. LAVAN:

21   Q.      Do you have it, Mr. Aloia, in front of you?

22   A.      Yes.

23   Q.      This is the E-mail from Mark Heenan sent on

24   March 11th, 2016 to Thomas Aloia.

25          That's you, correct?

                    Gregg B. Wolfe, RPR, CM
                         215-460-1511

1   A.      There are both.  There's an E-mail from me and

2   an E-mail from Mark.

3   Q.      Right, but at the very top that's an E-mail

4   from Mark --

5   A.      Okay.

6   Q.      -- where he's using the Decus Construction

7   logo, correct?

8   A.      Correct.

9           MS. LAVAN:  Go down a little bit of that.

10  BY MR. WATSON:

11  Q.      And then it says it's from Thomas to Mark,

12  Thursday, March 10th; is that correct?

13  A.      Yes.

14  Q.      And it says, "Mark, see my comments below."

15          And that's from you?

16  A.      Correct.

17  Q.      Would you agree that below that it says, from

18  Mark Heenan, he writes to you on March 10th,

19  "Thomas."  And he says, "Starting, I've attached a

20  revised budget"; is that correct?

21  A.      Yes.

22  Q.      And would you agree that you then took this

23  E-mail and made comments in the body of the E-mail to

24  respond to what Mark was saying?

25  A.      I believe so, yes.  I'm trying to decipher which

Gregg B. Wolfe, RPR, CM
215-460-1511

1    ones are which.

2    Q.     Okay.  Also, too, John did the same thing as

3    well?  Actually, I apologize, this was just from you.

4            Mr. Aloia, is that a color-coded copy in your

5    binder?

6            THE COURT:  59?

7            MS. LAVAN:  53.  Unfortunately, this one is

8    not color coded, so we're going to try to distinguish

9    what are your comments and what Mark said.  But I do

10   notice that if you look, some of it is bold and some of

11   it is not.  I'm hoping that will help.

12           THE COURT:  What exhibit is it, ma'am?

13           MS. LAVAN:  Exhibit 53, Your Honor.

14           THE COURT:  53.  Okay, thank you.

15   BY MS. LAVAN:

16   Q.     So this E-mail says, "Decus Construction will

17   be comprised of three partners, Mark Heenan, John

18   Sciotto and Thomas Aloia," correct, right in the

19   middle there?

20   A.     That's what Mark wrote.

21   Q.     Below there it says, "Each partner will owe

22   Decus contracts generating a minimum of $250,000,"

23   so-and-so on.  And it says, "If less, the

24   partner-guaranteed distributions shall be reduced

25   accordingly."

1          And then it looks like, if I understand the

2     structure, it looks to be bold?

3     A.     Yes.  This is actually an E-mail from Mark to

4     me.  Mark says, "Each partner will owe some gross

5     profit."

6          I said, "I understand the structure you're

7     suggesting.  However, the structure we discussed was a

8     partnership with a 20 percent to Heenan and the

9     remainder split between myself and John.  The

10    partnership should be a collected effort and

11    corresponding bonus structure based upon percentages,

12    quarterly or annually, maybe for project.  Truing up

13    bonuses too soon will put the cash flow behind and

14    potentially cripple the company financially.

15         "My initial conversation with John or about

16    having a three-way division of interest.  It then became

17    25 percent, and most recently 20 percent.  I agree

18    entirely that it should be a collected effort, and don't

19    think the bonus structure should be any more frequent

20    than annual or bi-annual unless we are in a position

21    that that becomes easy."

22         In my mind, that still stays at the 20 percent

23    to Mark.

24    Q.     But is it safe to say that it had changed

25    over time?  I think you testified that it was

1    20 percent and then, you know, at one point it was

2    equal, and then at another time he was supposed to

3    buy in, correct?

4    A.       Well, it keeps changing, and I know you're

5    characterizing it as I'm changing it.  But clearly if

6    you look down the page, I write to Mark.  "This doesn't

7    seem like a partnership, rather a bunch of independent

8    sales guys.  How do you structure bonuses with various

9    roles?  The changes" -- and it goes on further.

10          But the changes aren't coming from me.  They

11   are coming from Mark.  Then they changed again soon

12   after that and again later on and then reverted back to

13   just a non-equity profit sharing agreement in August.

14   Q.       But that's not true, Mr. Aloia, is it,

15   because you didn't originally have anything about a

16   buy-in provision in the beginning when you were

17   discussing the partnership.  But in this E-mail, you

18   say --

19               MS. LAVAN:  Go down a little bit more.

20   BY MS. LAVAN:

21   Q.       Is that bold language, again, your comments

22   to what Mark is saying?

23   A.       Yes.  "Need to discuss this so I understand

24   where you're going with this."  I don't understand it.

25   Q.       And you said, "I'm okay with a minimum salary

1    for you under Decus Construction, and we can create a

2    buy-in structure," correct?

3    A.       Correct.

4    Q.       So all of a sudden the tables are turning,

5    and you want money from Mark where you didn't

6    originally discuss him buying into Decus Construction

7    at all, did you?

8    A.       Our original conversations weren't that he was

9    going to be a partner.  At this point, this is the

10   March, I believe, he still is under the February

11   document that we sent him that gets him a 20-percent net

12   profit.

13   Q.       But he never signed that document, did he?

14   A.       No, we never signed a partnership agreement.

15   These are all negotiations.

16   Q.       You know what, Mr. Aloia, isn't it true that

17   now it's convenient for you when you take everything

18   and you make it legal, that your story changes, that

19   all of a sudden it doesn't matter if we have a signed

20   contract, correct?

21   A.       I don't think I've taken that stance.

22   Q.       But you had a verbal consulting agreement,

23   Mr. Aloia.

24   A.       We did.

25   Q.       Okay.  That wasn't in writing.

Gregg B. Wolfe, RPR, CM
215-460-1511

T. ALOIA - CROSS
104

1   A.      It was memorialized in writing in February.

2   Q.      But he didn't sign it, did he?

3   A.      He did not.

4   Q.      So you wanted him to act and work under a

5   verbal consulting agreement, correct?

6   A.      That was the agreement we agreed to.

7   Q.      But he wasn't supposed to act under a verbal

8   partnership agreement, right?

9   A.      There was no verbal partnership agreement.

10  There's nothing that shows that there was any

11  partnership or any meeting of the minds for a

12  partnership.

13  Q.      "Meeting of the minds" is a legal term,

14  Mr. Aloia, isn't it?

15  A.      If you're classifying it as.  In my industry, we

16  think of the meeting of the minds as a collective effort

17  and everyone agrees.

18  Q.      Well, you know that's not true.  You know

19  Mr. Heenan believed he was a partner because you led

20  him to believe that.

21          Let's go on and continue to other E-mails.

22          Would refer to Exhibit 59.  This is an

23  E-mail -- are you there yet?

24          MS. LAVAN:  Your Honor, do you have it?

25          THE COURT:  I have 59, yes.

Gregg B. Wolfe, RPR, CM
215-460-1511

1    BY MS. LAVAN:

2    Q.      And this one this time is from John Sciotto,

3    sitting right here, and this is sent Sunday, May 1st.

4            It's to Thomas Aloia and Mark Heenan, correct,

5    at the very top?

6    A.      Yes.

7    Q.      And it says, "Guys, my comments are below as

8    well."

9            If you go down, it says from "Thomas Aloia,"

10   that's you, correct?

11   A.      Yes.

12   Q.      That's Friday, April 29th, 2016; is that

13   correct?

14   A.      That is correct.

15   Q.      "To Mark, CC: John Sciotto."  It says, "Mark,

16   my comments are below.  We can discuss further on

17   Monday at 9 at the coffee shop"; is that right?

18   A.      That is correct.

19   Q.      If you go down lower, this is the E-mail from

20   Mark dated Friday, April 29th.  It says to Thomas,

21   and then this is color coded.

22           Is it safe to say or that your writing is in

23   red, your comments to this E-mail are the ones in red?

24   A.      That is correct.

25   Q.      And Mark, Mr. Heenan's, they are in black,

1    correct?  Not comments, but his E-mail is in black.

2    A.      Correct.

3    Q.      And that John's comments are in blue; is that

4    correct?

5    A.      That is correct.

6    Q.      This is a very long E-mail.  On the second

7    page, all the way down next paragraph, right here, do

8    you see that, Mr. Aloia?

9    A.      I do, yes.

10   Q.      Actually, I apologize.  We're going to go up

11   to "I understand."  "I understand there is a

12   partnership opportunity with Decus Construction."

13          You say, "I gave you a copy of a partnership

14   agreement months ago.  Waiting on your comments"; is

15   that correct?

16   A.      "Ball is in your court."

17   Q.      Okay.  But John, who is your partner, right?

18   A.      Yes.

19   Q.      Says, "I have been pretty open to this.  As

20   we discussed, we would open up a new entity, which

21   Thomas has done."

22          Correct me if I'm wrong, but you did form the

23   new entity that we just discussed as an exhibit that you

24   testified that you did sign, albeit an electronic

25   signature, that's what is being referred to, correct?

107

1  A.       Which is what I did.  I created a new company.

2  Q.       That is free of legal issues, lawsuits,

3  Liberty lien on B Town.

4           Is that what it says?

5  A.       That is what John wrote, yes.

6  Q.       And that new entity was formed because you

7  were afraid that you were going to get sued because

8  of the Brewerytown job because of non-performance,

9  correct?

10 A.       That is incorrect.

11 Q.       Did you have a dispute?

12 A.       We did not.  We got paid 100 percent.

13 Q.       There was no dispute there?

14 A.       There was no dispute with the client.

15 Q.       "I have made suggestions to working together.

16 That's coming from John.  The proposal presented back

17 was fairly one-sided by Mark.  I would like to move

18 forward in an open and equal forum.  We need to

19 operate this way or else it's pointless to continue."

20          It goes on to say that.  But there's no doubt

21 that the clean entity that John is referring to is the

22 one that you formed that neither John or Mark were

23 partners in.  You didn't put their names on the

24 document?

25 A.       I would disagree with that.  John is a partner

1   of it, Mark is not.

2   Q.      You didn't put John or Mark's name on that

3   legal document that was filed with the State, did

4   you, Mr. Aloia?

5   A.      I didn't draft the document.  You're

6   mischaracterizing it.

7   Q.      You did that for your own benefit, didn't

8   you, Mr. Aloia?

9   A.      I did not.

10  Q.      This E-mail even further suggests that John

11  believed that this new clean entity was formed for

12  your partnership, right?

13  A.      With me.  I mean, he clearly says the proposal

14  presented was fairly one-sided by Mark.  He doesn't

15  agree with it.

16  Q.      Talking about the clean entity that was

17  formed that led Mark to believe that he was part of

18  this new entity that you formed with only your name

19  on it, right, Mr. Aloia?

20  A.      There is nothing that states that Mr. Heenan is

21  part of the corporation.  What it states is that there

22  is a clean company to work from.  It doesn't say Mark is

23  included in it.

24  Q.      It says a clean entity.

25  A.      It doesn't say Mark is included in it.  Nowhere

1  in any of the documentation does it say that Mark is

2  included as a partner.  Let me finish.

3  Q.    You're absolutely right, Mr. Aloia, you led

4  him to believe that he was a partner in Decus

5  Construction, Inc. for your own benefit while he did

6  all the work, performed on all the jobs and you went

7  and wanted to collect money for work you did not

8  perform.

9      That is the crux of our case, Mr. Aloia.  There

10  it is.

11          MR. WATSON:  Objection.

12          THE WITNESS:  You are incorrect.  You have

13  not supplied one document where somebody calls Mark a

14  partner other than himself.

15  BY MS. LAVAN:

16  Q.    I have explained document after document, but

17  here's the thing.

18      You want to separate a legal document with an

19  E-mail, correct?

20  A.    No, I don't.

21  Q.    You're claiming that there should be a signed

22  shareholders agreement, correct?

23  A.    There should be a signed shareholders agreement

24  or a letter of understanding, a letter of intent,

25  something signed.  There's nothing signed.

1    Q.    If you're so concerned about legal entities,

2    John Sciotto was your partner, right?

3    A.    Yes.

4    Q.    But on that document by the State you didn't

5    even put your own partner's name on it as a

6    shareholder, did you?

7    A.    I didn't draft that document.  But the signed

8    document that the two of us did put our signatures on to

9    the IRS clearly states we are a 50/50 partnership.  We

10   also file our tax returns where we both get K1s for

11   those companies, Decus, Inc. and Decus Construction Inc.

12   Q.    But you didn't --

13   A.    On those documents it also says 50 percent and

14   50 percent.

15   Q.    Did you produce that?

16   A.    My tax returns?

17   Q.    Yes.

18   A.    No.

19   Q.    Okay.

20         MS. LAVAN:  So go down a little bit

21   further.  Go down more.  I'm sorry.  Go to the red up a

22   little further.

23   BY MS. LAVAN:

24   Q.    You stated that just now that you were the

25   one, you authorized somebody else to form that legal

1   entity and you signed it, but you didn't really

2   review it, correct?

3   A.      I did not review it, no.

4   Q.      On this E-mail, again, your writing is in

5   red?

6   A.      Yes.

7   Q.      You say, "We can all discuss on Monday.  I

8   wasn't part of your discussions with John early on."

9           That's true, isn't it?

10  A.      Yes.

11  Q.      Because John was actually the one who was

12  vetting Mark, for the most part, correct?

13  A.      I disagree with you.

14  Q.      And "I created" -- "I created."  Are you "I"?

15  A.      I am.

16  Q.      "I created Decus Construction to give us."

17          "Us," who is "us"?

18  A.      I would assume that's John and I and Mark to

19  work towards an agreement if we can.

20  Q.      So "I created Decus Construction Inc.," and

21  that was on November 27th, 2015, correct?

22  A.      Correct.

23  Q.      Just a few days after you discussed

24  partnership not only verbally but in an E-mail,

25  correct?

1    A.      Correct.

2    Q.      And you say, "I created Decus Construction to

3    give us a clean company to work from," right?

4    A.      "To work from," yes.

5    Q.      What was Mr. Heenan supposed to think time

6    and time again when you're sending these E-mails,

7    you're making him think he's a partner, you're saying

8    you "created a new clean entity for us."

9            He was created to believe from you, Mr. Aloia,

10   that he was a partner, correct?

11   A.      No.

12   Q.      Regardless of whether or not there was a

13   signed shareholders agreement, you didn't really care

14   about that because you had a verbal consulting

15   agreement.  So at the end of the day something being

16   signed, that wasn't really important to you.

17   A.      It was important.  That's why we finalized the

18   partnership agreements that were never executed.

19   Q.      Right, you did finalize it, didn't you,

20   Mr. Aloia?

21   A.      We did.

22   Q.      And Mark Heenan executed it?

23   A.      Mark signed it.

24   Q.      Is there a difference between signing and --

25           MR. WATSON:  Objection, Your Honor.

Gregg B. Wolfe, RPR, CM
215-460-1511

1          THE COURT:  Overruled.

2          MR. WATSON:  He has to answer the question.

3          THE COURT:  No, he did.  He said there's a

4   difference between signing and executing.

5   BY MS. LAVAN:

6   Q.     Is there a difference between signing a

7   document and executing a document?

8   A.     Well, a fully executed document, there is a

9   difference, if only one party signs it.

10          THE COURT:  Well, that wasn't the question.

11   Is there a difference between signing and executing it?

12          THE WITNESS:  No.

13          MS. LAVAN:  Thank you, Your Honor.

14   BY MS. LAVAN:

15   Q.     Mr. Heenan did in fact sign that agreement?

16   A.     He didn't sign a partnership agreement.  He

17   signed a non-equity agreement.

18   Q.     You asked him to continue to work with you to

19   become a signed partner even after you claim you

20   found out that Mr. Heenan was stealing money from

21   you?

22   A.     We didn't sign anything.

23   Q.     You asked Mr. Heenan to continue working with

24   partnership discussions.  You were sending drafts

25   back and forth even after you found out, and you

1   claim Mr. Heenan is stealing money from you.

2   A.      That's incorrect.  We sent him a profit sharing

3   agreement.

4   Q.      Okay.  A profit sharing agreement.

5           So, again, you are still talking about being a

6   partner with a guy that steals from you?

7   A.      Yes, we needed him to come clean with us.  We

8   were giving him an opportunity to come clean and to be

9   the guy that he said he was.  Unfortunately, I wrote him

10  an E-mail with about 12 items that he needed to take

11  care of, and he didn't take care of them so we

12  terminated any business relationship with him.

13  Q.      So you were misleading him to get what you

14  wanted out of the arrangement, which included money,

15  right, Mr. Aloia?

16  A.      No, we weren't misleading him.  We were clear

17  and concise with 12 points that we wanted him to take

18  care of.

19  Q.      But that was after.  Those 12 points were

20  after, and before you had been going back and forth

21  and continuing partnership discussions with him?

22  A.      No, that was after we found out that he had

23  created a dba of our business and was collecting checks

24  from clients that we believed were our clients on

25  projects that we worked on, and we found out that he

1    high-jacked our website, created another domain name

2    virtually the same as ours, changed bidding documents

3    and put his personal information on it, used our mark

4    throughout the commerce, and what else did we find?

5    Q.      I don't know, Mr. Aloia, wasn't that your

6    claim after you hired legal counsel?

7    A.      No.  After our August 26th meeting, we started

8    to find stuff out.  It wasn't until after we hired

9    counsel that we had a better understanding of what was

10   going on.

11   Q.      But after your August 26th meeting, you were

12   still talking about partnership arrangements with Mr.

13   Heenan --

14   A.      Profit sharing.

15   Q.      Profit sharing, right?  You were still

16   talking to Mr. Heenan about profit sharing --

17   A.      We were.

18   Q.      -- correct?

19   A.      Yes.

20   Q.      And this was after you said you found out

21   that he was stealing money from your clients, your

22   clients, and that he was cloning your website,

23   correct?

24   A.      Correct.

25   Q.      And that was even after you found out that he

1    was using the logo, correct?

2    A.      Well, the logo we didn't find out until we got

3    into his E-mails.

4    Q.      So one thing missing.  You found out he was

5    stealing from you, but you still continued to talk

6    about partnership with him.

7    A.      Profit sharing.  Our original agreement.  Our

8    original agreement.

9    Q.      So you explain, please, if it was so

10   important to you and you so believed that Mr. Heenan

11   was stealing money from you, why did you want him as

12   a partner or as a profit sharing member, anything at

13   all, at that point?

14   A.      Well, at that point we had relied on him for

15   almost a year for our business moving forward.  We put a

16   lot of trust in him to get us business moving forward.

17   When we parted ways with him, we lost a backlog of work,

18   which put a void in our projects.  So we did want it to

19   work.  We wanted it to work.  We had employees that

20   relied on us.  We wanted to continue working.

21   Q.      You relied on him those last eight months to

22   do your job, to go out and get projects and get new

23   clients, didn't you, Mr. Aloia?

24   A.      It wasn't my job, but we relied on him for

25   bringing in business, business development.

1  Q.      Let me guess, Mr. Heenan, with his extensive

2  background agreed to do this for you for $750 a week

3  consulting agreement while, though -- that's a lot of

4  money, correct me if I'm wrong, correct?  $750 a

5  week, that's a good amount of money, right?

6                  MR. WATSON:  Objection.

7                  THE COURT:  Objection sustained.

8  BY MS. LAVAN:

9  Q.      But he was also working at Brewerytown, doing

10  the estimates, on site.  He was doing all that work

11  and getting paid $750 a week to do that work,

12  correct?

13  A.      He wasn't doing anything at Brewerytown.

14  Actually, he didn't complete one task at Brewerytown.

15  He started with the BMI system, which he never did.  We

16  actually had interns finish that work.  He was to do a

17  schedule that he never completed.

18          John and I both drafted schedules to get to the

19  client, because we couldn't find mark.  He was, I guess,

20  off the grid at that point.  So his work at Brewerytown

21  was very limited.  It may have been only limited to

22  maybe two weeks, but since John was there daily he could

23  probably speak more about that.

24  Q.      Before I go through all these documents, do

25  you agree that you had sent Mr. Heenan the logo to

1    use for Decus business?

2    A.      I did, yes.

3                MS. LAVAN:  I want to bring up Exhibit 74,

4    please.

5    BY MS. LAVAN:

6    Q.      This is an E-mail from you, Thomas -- do you

7    have the Exhibit in front of you, 74?

8    A.      Yes.

9    Q.      Wednesday, August 3rd, and it's to

10   Mark Heenan and John Sciotto, correct?

11   A.      Correct.

12   Q.      It says, "Mark, wanted to follow-up on some

13   general housekeeping."  And it's in black text.

14          Are those your comments or your language in the

15   E-mail, the black text?

16   A.      Yes.

17   Q.      It says, "John and I have reviewed your

18   changes.  The majority of the minor changes are

19   acceptable.  We should sit down and discuss a final

20   draft and execute to close the matter.  Below is a

21   quick calculation of shares and equity.

22   Alternatively, I sent you an agreement that we could

23   use in the interim if you need more time."

24          Whose writing is in blue?

25   A.      I believe that's Mark's.

1    Q.      He says, "I don't need more time.  The draft

2    shareholders agreement has been in your hands for

3    almost two months without a response.  Please send

4    over any proposed edits and/or comments.  It will

5    also need to be updated."

6            This here is your text in black, correct?

7    A.      Correct.

8    Q.      It lists the total shares, which we know

9    there were 200 total shares, because that's what the

10   legal document states, right?

11   A.      Correct.

12   Q.      It gives the shares, it gives the equity and

13   it gives the split.

14           What is the split for?  Is that profit?

15   A.      No, it's the shares.  So there's 200 total

16   shares.  The split would be 67, 67 and 66 on the shares.

17   Q.      Below it says that total investment here, but

18   it does say anywhere here anything about a 20-percent

19   profit sharing?

20   A.      In those numbers, no.  It says it in the body of

21   the text.  It says, "Alternatively, I would send you an

22   agreement that you can use in the interim, which is the

23   20 percent.  If we can't agree on these terms, then

24   we'll keep going with the 20 percent."

25   Q.      But one of the agreements that you sent in

1   February also was a shareholders agreement where you

2   had the equity of 50 percent for each party, correct?

3   A.      No, that's not correct.  It was 50/50.  We only

4   showed two people or two spots for people.  It didn't

5   show three.  It was a boilerplate document, and I

6   believe that actually was sent in April, if I'm thinking

7   of the one I'm referring to.

8   Q.      Mark sent you a shareholders agreement with

9   50/50 equity on it split.  I'm sorry, equally among

10  the parties; is that correct?

11  A.      Fifty --

12  Q.      It was equal between the parties, 33, 33 and

13  33.  You, John and Mark, correct?

14  A.      I can't agree to anything I don't have in front

15  of me.

16  Q.      We'll find it.

17          MS. LAVAN:  August 26th, Exhibit 84.  Go to

18  62.  We're going to go back to 62.  I apologize.  At the

19  very back of that is an E-mail.

20  BY MS. LAVAN:

21  Q.      This is from Mark Heenan on May 23rd, and it

22  says, "Subject and attachments are shareholders

23  agreement.  MH comments preliminary document.

24  Initial comments.  He attaches --

25          MS. LAVAN:  Go up to the top.

Gregg B. Wolfe, RPR, CM
215-460-1511

```
 1    BY MS. LAVAN:
 2    Q.      He attaches the shareholders agreement,
 3    correct?
 4    A.      Correct.
 5    Q.      In your experience, a shareholders agreement
 6    is different than a profit sharing agreement; is that
 7    correct?
 8    A.      They can be one and the same if they are drafted
 9    properly.
10    Q.      Isn't it true that as a profit-sharing
11    venture, that you are not technically partners,
12    correct?
13    A.      It depends on how it's drafted.
14    Q.      Most of the time, though, you're just sharing
15    in the profits?
16    A.      If it's solely profits and net profits and
17    there's no ownership, yes.
18    Q.      It's also your testimony that you weren't
19    offering any ownership in the shares originally to
20    Mr. Heenan, correct?
21    A.      Originally, back in November, no, we weren't
22    offering him shares.
23    Q.      A shareholders's agreement is something where
24    you actually do give shares to the partners, correct?
25    A.      Correct.
```

122

1    Q.      Part of that is that you typically share in

2    the revenue based upon the shares that you have; is

3    that correct?

4    A.      That's correct.

5    Q.      This is the agreement -- well, that Mark sent

6    to you, correct?

7    A.      On May 23rd, yes.

8    Q.      Eventually, this is the agreement that

9    Mark Heenan executed; is that correct?

10   A.      All red lined like this, I don't know.

11   Q.      It was finalized.  Thank you.

12   A.      The agreement that looks like, I believe, Mark

13   signed has a buy-in, and he was to have a check with

14   that agreement.  I can't say this is a clean copy.

15   Q.      This is not a clean copy, but this is a

16   shareholders agreement.

17   A.      That is a red-line shareholders agreement, yes.

18   Q.      Is it safe to say that Mr. Heenan was under

19   the impression that not only was he a partner, but

20   that he was also a shareholder in Decus, Inc. and was

21   going to be a partner and he was working out the

22   shareholder's agreement.

23          Wasn't he led to believe that based on this

24   document going back and forth between you, him and John

25   Sciotto?

Gregg B. Wolfe, RPR, CM
215-460-1511

1   A.      I think this was a negotiation to become a

2   shareholding partner.

3   Q.      Right, just as though it was a negotiation

4   that you only wanted him to receive 20 percent of the

5   revenue, correct?

6   A.      That was agreed to.  I don't believe that was a

7   negotiation.  That was a negotiation that --

8   Q.      Where did Mr. Heenan agree to that?

9   A.      I think he invoiced us for the 750.

10  Q.      That was for the consulting agreement,

11  correct?

12  A.      Right.

13  Q.      But not the profit sharing agreement, right?

14  A.      Yes.  We weren't receiving the money for

15  20 percent, so I don't think he would invoice us for

16  that.

17  Q.      The 750 was a salary for him consulting.

18          It had nothing to do with profit sharing,

19  right, Mr. Aloia?

20  A.      It was a minimum salary, yes.

21  Q.      Eighty-four.  This is from you, Thomas Aloia,

22  dated Friday, August 26th, 2016 at 1:38, correct --

23  A.      Correct.

24  Q.      -- to John Sciotto and Mark Heenan?

25  A.      Correct.

1  Q.     And if you go down it says, "Mark, it was

2  extremely disappointing to find out that you have

3  been conducting business behind our backs."

4         You do go through all that, correct?

5  A.     Correct.

6  Q.     During this time frame, this was after you

7  found out Mark allegedly had stolen money from you,

8  correct?

9  A.     Correct.

10              MS. LAVAN:  If you go down a little bit

11  more.

12  BY MS. LAVAN:

13  Q.     You say in Number 9, "Limited partnership

14  agreement with Mark" --

15              MS. LAVAN:  I'm sorry, go a little bit

16  above that in 8 -- 9.

17  BY MS. LAVAN:

18  Q.     -- "limited partnership agreement with

19  Mark Heenan," correct?

20  A.     Correct.

21  Q.     "Full equity shares at execution of pledged

22  contracts and receipt of payments will include the

23  following:  A, base salary, proposed 1,000 a week,"

24  right?  Different than 750, correct?

25  A.     Correct.

1  Q.      "B, percentage of profits, sliding scale

2  based upon agreed pro forma with a full 33-percent

3  share at equity partner status."

4        An equity partner status to you and to the

5  legal term of that is equity is somebody who actually

6  has equity in the ownership of the business; is that

7  correct?

8  A.      Correct.

9  Q.      And that's a shareholder, correct?

10 A.      Correct.

11 Q.      So here, on August 26th, you were still

12 proposing that Mark be an equal shareholder at

13 33 percent, correct?

14 A.      Not at that time.  If you read the E-mail in its

15 entirety, it's a limited partnership agreement.  And if

16 you start, "However" -- in the top of it, "However, in

17 an attempt to avoid litigation and criminal prosecution,

18 John and I are amenable to the following proposal, which

19 was discussed at our earlier meeting," and it lists ten

20 items.

21       Number 9 is a limited partnership with

22 Mark Heenan.  "Full equity shares at execution of

23 pledged contracts and receipt of payments."

24       He wasn't getting anything until we got our

25 money back, and he wasn't getting anything until we had

1    the contracts.  It was stipulated with four different

2    items that he needed just for that limited partnership

3    on top of the other nine items that needed to have

4    happen.  One of them was a non-compete, and the first

5    line item was full transparencies.

6    Q.     Mr. Aloia, do you understand why these terms

7    have changed?  I mean, I can keep going through

8    E-mails, but you have changed the terms time and time

9    again.  Even after you found out he was stealing from

10   you, you still offered him 33 percent with equity.

11   A.     I changed the terms.

12   Q.     You're a smart guy, Mr. Aloia, aren't you?

13          THE COURT:  Is there a question?

14   BY MS. LAVAN:

15   Q.     You know what I'm referring to.

16          MR. WATSON:  Objection.

17          THE COURT:  No, no, we need a question.

18   Plenty of time to make an argument to the jury.  Do you

19   have a question?

20   BY MS. LAVAN:

21   Q.     Just because I can't get you to agree that

22   you keep changing these terms and we have to keep

23   going, we have to keep going.

24          MS. LAVAN:  So keep going down.  At the top

25   actually, go to the top.

Gregg B. Wolfe, RPR, CM
215-460-1511

1    BY MS. LAVAN:

2    Q.      This is August 26th, right?

3    A.      Yes.

4    Q.      This was the Café incident; is that right?

5    A.      Correct.

6    Q.      You claim you didn't threaten Mr. Heenan,

7    right?

8    A.      I didn't.

9    Q.      Well, that's funny because on August 26th,

10   this says, "Mark, it was extremely disappointing to

11   find out that you have been conducting business

12   behind our backs under our legal trade name.

13   However, in an attempt to avoid litigation and

14   criminal prosecution, criminal prosecution John and I

15   are amenable to the following proposal."

16           In other words, Mr. Aloia, you threatened him,

17   tried to coerce him that if he didn't pay you, you were

18   going to file litigation and criminal prosecution

19   against him to the extent that you even went so far

20   after you threatened him, you're going to give him

21   33 percent of the business.

22   A.      We weren't giving him 33 percent on that.  If he

23   met all of our terms, we would give him 33 percent.

24   Q.      If he met all those terms after you

25   threatened to file criminal prosecution against him.

1   A.      No, it was to avoid what he had just admitted to

2   us.

3   Q.      It's your testimony you didn't threaten him,

4   right, Mr. Aloia, at the Café that day?

5   A.      I wouldn't take that as a threat under the

6   circumstances.  Under the circumstances, Mr. Heenan had

7   identified that he was a criminal.  The only option we

8   had was litigation.  We wanted to avoid that.  If he was

9   coming clean and he admitted this finally, it was a step

10  towards the right direction.  Maybe we can get back on

11  track if he can meet ten items.

12  Q.      If he would pay you money, that was what you

13  wanted from him?

14  A.      Stolen money, correct.

15  Q.      Part of that conversation, on August 26th,

16  where you threatened to file criminal prosecution

17  against him, you also threatened to file and display

18  a website with Mr. Heenan's picture on it, correct?

19  A.      I did not.

20  Q.      But at that point you were well aware of what

21  was going on between him and Mr. Hessert; is that

22  correct?

23  A.      No.

24          MS. LAVAN:  Your Honor, may I just have a

25  moment, please?

```
 1              THE COURT:  Certainly.

 2  BY MS. LAVAN:

 3  Q.      Continuing on with Exhibit 84, which is this

 4  one, not only did you demand and threaten him with

 5  criminal prosecution, you asked for a whole bunch of

 6  other things and then -- correct?

 7  A.      Yes, I asked ten items.

 8  Q.      Ten items.  "The first one is full

 9  transparencies of the business dealings while working

10  with John and I for the past ten months.  We

11  understand you may have other business relationships

12  and other sources of income.  However, we want to see

13  the paper trail of those projects."

14  A.      "The projects."

15  Q.      "The projects and contracts that we have been

16  discussing as a team for the past six to ten months,"

17  correct?

18  A.      Correct.

19  Q.      You say "Two, immediately cease any and all

20  business transactions under Heenan Holdings LLC doing

21  business as Decus Construction."

22  A.      Correct.

23  Q.      You were aware that Mr. Heenan was still

24  operating under Decus Holdings LLC at that time,

25  correct?
```

1   A.      Yes.

2   Q.      And you were still operating your own

3   business by the name of Abcon, correct?

4   A.      That's in correct.  The business that I operated

5   is known as Arris.

6   Q.      You did have an ownership in Abcon, correct?

7   A.      Many, many years ago.

8   Q.      But you sold it to your wife?

9   A.      I sold it to my partner, a gentleman by the name

10  of Steven Burke, and I went to go and work for another

11  construction company in North Jersey, and then my wife

12  bought it back when he wanted to go and do Steven Burke

13  Contracting.

14  Q.      You didn't buy it back, though, did you?

15  A.      I did not.

16  Q.      Because you couldn't, correct?

17  A.      I could have.

18  Q.      You couldn't because it was a bankruptcy

19  issue.

20          You couldn't buy that entity back; is that

21  correct, Mr. Aloia?

22  A.      That's incorrect.  The day after the filing of a

23  bankruptcy I could have done anything I wanted to.

24  Q.      But you had your wife buy it?

25  A.      I believe in 2015 she did.

1   Q.      You say, "Proof of dissolution of Heenan

2   Holdings, dba Decus Construction."

3           Mr. Heenan did do that, correct?

4   A.      He did do it, yes.

5   Q.      So as soon as you took issue with the fact

6   that he was using Heenan Holdings and the LLC and the

7   dba Decus Construction, he ceased doing it, correct?

8   A.      I don't know to what extent.  He still had

9   probably bank accounts.  We never saw any documents,

10  with the exception of an E-mail he sent us that he

11  stated that he dissolved it and had a confirmation from

12  the State of New Jersey.  But we never got the

13  documentation from him.

14  Q.      The documentation also included checks that

15  he received, which were on the screen previously,

16  correct, that your attorney had showed to you?

17  A.      No.  Those were checks that he whited out.

18  Q.      But he did tell you that he was going to

19  redact those signatures in that E-mail to you,

20  correct?

21  A.      Actually, if you look at those checks, those six

22  or seven checks, those were well into October, November

23  and I believe the last one was in December.  So he was

24  still operating somehow under Decus Construction.  They

25  didn't change to Heenan Holdings.  I believe they stayed

132

1    under Decus Construction.

2    Q.      That's your understanding, correct?  But the

3    contract said Heenan Holdings.

4    A.      Heenan Holdings dba Decus Construction.

5    Q.      Some of them just said Heenan Holdings,

6    correct?

7    A.      Some of what?

8    Q.      Some of those contacts.

9    A.      No, both of them he put as Heenan Holdings dba

10   Decus Construction.

11   Q.      You were well aware that he was operating

12   Heenan Holdings?

13   A.      At this point, we were well aware he was

14   operating Heenan Holdings dba Decus Construction, which

15   is part of Heenan Holdings.  So, yes.

16   Q.      You were demanding even more.  You were

17   demanding a copy of all bank statements and deposits

18   into your accounts and you kept on making demands

19   amongst him, correct?

20   A.      There was a list of ten items.  If he wanted to

21   move forward with us, those were what we wanted him to

22   do.

23   Q.      It was after that all these demands where you

24   had all this knowledge allegedly, that you still

25   continued to discuss partnership with him?

1    A.       From this E-mail, yes.

2              MS. LAVAN:  That's all I have, Your Honor.

3              THE COURT:  All right, ladies and

4    gentlemen, before we -- well, let me ask Mr. Watson,

5    just to be clear.

6         I suspect you're going to have redirect of this

7    witness?

8              MR. WATSON:  Maybe 45 minutes.

9              THE COURT:  Okay.  Let's do that, ladies

10   and gentlemen.  Let's enjoy our lunch so he can prepare

11   and streamline his questioning.  We'll take a break now

12   until 1:00 p.m.  We'll start then.  The witness will

13   remain on the stand, and then we'll have him on

14   redirect.

15             Thank you very much.

16             (The jury exited the courtroom at 12:15 p.m.,

17   at which time a luncheon recess was held.)

18

19

20

21

22

23

24

25

```
1                          I N D E X

2

3    WITNESS NAME          DIRECT  CROSS  REDIRECT RECROSS

4    THOMAS ALOIA

5      By  Mr. Watson        7
       By  Ms. LaVan                 42
6

7

8

9                  C E R T I F I C A T I O N

10

11        I certify that the foregoing is a correct

12   transcript from the record of the proceedings in the

13   above-entitled matter.

14

15

16   _____                _____

17     Date                    Gregg B. Wolfe, R.P.R., C.M.

18

19

20

21

22

23

24

25
```

**BY MR. WATSON:**
**[16]** 7/21 7/25 10/1 11/8 14/16 18/20 19/1 20/24 32/21 33/19 34/1 35/7 39/9 40/10 41/16 99/9
**BY MS. LAVAN:**
**[44]** 42/12 44/17 48/4 53/6 54/3 56/20 57/6 57/14 58/11 58/19 61/5 61/11 62/1 67/13 73/3 80/9 87/5 88/1 89/6 90/1 92/16 92/22 93/24 94/16 94/24 95/19 98/19 100/14 102/19 104/25 109/14 110/22 113/4 113/13 117/7 118/4 120/19 120/25 124/11 124/16 126/13 126/19 126/25 129/1
**MR. WATSON: [41]**
3/5 3/7 7/1 7/18 9/23 11/3 14/15 18/18 18/23 20/22 33/1 38/13 38/22 39/6 40/7 42/5 44/15 48/2 53/1 53/18 55/25 56/22 57/8 58/9 58/16 60/23 61/2 67/11 71/9 72/1 86/23 87/1 93/12 93/16 95/13 109/10 112/24 113/1 117/5 126/15 133/7
**MS. LAVAN: [49]**
4/13 4/22 5/5 5/7 5/14 5/20 5/23 5/25 18/22 32/14 33/11 35/4 38/16 38/25 39/17 39/21 39/25 41/10 42/9 53/5 53/22 60/24 71/4 72/6 72/25 80/7 89/5 89/25 92/14 92/20 93/18 94/15 94/22 98/17 99/8 100/6 100/12 102/18 104/23 110/19 113/12 118/2 120/16 120/24 124/9 124/14 126/23 128/23 133/1
**THE COURT: [85]**
2/2 3/6 4/9 4/18 4/23 5/6 5/13 5/16 5/22 5/24 6/1 7/2 7/10 10/25 11/5 14/14 18/16 18/19 32/16 32/24 33/13 33/17

33/25 35/5 38/18 38/24 39/2 39/8 39/20 39/22 40/2 40/9 41/11 41/15 42/7 42/10 48/3 53/3 53/19 53/23 56/1 56/5 56/23 57/10 56/8 58/17 60/25 61/3 61/7 61/10 61/17 67/12 70/6 70/14 71/8 71/10 71/22 72/4 72/10 72/13 72/16 72/22 86/24 87/2 87/19 92/21 93/14 93/17 93/20 94/10 94/13 95/15 100/5 100/11 100/13 104/24 112/25 113/2 113/9 117/6 126/12 126/16 128/25 133/2 133/8
**THE WITNESS: [27]**
7/6 9/24 11/4 11/6 18/24 32/20 32/25 33/2 33/12 33/16 41/14 44/16 56/4 56/6 56/25 58/10 61/8 71/16 71/24 72/12 72/15 72/20 87/24 93/22 94/12 109/11 113/11

**$**
**$1,500 [1]** 96/21
**$100,000 [1]** 96/23
**$11 [1]** 77/1
**$11 million [1]** 77/1
**$128,000 [8]** 66/10 67/17 67/19 68/7 68/20 68/22 68/25 69/4
**$128,137 [1]** 36/11
**$134,000 [1]** 58/5
**$187,000 [8]** 55/17 55/18 55/19 55/21 56/8 57/8 57/16 57/25
**$250,000 [1]** 100/22
**$3 [1]** 40/23
**$3 million [1]** 40/23
**$300,000 [5]** 27/16 27/23 28/9 28/11 28/13
**$4.486 [2]** 31/21 40/13
**$4.486 million [2]** 31/21 40/13
**$401,000 [2]** 31/6 38/9
**$5 [3]** 78/10 78/14 79/2

**$5 million [3]** 78/10 78/14 79/2
**$5.2 [2]** 79/8 79/23
**$5.2 million [2]** 79/8 79/23
**$680,000 [1]** 32/1
**$7,058 [2]** 8/22 23/9
**$750 [3]** 117/2 117/4 117/11
**$8,023 [2]** 23/2 23/11
**$9,000 [1]** 98/14
**$965 [1]** 10/7

**'**
**'16 [3]** 9/16 34/25 35/1

**0**
**08057 [1]** 1/21

**1**
**1,000 [1]** 124/23
**1-31-16 [1]** 9/11
**1.1 million [1]** 75/19
**1.19 million [1]** 31/9
**1.5 million [1]** 31/13
**10,000 [1]** 3/24
**100 percent [2]** 36/23 107/12
**106 [6]** 18/15 18/16 18/17 18/18 18/19 18/24
**10:30 [2]** 70/14 71/2
**10:50 a.m [2]** 71/4 72/22
**10th [2]** 99/12 99/18
**11-22-2005 [1]** 89/17
**11-27-2005 [1]** 89/20
**11-27-2015 [1]** 89/12
**1145 [1]** 24/21
**1150 [1]** 24/22
**11th [2]** 9/18 98/24
**12 [3]** 114/10 114/17 114/19
**1234 [1]** 1/24
**128 [1]** 66/11
**12:15 [2]** 70/12 70/12
**12:15 p.m [1]** 133/16
**13 [2]** 80/5 80/7
**130,000-some [1]**

59/13
**1324 [3]** 19/23 20/2 20/4
**1325 [1]** 20/3
**134 [1]** 58/4
**134,570 [1]** 37/17
**15 [2]** 10/15 70/8
**1511 [1]** 1/25
**16 [5]** 9/11 9/14 10/7 10/8 25/9
**16-CV-5849 [1]** 1/7
**187 [1]** 58/2
**187,000 [2]** 37/19 37/20
**18th [2]** 15/13 15/14
**19106 [1]** 1/25
**19422 [1]** 1/17
**19th [2]** 19/1 19/4
**1:00 p.m [1]** 133/12
**1:38 [1]** 123/22
**1st [1]** 105/3

**2**
**2,200 [1]** 16/18
**20 [3]** 30/16 61/22 73/2
**20 percent [18]** 38/13 39/17 40/21 40/22 40/24 40/25 85/2 85/4 86/12 98/9 101/8 101/17 101/22 102/1 119/23 119/24 123/4 123/15
**20-percent [4]** 85/13 98/2 103/11 119/18
**200 [3]** 1/16 119/9 119/15
**2005 [2]** 89/17 89/20
**2011 [1]** 27/15
**2013 [1]** 42/15
**2015 [9]** 42/18 44/24 88/8 89/12 91/3 91/21 93/3 111/21 130/25
**2016 [15]** 9/4 11/18 12/23 15/14 19/1 22/2 22/3 24/20 26/23 27/7 33/24 96/10 98/24 105/12 123/22
**2018 [1]** 1/11
**215 [1]** 1/25
**22 [1]** 11/10
**23rd [2]** 120/21 122/7
**24th [1]** 93/3
**25 [2]** 80/4 80/6
**25 percent [1]** 101/17

**26 [2]** 1/11 80/7
**26th [12]** 19/17 25/2 25/10 38/5 115/7 115/11 120/17 123/22 125/11 127/2 127/9 128/15
**27 [3]** 75/9 92/15 92/21
**271 [1]** 1/20
**27th [4]** 88/8 91/21 93/10 111/21
**29 [2]** 25/12 40/22
**29th [4]** 24/19 27/7 105/12 105/20
**2nd [2]** 11/18 12/23

**3**
**3-30-16 [1]** 10/7
**31st [1]** 9/4
**33 [3]** 120/12 120/12 120/13
**33 percent [5]** 125/13 126/10 127/21 127/22 127/23
**33-percent [1]** 125/2
**38 [1]** 20/21
**3rd [1]** 118/9

**4**
**4-8-16 [1]** 9/14
**4.86 [1]** 40/22
**40 [3]** 20/22 21/2 64/12
**41 [3]** 7/25 8/2 9/22
**45 [1]** 133/8
**450 [1]** 1/16
**460-1511 [1]** 1/25

**5**
**5.2 million [1]** 79/5
**50 [3]** 110/9 120/3 120/9
**50 percent [3]** 110/13 110/14 120/2
**50,000 [1]** 31/19
**50/50 [3]** 110/9 120/3 120/9
**504 [1]** 30/17
**53 [6]** 37/19 38/4 98/18 100/7 100/13 100/14
**56 [2]** 9/21 10/4
**5849 [1]** 1/7
**59 [3]** 100/6 104/22 104/25

**6**
**6 million [1]** 30/12
**6-1-16 [1]** 10/8
**60-day [1]** 16/17

**6**

**601 [1]** 1/24
**62 [2]** 120/18 120/18
**625 [1]** 22/21
**66 [1]** 119/16
**67 [2]** 119/16 119/16
**680,000 [1]** 32/5
**695 [1]** 76/22
**695,000 [2]** 31/17 77/6

**7**

**700,000 [1]** 31/15
**73 [1]** 10/14
**74 [2]** 118/3 118/7
**750 [4]** 85/12 123/9 123/17 124/24
**750 percent [1]** 98/8
**78 [4]** 14/13 14/15 14/15 14/16

**8**

**8-26-16 [1]** 25/9
**8-29 [1]** 25/12
**80 [1]** 24/16
**819 [1]** 11/10
**826 [1]** 12/12
**830 [1]** 13/2
**834 [2]** 13/3 13/4
**84 [2]** 120/17 129/3
**881 [1]** 13/13
**884 [1]** 13/12

**9**

**9:00 a.m [1]** 2/2
**9:05 a.m [1]** 7/10

**A**

**a.m [6]** 2/2 7/10 70/14 71/2 71/4 72/22
**AA [1]** 21/9
**Abcon [2]** 130/3 130/6
**ability [2]** 2/4 81/19
**able [8]** 3/25 16/18 41/7 55/8 76/2 76/13 77/1 92/6
**about [84]** 3/20 4/15 4/19 14/7 16/24 20/18 26/1 26/6 27/8 28/21 29/4 29/11 29/15 30/6 30/7 30/23 31/9 32/8 32/23 37/23 39/12 41/12 44/14 48/11 53/18 54/1 57/23 61/19 61/20 63/24 64/8 66/9 70/4 70/11

70/19 71/7 71/12 71/23 71/24 71/25 72/9 72/11 72/14 72/15 72/19 72/20 75/7 75/8 75/18 79/2 83/24 84/4 84/9 84/14 88/11 89/20 90/20 94/12 95/11 95/12 95/21 96/2 96/19 96/23 96/25 97/1 97/17 97/22 97/24 97/25 98/2 98/5 101/15 102/15 108/16 110/1 112/14 114/5 114/10 115/12 115/16 116/6 117/23 119/18
**above [2]** 124/16 161/13
**above-entitled [1]** 161/13
**Absent [1]** 2/23
**absolutely [2]** 2/19 109/3
**accept [1]** 2/7
**acceptable [1]** 118/19
**acceptance [1]** 2/16
**accepted [1]** 2/17
**access [4]** 17/2 17/6 17/8 17/12
**accordingly [1]** 100/25
**account [2]** 17/5 17/7
**accounts [2]** 131/9 132/18
**accurate [4]** 4/4 11/15 41/18 92/7
**act [3]** 78/23 104/4 104/7
**acting [2]** 43/5 43/6
**action [3]** 1/3 59/2 73/12
**actions [1]** 41/23
**active [1]** 18/1
**actual [4]** 25/22 29/17 83/8 89/1
**actuality [1]** 65/4
**actually [39]** 9/15 10/21 13/7 13/18 16/10 16/23 21/13 26/12 26/14 33/8 38/1 59/16 62/9 66/15 67/20 74/18 75/18 75/19 76/6 76/23 77/13 79/24 80/18 84/18 85/19 89/2 91/10 97/17 100/3 101/3 106/10 111/11 117/14 117/16 120/6 121/24

125/5 126/25 131/21
**add [1]** 6/19
**additional [1]** 62/18
**address [4]** 10/25 13/25 16/12 82/13
**addressed [1]** 4/13
**addresses [1]** 90/18
**addressing [1]** 5/9
**adjacent [1]** 28/23
**admitted [4]** 4/8 37/24 128/1 128/9
**admittedly [2]** 3/16 3/21
**advice [1]** 43/1
**advise [2]** 43/14 43/22
**advised [1]** 44/20
**affairs [1]** 95/22
**affirm [1]** 74/20
**afraid [1]** 107/7
**after [34]** 8/10 9/19 13/19 16/11 19/17 19/18 22/21 24/6 42/3 45/4 47/15 48/11 55/8 88/10 102/12 109/16 111/23 113/19 113/25 114/19 114/20 114/22 115/6 115/7 115/8 115/11 115/20 115/25 124/6 126/9 127/20 127/24 130/22 132/23
**again [27]** 12/23 16/24 23/14 26/17 27/8 32/3 55/21 63/12 69/23 70/5 70/11 75/11 79/22 80/24 81/3 85/23 86/10 94/18 97/23 98/7 102/11 102/12 102/21 111/4 112/6 114/5 126/9
**against [10]** 2/21 2/24 6/11 8/19 36/21 59/25 70/3 127/19 127/25 128/17
**agency [1]** 23/16
**ago [6]** 53/18 60/6 80/13 94/12 106/14 130/7
**agree [21]** 4/14 27/22 78/1 79/10 85/10 85/12 93/10 93/12 94/2 94/7 95/21 97/5 99/17 99/22 101/17 108/15 117/25 119/23 120/14 123/8 126/21
**agreed [6]** 84/24 97/2 104/6 117/2 123/6 125/2

**agreement [66]** 10/18 40/18 51/23 82/21 82/22 83/1 83/9 83/10 84/19 84/19 84/24 85/2 85/3 85/9 85/14 85/15 85/22 90/20 90/23 90/25 91/2 98/10 98/12 102/13 103/14 103/22 104/5 104/6 104/8 104/9 106/14 109/22 109/23 111/19 112/13 112/15 113/15 113/16 113/17 114/3 114/6 116/7 116/8 117/3 118/22 119/2 119/22 120/1 120/8 120/23 121/2 121/5 121/6 121/23 122/5 122/8 122/12 122/17 122/22 123/10 123/13 124/14 124/18 125/15
**agreements [7]** 27/2 27/3 86/3 86/4 97/22 112/18 119/25
**agrees [1]** 104/17
**ahead [6]** 29/20 34/25 61/5 87/24 93/22 95/19
**ahold [3]** 92/9 92/12 92/13
**albeit [1]** 106/24
**Alex [5]** 24/14 27/10 27/10 27/12 27/12
**all [68]** 6/17 7/3 8/25 10/3 12/3 12/9 13/21 14/10 22/11 22/20 23/22 25/5 32/4 33/8 38/11 38/23 41/7 43/18 48/15 49/7 49/16 51/16 55/20 58/8 59/16 59/17 60/3 63/3 68/8 70/17 72/21 74/7 74/20 75/9 77/16 77/17 82/5 84/14 84/24 85/6 85/18 86/14 87/21 87/23 88/6 89/8 97/15 103/4 103/7 103/15 103/19 106/7 109/6 109/6 111/7 116/13 117/10 117/24 122/10 124/4 127/23 127/24 129/19 132/17 132/23 132/24 133/2 133/3

**allegedly [2]** 124/7 132/24
**allowed [1]** 17/8
**allowing [1]** 46/2
**allows [1]** 17/21
**almost [5]** 16/18 32/14 79/17 116/15 119/3
**ALOIA [51]** 7/8 7/23 14/18 20/1 42/14 46/7 51/14 53/9 55/22 58/10 71/6 73/5 80/2 83/25 85/8 85/25 87/16 88/7 89/8 92/2 92/18 92/25 94/6 98/21 98/24 100/4 100/18 102/14 103/16 103/23 104/14 105/4 105/9 106/8 108/4 108/8 108/19 109/3 109/9 112/9 112/20 114/15 115/5 116/23 123/19 123/21 126/6 126/12 127/16 128/4 130/21
**along [2]** 53/9 53/16
**already [5]** 37/13 45/4 78/24 86/16 90/20
**also [31]** 2/8 17/23 24/3 25/16 27/23 33/9 44/7 45/16 46/5 47/4 55/6 59/14 62/6 65/9 69/18 78/20 82/5 82/17 88/24 97/17 98/5 100/2 110/10 110/13 117/9 119/5 120/1 121/18 122/20 128/17 131/14
**Alternatively [2]** 118/22 119/21
**although [1]** 33/7
**always [2]** 6/11 57/5
**am [8]** 6/23 7/2 12/13 49/11 49/14 54/13 94/21 111/15
**amazing [1]** 56/22
**amenable [2]** 125/18 127/15
**amended [2]** 6/15 6/18
**among [2]** 96/17 120/9
**amongst [1]** 132/19
**amount [13]** 8/22 23/13 23/14 25/15 26/20 41/24 55/12 55/15 65/12 66/12 73/13 75/13 117/5

**A**

amounted [1] 67/19
amounts [1] 10/10
amplify [1] 2/25
an [89] 2/12 5/2 6/3
6/15 9/11 12/1 12/3
14/6 14/19 15/8 21/4
21/6 21/9 21/16
22/16 28/5 28/10
28/23 28/25 29/13
33/8 33/21 35/7
35/24 37/10 39/1
39/21 40/4 40/5
41/18 43/21 47/14
50/23 51/23 54/8
56/25 63/17 63/17
67/6 67/15 68/3 68/5
68/16 78/23 80/6
81/21 83/1 83/7 85/1
85/3 85/9 85/14
86/11 86/15 86/16
87/14 89/17 90/20
90/23 90/25 91/7
92/1 92/18 94/18
97/8 99/1 99/2 99/3
101/3 104/22 106/23
106/24 107/18
109/18 111/19
111/24 114/8 114/10
118/6 118/22 119/21
120/19 125/4 125/12
125/17 126/18
127/13 130/6 131/10
and [435]
and/or [1] 119/4
Angie's [1] 17/19
annual [2] 101/20
101/20
annually [1] 101/12
another [13] 10/6
12/14 15/18 18/6
22/23 26/17 27/21
29/18 62/23 98/17
102/2 115/1 130/10
answer [29] 2/12
6/3 24/13 32/9 37/10
48/2 51/1 55/2 55/25
56/1 56/3 56/6 56/25
57/10 57/22 59/7
59/9 59/10 60/23
61/5 63/9 63/12
78/18 83/5 93/14
93/22 95/15 95/17
113/2
answered [5] 57/11
57/13 57/21 59/8
87/4
answering [1]
59/11
answers [1] 95/18
anticipated [25]

31/5 31/7 38/8 40/14
69/19 69/23 69/25
70/1 73/17 73/19
73/20 73/22 73/25
74/24 74/25 75/1
75/4 75/12 75/17
77/6 77/7 77/17
78/19 79/23 96/10
anticipation [1]
75/18
any [41] 10/11
14/12 25/21 36/19
36/20 50/21 51/7
52/6 59/4 59/24
62/24 63/1 63/6 69/8
70/19 70/22 71/17
74/5 74/15 75/11
75/15 75/16 75/20
75/21 75/25 76/5
76/15 76/22 77/12
78/8 79/8 96/2
101/19 104/10
104/11 109/1 114/12
119/4 121/19 129/19
131/9
anyone [3] 7/5
21/15 70/16
anything [25] 16/25
23/23 27/12 33/11
34/7 39/3 39/14
46/16 54/1 68/12
68/14 68/15 79/11
84/13 85/12 97/15
102/15 113/22
116/12 117/13
119/18 120/14
125/24 125/25
130/23
anywhere [1]
119/18
apologize [10] 9/24
11/4 12/22 14/13
14/16 17/16 20/22
100/3 106/10 120/18
apparently [4] 4/3
8/13 25/12 49/6
appealing [1] 15/8
APPEARANCES [1]
1/13
appears [1] 8/7
application [7] 21/4
21/6 21/8 21/22 22/4
22/23 23/15
applications [4]
10/11 24/3 55/14
55/16
appreciate [1] 5/24
approach [1] 38/23
appropriate [2]
83/7 98/7
approximately [1]
42/15

April [4] 22/1
105/12 105/20 120/6
April 29th [2]
105/12 105/20
architect [2] 13/23
66/1
architects [1] 66/1
are [93] 3/4 3/8
3/21 4/12 4/15 4/17
4/20 4/25 6/10 6/10
6/25 7/12 7/14 8/18
12/12 19/6 21/13
24/2 25/1 25/6 30/3
31/24 31/25 31/25
33/10 35/3 35/18
37/7 37/8 37/11
38/11 41/3 52/3
52/16 59/14 61/19
61/22 63/16 64/11
65/6 66/4 67/9 67/22
68/7 69/5 69/9 69/24
70/1 72/18 72/23
73/5 73/16 74/13
75/24 77/17 77/17
78/14 78/15 78/15
78/18 78/20 78/22
78/24 80/11 85/6
85/17 89/8 94/14
94/20 99/1 100/1
100/9 101/20 102/11
103/4 103/15 104/23
105/7 105/16 105/23
105/25 106/3 109/12
110/9 111/14 114/5
118/14 118/18
120/22 121/8 121/11
125/18 127/15
aren't [3] 3/14
102/10 126/12
argue [1] 61/1
argument [2] 56/25
126/18
argumentative [1]
87/1
around [1] 34/8
arrangement [2]
48/11 114/14
arrangements [1]
115/12
Arris [1] 130/5
article [1] 93/7
Articles [1] 91/20
as [80] 2/12 2/22
3/3 4/2 4/2 4/11 6/12
6/19 8/23 9/16 10/10
11/14 12/1 12/18
12/18 13/22 13/22
14/1 14/2 14/7 16/2
17/2 18/17 20/7
23/23 32/25 32/25
33/6 35/7 38/12
38/21 39/19 42/3

43/6 43/24 52/17
53/12 53/12 57/20
62/17 64/18 65/14
65/14 66/13 66/14
74/17 76/4 76/10
77/12 78/19 80/1
85/21 86/6 86/21
88/14 89/4 91/14
95/10 96/18 100/2
102/5 104/15 104/16
105/7 106/19 106/23
109/2 110/5 115/2
116/11 116/12
121/10 123/3 128/5
129/16 129/21 130/5
131/5 131/5 132/9
aside [1] 39/16
ask [11] 3/2 45/10
45/13 48/14 54/3
62/10 83/6 85/18
86/10 94/6 133/4
asked [23] 14/7
14/11 39/2 43/1
43/24 50/19 51/25
52/2 57/12 57/20
59/7 59/9 63/3 71/11
71/19 71/25 88/3
90/12 90/13 113/18
113/23 129/5 129/7
asking [6] 17/11
22/25 44/14 54/13
57/24 83/7
assume [6] 4/20
17/5 26/24 26/25
69/7 111/18
assume it [1] 26/25
assuming [2] 6/18
31/4
at [96] 2/2 2/3 4/6
5/3 7/9 9/5 13/2
13/21 16/20 18/24
19/13 20/19 20/24
22/4 23/1 25/21
27/11 28/9 28/11
30/9 30/10 30/13
34/18 34/22 44/10
45/5 45/6 45/14 46/2
46/24 48/10 48/13
48/18 49/2 49/12
49/14 49/17 50/14
52/3 52/13 52/24
53/10 59/1 59/4 60/8
60/16 61/10 61/13
62/18 67/7 69/13
70/12 70/14 71/2
71/3 71/20 72/22
83/16 84/10 85/7
91/18 97/15 99/3
101/22 102/1 102/2
103/7 103/9 105/5
105/17 105/17
112/15 116/12

116/13 116/14 117/9
117/13 117/14
117/20 117/20
120/18 123/22
124/21 125/3 125/12
125/14 125/19
125/22 126/24 128/4
128/20 129/24
131/21 132/13
133/16 133/17
attach [1] 82/14
attached [7] 19/16
25/24 30/22 46/8
46/10 91/15 99/19
attaches [2] 120/24
121/2
attachments [1]
120/22
attempt [2] 125/17
127/13
attended [1] 64/17
attorney [17] 43/21
52/2 52/7 62/15 63/2
63/16 63/23 67/6
69/24 71/6 71/12
71/18 72/9 74/10
78/9 83/6 131/16
attorneys [1] 66/18
August [25] 11/18
12/3 12/23 15/13
15/14 19/1 19/3 19/6
19/9 19/17 24/19
25/2 25/10 27/7 38/5
102/13 115/7 115/11
118/9 120/17 123/22
125/11 127/2 127/9
127/9 128/15
August 18th [1]
15/14
August 19th [1]
19/1
August 26th [10]
19/17 25/2 38/5
115/11 120/17
123/22 125/11 127/2
127/9 128/15
August 29th [2]
24/19 27/7
August 2nd [2]
11/18 12/23
August 3rd [1]
118/9
authority [12]
80/22 80/23 81/15
81/17 81/21 81/23
82/1 82/24 82/25
83/16 92/3 94/10
authorize [1] 82/19
authorized [12] 9/7
9/8 14/3 15/2 16/21
18/9 20/16 22/7
22/10 35/11 81/10

**A**

**authorized... [1]**
110/25
**Avery [1]** 9/3
**avoid [1]** 125/17
127/13 128/1 128/8
**avoided [1]** 70/2
**award [2]** 79/7
79/22
**aware [31]** 32/7
59/14 60/11 62/3
62/6 62/17 63/6
63/16 63/18 63/20
64/11 65/6 66/17
67/22 67/24 68/7
69/5 69/9 69/18
69/21 71/5 71/7
73/16 74/2 74/4
75/24 88/24 128/20
129/23 132/11
132/13
**away [7]** 25/17
27/17 27/25 28/3
31/25 32/4 35/22
**Awhile [1]** 80/13

**B**

**baby [1]** 28/1
**back [34]** 7/12 9/21
13/8 14/13 16/23
38/21 38/22 40/8
69/6 70/10 70/12
71/22 83/12 84/6
84/20 85/1 85/5
95/18 96/24 97/14
97/22 102/12 107/16
113/25 114/20
120/18 120/19
121/21 122/24
125/25 128/10
130/12 130/14
130/20
**background [1]**
117/2
**backing [1]** 16/2
**backlog [2]** 96/9
116/17
**backs [2]** 124/3
127/12
**bad [1]** 41/8
**bakery [1]** 54/9
**balance [3]** 36/13
36/15 37/18
**Ball [1]** 106/16
**bank [4]** 83/3 83/4
131/9 132/17
**bankruptcy [5]** 34/5
43/13 43/17 130/18
130/23
**banks [1]** 34/20
**base [2]** 37/18
124/23

**baseball [1]** 61/20
**based [6]** 61/17
97/10 101/11 122/2
122/23 125/2
**basic [1]** 17/22
**basically [2]** 33/7
41/8
**basis [2]** 66/17
67/11
**Bates [7]** 13/13 60/9
60/17 61/7 61/18
61/20 61/24
**Bates-labeled [1]**
61/7
**be [62]** 2/6 4/8 4/12
6/3 8/7 11/1 15/24
16/21 21/14 21/15
22/25 25/4 28/8
30/10 30/11 30/25
32/12 38/20 40/20
40/25 53/10 54/13
66/11 67/1 70/10
72/20 72/20 73/22
76/21 77/9 77/19
77/23 78/3 80/4
81/10 81/12 83/20
84/25 85/11 86/15
87/1 90/13 92/1 92/7
96/23 97/18 100/17
100/24 101/2 101/10
101/18 101/19 103/9
109/21 109/23 114/8
119/5 119/16 121/8
122/21 125/12 133/5
**beautiful [1]** 57/22
**became [1]** 101/16
**because [52]** 2/6
2/9 2/22 4/5 9/16
12/6 13/20 14/6
27/21 28/14 28/23
43/9 43/17 47/22
48/17 48/18 49/1
52/7 55/7 55/19
59/12 59/14 59/21
60/1 60/3 62/19
63/18 64/25 68/8
69/10 72/8 76/2
76/12 77/24 79/19
83/25 88/5 89/17
97/4 102/15 104/19
107/6 107/7 107/8
111/11 112/14
117/19 119/9 126/21
127/9 130/16 130/18
**become [3]** 32/7
113/19 123/1
**becomes [1]** 101/21
**been [32]** 6/16
16/13 23/25 25/16
27/11 28/15 35/4
36/23 37/14 38/1
43/25 45/2 58/24

59/18 59/19 60/3
64/11 67/24 69/21
71/5 71/13 74/20
88/5 89/21 95/6
106/19 114/20
117/21 119/2 124/3
127/11 129/15
**before [22]** 1/11 8/4
12/25 13/6 13/17
16/21 21/19 37/14
43/15 43/22 44/19
45/24 48/9 48/19
67/1 72/10 85/21
91/5 93/6 114/20
117/24 133/4
**before we [1]** 133/4
**began [1]** 2/1
**begin [1]** 2/18
**beginning [6]** 48/10
48/13 49/8 52/14
52/25 102/16
**behalf [2]** 22/5
35/21
**behind [3]** 101/13
124/3 127/12
**being [13]** 7/13
34/22 37/8 37/12
38/21 51/14 74/9
88/11 92/6 98/5
106/25 112/15 114/5
**believe [46]** 5/11
10/20 13/1 19/11
22/1 25/13 27/9
28/18 33/24 41/18
45/3 45/18 52/5
53/10 59/1 63/15
65/4 66/19 68/10
69/22 72/7 73/8 74/8
74/13 74/16 76/24
77/9 84/1 86/2 88/13
91/3 95/5 99/25
103/10 104/20
108/17 109/4 112/9
118/25 120/6 122/12
122/23 123/6 130/25
131/23 131/25
**believed [5]** 84/1
104/19 108/11
114/24 116/10
**Bell [1]** 1/17
**below [8]** 6/21
99/14 99/17 100/21
105/7 105/16 118/20
119/17
**benefit [2]** 108/7
109/5
**best [2]** 15/24 22/12
**better [2]** 26/13
115/9
**between [18]** 12/14
29/15 29/20 50/11
51/23 73/7 80/12

90/20 90/25 96/24
101/9 112/24 113/4
113/6 113/11 120/12
122/24 128/21
**beyond [3]** 10/8
16/17 85/12
**bi [1]** 101/20
**bi-annual [1]**
101/20
**bid [2]** 13/15 96/11
**bidding [1]** 115/2
**biggest [2]** 27/19
52/15
**bill [5]** 47/11 47/19
68/12 69/3 70/2
**Bill Hessert [1]**
47/19
**billed [4]** 68/15
68/20 68/22 68/23
**bills [1]** 35/20
**binder [4]** 91/14
91/15 92/19 100/5
**bio [1]** 17/20
**bit [7]** 90/10 94/23
99/9 102/19 110/20
124/10 124/15
**bits [1]** 26/7
**black [5]** 105/25
106/1 118/13 118/15
119/6
**blank [1]** 27/4
**blow [1]** 80/8
**blue [4]** 1/17 9/3
106/3 118/24
**BMI [1]** 117/15
**body [3]** 87/2 99/23
119/20
**boilerplate [1]**
120/5
**bold [3]** 100/10
101/2 102/21
**bonus [2]** 101/11
101/19
**bonuses [2]** 101/13
102/8
**Booked [1]** 96/9
**both [10]** 4/11 6/7
53/14 81/14 81/15
81/17 99/1 110/10
117/18 132/9
**bottom [8]** 17/24
60/8 60/17 61/21
80/8 83/17 91/18
93/8
**bought [1]** 130/12
**box [2]** 65/17 91/24
**breach [1]** 59/1
**break [4]** 3/9 20/24
70/8 133/11
**Brewerytown [7]**
45/5 51/4 107/8
117/9 117/13 117/14

117/20
**Brian [1]** 66/2
**briefly [1]** 3/3
**bring [5]** 2/4 26/17
63/3 73/2 118/3
**bringing [1]** 116/25
**broke [2]** 25/11
77/22
**broken [1]** 3/4
**brought [3]** 2/6
2/12 79/19
**budget [1]** 99/20
**build [2]** 33/11 34/7
**building [7]** 13/23
17/24 54/20 56/18
68/5 68/14 82/4
**BuildZoom [4]**
17/18 18/10 18/12
19/1
**BuildZoom.com [1]**
17/17
**bunch [2]** 102/7
129/5
**Burke [2]** 130/10
130/12
**business [38]** 18/4
18/5 18/12 34/17
41/4 41/25 42/1 42/4
42/23 44/8 80/15
80/18 81/4 81/11
81/12 81/17 82/11
84/11 87/11 88/12
89/23 114/12 114/23
116/15 116/16
116/25 116/25 118/1
124/3 125/6 127/11
127/21 129/9 129/11
129/20 129/21 130/3
130/4
**but [132]** 2/19 3/5
3/20 3/24 4/3 4/18
4/24 7/17 8/10 11/23
12/8 12/10 13/8
13/21 14/9 17/4
17/11 23/14 23/24
24/14 26/24 27/4
27/10 27/15 28/25
31/25 38/19 39/22
40/5 40/7 42/21 43/7
43/16 43/22 44/14
44/21 45/3 45/22
46/1 46/6 46/10 49/4
51/16 53/13 57/8
57/13 59/19 62/22
63/1 65/20 65/22
66/13 67/4 67/23
68/12 69/7 70/1
70/18 72/19 74/8
74/22 75/11 76/4
76/17 77/5 77/20
78/6 81/9 81/23
82/17 82/20 83/12

{CASENUM}   {WITNESSNAME}   {DATE}

**B**

**but... [60]** 83/15 84/10 85/9 85/23 86/1 86/9 86/15 87/7 87/22 88/24 91/7 91/12 91/15 95/17 96/1 97/1 97/3 97/18 97/19 98/7 98/14 99/3 100/9 101/24 102/5 102/10 102/14 102/17 103/13 103/22 104/2 104/7 106/1 106/17 106/22 107/20 109/16 110/4 110/7 110/12 111/1 111/24 114/19 115/11 116/5 116/24 117/9 117/22 119/17 119/25 122/15 122/19 123/13 126/8 128/20 130/8 130/24 131/12 131/18 132/2
**buy [12]** 84/9 84/24 97/22 97/25 98/7 102/3 102/16 103/2 122/13 130/14 130/20 130/24
**buy-in [5]** 84/24 98/7 102/16 103/2 122/13
**buy-ins [3]** 84/9 97/22 97/25
**buying [1]** 103/6
**by [28]** 1/15 4/17 5/1 8/23 16/21 21/16 24/3 31/7 33/3 37/8 40/17 47/10 59/16 61/24 63/10 68/8 71/13 80/23 86/2 89/10 96/6 107/17 108/14 110/4 130/3 130/9 161/5 161/5

**C**

**C.M [1]** 161/16
**Café [4]** 19/17 25/10 127/4 128/4
**calculation [1]** 118/21
**calendar [1]** 34/23
**call [7]** 6/5 48/7 51/1 51/2 72/3 72/4 79/16
**called [4]** 6/6 44/11 60/9 87/11
**calling [1]** 71/25
**calls [3]** 64/18 79/13 109/13
**Camden [9]** 24/18 26/3 26/15 31/4 31/4 38/8 74/8 74/18 75/9
**came [3]** 60/19 62/7

**can [43]** 6/21 8/2 8/2 17/5 17/6 18/16 21/2 22/16 22/17 23/4 24/17 24/25 30/18 32/24 35/7 38/10 39/4 55/2 56/3 61/21 66/5 70/5 70/6 73/3 75/12 80/8 80/14 88/21 88/24 92/18 92/20 95/17 98/18 103/1 105/16 111/7 111/19 119/22 121/8 126/7 128/10 128/11 133/10
**can't [18]** 5/20 38/21 40/1 41/14 43/14 47/9 58/18 59/10 59/20 63/9 63/12 63/22 74/20 79/15 119/23 120/14 122/14 126/21
**cannot [3]** 2/24 53/20 70/18
**capacity [1]** 44/15
**cards [1]** 82/11
**care [4]** 112/13 114/11 114/11 114/18
**careful [1]** 11/2
**case [4]** 7/6 7/12 28/8 109/9
**cash [1]** 101/13
**catches [1]** 6/6
**categories [2]** 3/4 3/10
**caught [1]** 6/7
**cause [2]** 4/9 28/5
**CC [1]** 105/15
**CC'd [1]** 33/9
**cease [1]** 129/19
**ceased [1]** 131/7
**center [4]** 8/22 21/5 28/24 29/1
**certain [1]** 27/12
**certainly [4]** 6/22 6/23 7/17 129/1
**certify [2]** 66/22 161/11
**certifying [1]** 22/12
**cetera [1]** 96/8
**chance [4]** 3/1 3/9 22/18 36/4
**change [4]** 56/19 85/18 85/23 131/25
**changed [8]** 32/1 84/25 101/24 102/11 115/2 126/7 126/8 126/11
**changes [5]** 102/9 102/10 103/18 118/18 118/18

**changing [5]** 85/10 86/10 102/4 102/5 126/22
**characterization [2]** 63/13 63/22
**characterize [4]** 53/21 58/18 70/18 70/25
**characterizing [2]** 7/16 102/5
**check [5]** 5/23 6/22 32/5 84/23 122/13
**checked [2]** 5/25 6/24
**checklists [1]** 21/14
**checks [5]** 114/23 131/14 131/17 131/21 131/22
**cherry [1]** 51/17
**cherry-picked [1]** 51/17
**Chief [1]** 65/21
**Chris [1]** 64/17
**circumstances [2]** 128/6 128/6
**Citizens [1]** 83/4
**CIVIL [1]** 1/2
**claim [11]** 2/12 2/20 45/22 49/5 52/1 55/10 59/17 113/19 114/1 115/6 127/6
**claimed [6]** 27/15 33/10 47/10 57/16 62/8 67/18
**claiming [6]** 52/16 52/18 69/19 73/12 79/7 109/21
**claims [3]** 6/10 52/21 78/10
**clarify [1]** 83/6
**classifying [1]** 104/15
**clause [1]** 27/24
**clean [12]** 107/21 108/11 108/16 108/22 108/24 112/3 112/8 114/7 114/8 122/14 122/15 128/9
**clear [4]** 6/3 54/13 114/16 133/5
**clearly [3]** 102/5 108/13 110/9
**Clerk's [2]** 6/8 6/21
**client [11]** 3/15 4/9 4/17 5/1 5/22 56/7 60/14 66/4 70/1 107/14 117/19
**clients [11]** 3/22 3/22 18/7 33/6 33/9 41/9 114/24 114/24 115/21 115/22 116/23

**clone [3]** 15/17 15/22 16/1
**cloning [1]** 115/22
**close [1]** 118/20
**cloud [1]** 35/22
**CM [1]** 1/24
**CML [19]** 10/17 12/15 29/3 29/4 29/18 30/5 30/8 37/16 54/5 62/3 62/11 62/18 63/8 63/19 63/19 75/8 76/19 76/22 78/21
**CML3 [1]** 77/9
**CNL [1]** 31/17
**coattails [2]** 33/7 34/8
**coded [3]** 100/4 100/8 105/21
**coerce [1]** 127/17
**coffee [2]** 20/24 105/17
**collect [3]** 55/13 60/22 109/7
**collected [3]** 55/10 101/10 101/18
**collecting [1]** 114/23
**collective [1]** 104/16
**collude [2]** 47/18 47/21
**colluded [1]** 48/12
**colluding [1]** 47/16
**color [4]** 15/6 100/4 100/8 105/21
**color-coded [1]** 100/4
**colors [1]** 15/7
**column [1]** 38/11
**combing [1]** 19/15
**come [8]** 21/12 69/6 70/12 71/24 82/14 95/17 114/7 114/8
**comes [2]** 50/9 67/10
**coming [6]** 25/20 35/18 102/10 102/11 107/16 128/9
**comment [2]** 63/23 71/20
**comments [14]** 99/14 99/23 100/9 102/21 105/7 105/16 105/23 106/1 106/3 106/14 118/14 119/4 120/23 120/24
**commerce [1]** 115/4
**commercial [1]** 17/19
**commission [1]** 40/20

**Common [1]** 83/21
**communicate [1]** 15/2
**communicating [1]** 32/8
**communication [1]** 5/3
**communications [4]** 5/1 32/11 32/13 35/9
**companies [2]** 90/11 110/11
**company [49]** 10/22 11/6 11/21 12/6 12/15 16/12 17/20 17/25 18/12 18/12 19/16 22/17 29/19 32/8 33/4 33/5 34/4 34/10 35/15 35/23 36/2 37/2 37/4 37/6 40/12 41/20 41/22 44/2 44/20 45/5 47/14 50/17 58/9 58/23 59/25 65/21 83/23 86/16 86/22 87/11 88/4 91/4 96/7 97/18 101/14 107/1 108/22 112/3 130/11
**company's [1]** 11/5
**compete [1]** 126/4
**complaint [5]** 2/10 6/5 6/6 6/16 59/24
**complete [3]** 22/13 96/7 117/14
**completed [2]** 74/20 117/17
**completely [1]** 16/11
**completion [1]** 62/13
**comprised [1]** 100/17
**concern [1]** 23/20
**concerned [4]** 32/23 84/14 84/17 110/1
**concerning [2]** 2/4 7/5
**concerns [1]** 12/4
**concise [1]** 114/17
**concrete [1]** 56/19
**conditional [1]** 8/19
**conditions [1]** 27/22
**conducting [2]** 124/3 127/11
**conference [4]** 2/3 64/18 79/13 79/16
**confirm [2]** 2/9 3/25
**confirmation [1]** 131/11
**confront [1]** 20/18
**confronted [1]** 24/9

**C**

confusing [1] 83/19
confusion [2] 50/11
58/8
consider [1] 6/23
construction [86]
1/4 7/14 7/17 8/16
9/10 9/12 9/17 10/18
11/8 11/16 17/9
17/20 21/10 23/10
23/17 23/18 23/21
23/23 23/24 24/4
28/4 28/16 29/9 30/2
30/3 35/1 49/24 50/3
50/4 50/6 50/8 50/11
50/14 50/15 50/16
50/19 50/22 51/12
51/24 52/15 53/11
55/24 56/7 57/4
58/25 60/7 64/3
64/12 80/6 80/15
81/13 81/18 81/20
81/24 82/2 82/18
83/21 84/2 85/11
85/20 86/2 86/20
88/7 88/20 89/15
90/21 91/1 99/6
100/16 103/1 103/6
106/12 109/5 110/11
111/16 111/20 112/2
129/21 130/11 131/2
131/7 131/24 132/1
132/4 132/10 132/14
consult [2] 43/12
43/16
consultant [1] 41/4
consulted [1] 42/25
consulting [9]
40/17 45/5 98/11
103/22 104/5 112/14
117/3 123/10 123/17
contact [3] 48/6
48/10 48/14
contacted [5] 13/9
16/14 47/24 55/8
96/1
contacting [1] 35/3
contacts [2] 65/1
132/8
content [5] 15/5
15/9 15/11 15/23
82/6
context [4] 8/6
21/21 21/25 84/16
continue [9] 7/1
61/24 72/25 97/9
104/21 107/19
113/18 113/23
116/20
continued [3] 7/21
116/5 132/25

continuing [2]
114/21 129/3
contract [27] 9/12
10/17 10/21 13/4
13/8 13/10 13/11
13/20 23/24 26/20
27/15 27/18 27/21
28/10 28/10 28/25
29/9 30/14 36/13
36/15 37/19 47/6
55/18 59/2 62/20
103/20 132/3
contracted [5] 9/13
14/22 25/5 35/21
63/19
contracting [5]
3/12 23/16 23/25
57/3 130/13
contractor [8] 8/17
10/10 17/21 21/13
21/13 55/5 62/24
66/14
contractors [1]
21/17
contracts [7] 41/10
84/15 100/22 124/22
125/23 126/1 129/15
convenience [6]
27/24 28/2 28/4 28/6
28/7 32/3
convenient [1]
103/17
conversation [5]
49/7 71/23 72/10
101/15 128/15
conversations [3]
71/15 71/18 103/8
copied [1] 16/21
copy [14] 13/10
13/11 27/18 39/7
78/13 91/9 91/10
91/10 91/13 100/4
106/13 122/14
122/15 132/17
corner [3] 19/24
20/2 60/9
corporation [4]
87/15 89/5 91/15
108/21
correct [282]
correctly [2] 2/5
52/1
corresponded [1]
88/11
correspondence [6]
14/19 16/13 20/20
37/9 84/5 88/13
correspondences
[2] 4/16 81/7
corresponding [1]
101/11
cost [3] 25/15 26/21

84/10
could [27] 2/6 2/17
4/21 15/22 16/15
19/15 21/12 21/14
22/22 25/20 28/15
45/2 53/16 61/9
61/10 65/18 66/19
68/19 77/8 77/8
77/19 78/2 82/14
117/22 118/22
130/17 130/23
couldn't [10] 29/25
33/11 43/18 92/9
92/11 92/13 117/19
130/16 130/18
130/20
counsel [10] 33/18
42/8 53/20 70/17
70/23 70/24 71/13
71/15 115/6 115/9
counsel's [1] 2/16
Counterclaim [1]
2/13
couple [5] 6/18
21/14 47/3 66/4
96/22
coupled [1] 35/3
course [1] 7/13
court [10] 1/1 2/1
2/11 2/22 2/24 6/4
71/3 87/20 87/22
106/16
courtroom [5] 7/9
70/14 71/22 72/22
133/16
coy [1] 53/13
CP [1] 79/12
CP-1 [1] 79/12
CP1 [6] 31/3 73/15
74/2 74/18 75/1
77/24
CP2 [3] 31/7 75/16
75/18
create [7] 5/20 5/20
14/9 15/7 41/7 50/10
103/1
created [12] 9/2
29/19 107/1 111/14
111/14 111/16
111/20 112/2 112/8
112/9 114/23 115/1
creating [1] 35/22
credibility [1] 72/5
credit [1] 91/19
criminal [8] 125/17
127/14 127/14
127/18 127/25 128/7
128/16 129/5
cripple [1] 101/14
cross [5] 42/9 42/12
72/24 87/3 161/3
cross-examination
[3] 42/12 72/24

87/3
cross-examine [1]
42/9
crux [1] 109/9
cup [1] 20/23
curious [1] 6/12
current [2] 18/1
23/2
cut [1] 17/2
CV [1] 1/7
cyberpiracy [1]
78/23

**D**

daily [1] 117/22
damage [1] 36/6
damaged [1] 36/2
damages [6] 36/5
73/13 78/10 78/14
78/22 79/2
Dan [6] 14/20 14/24
15/5 15/16 16/23
17/8
Dan's [1] 17/3
Dana [4] 89/10
90/12 91/16 94/3
Dana Lopardo [1]
90/12
data [4] 8/22 21/5
28/24 29/1
date [11] 9/4 11/18
26/22 27/6 68/2 89/8
89/12 89/18 90/19
93/3 161/16
dated [5] 9/10
12/23 15/12 105/20
123/22
dates [2] 9/15 13/23
day [11] 16/17
49/15 84/11 85/7
85/14 91/21 94/4
94/6 112/15 128/4
130/22
days [6] 16/15
25/13 88/10 93/6
94/18 111/23
dba [8] 9/17 82/18
114/23 131/2 131/7
132/4 132/9 132/14
dealing [3] 8/9 8/10
56/12
dealings [1] 129/9
December [1]
131/23
decide [1] 72/3
decipher [1] 99/25
decision [2] 2/18
DECUS [147]
Decus-based [1]
61/17
DECUS84 [1] 13/13
DecusConstruction.
com [2] 15/19 17/6

87/3
cross-examine [1]
42/9
crux [1] 109/9
cup [1] 20/23
curious [1] 6/12
current [2] 18/1
23/2
cut [1] 17/2
CV [1] 1/7
cyberpiracy [1]
78/23

DecusInc.com [2]
17/4 17/9
deducted [2] 37/18
38/4
defendant [2] 1/19
2/4
defendants [3] 2/5
2/21 6/19
defense [1] 71/14
defenses [1] 6/4
delay [1] 85/6
deleted [2] 16/13
16/16
delivered [1] 55/6
demand [1] 129/4
demanding [2]
132/16 132/17
demands [2] 132/18
132/23
denying [1] 84/8
department [1]
14/8
depends [1] 121/13
depose [5] 3/13
3/14 4/7 62/14 74/11
deposed [1] 63/2
deposition [7]
49/15 49/18 51/20
52/1 53/14 62/11
69/13
deposits [1] 132/17
depth [3] 95/3 95/8
97/20
deputy [1] 6/7
design [4] 9/2 15/4
15/8 30/2
designed [1] 15/6
designer [3] 14/21
14/25 15/1
designs [2] 28/24
66/1
destroy [2] 47/16
47/19
destroyed [1] 63/10
detail [2] 30/15
66/15
detailed [1] 57/22
devastating [1]
34/20
development [5]
41/4 42/1 42/2 42/4
116/25
did [186]
didn't [92] 4/2 4/3
5/17 6/15 14/12
16/25 27/22 36/17
44/2 45/10 45/13
45/24 46/1 46/16
46/17 47/8 47/18
47/21 47/22 48/17
48/17 49/18 49/24
50/10 50/25 52/7

## D

**didn't...** [66] 52/13 52/19 52/22 53/8 58/1 59/7 59/9 60/21 62/13 62/14 62/23 62/25 67/18 68/12 68/15 71/17 72/8 74/25 76/15 80/21 80/22 81/20 82/12 82/13 82/19 82/24 83/25 84/18 84/21 85/12 85/17 87/17 87/19 89/1 89/4 90/25 91/9 94/6 95/24 98/10 102/15 103/5 104/2 107/23 108/2 108/5 108/7 110/4 110/7 110/12 111/1 112/13 112/19 113/16 113/22 114/11 116/2 116/23 117/14 120/4 127/6 127/8 127/17 128/3 130/14 131/25
**difference** [8] 9/15 29/15 29/20 112/24 113/4 113/6 113/9 113/11
**different** [7] 5/3 15/6 34/6 68/11 121/6 124/24 126/1
**difficult** [1] 17/3
**difficulty** [1] 83/2
**diligence** [1] 59/22
**Diocese** [6] 24/19 26/3 26/16 38/9 74/9 75/9
**direct** [5] 7/14 7/21 18/6 26/20 161/3
**direction** [3] 71/12 72/18 128/10
**directions** [1] 70/15
**directs** [1] 18/4
**disagree** [6] 67/16 80/3 81/14 98/16 107/25 111/13
**disagreeing** [1] 72/18
**disappointing** [2] 124/2 127/10
**discuss** [8] 47/2 79/18 102/23 103/6 105/16 111/7 118/19 132/25
**discussed** [10] 47/1 47/4 84/6 85/21 95/10 101/7 106/20 106/23 111/23 125/19
**discussing** [6] 71/21 89/21 89/23

95/6 102/17 129/16
**discussions** [4] 84/9 111/8 113/24 114/21
**display** [1] 128/17
**dispute** [3] 107/11 107/13 107/14
**Disregard** [1] 20/21
**dissolution** [1] 131/1
**dissolved** [1] 131/11
**distinguish** [1] 100/8
**distributions** [1] 100/24
**district** [3] 1/1 1/1 2/14
**ditch** [1] 25/18
**divide** [1] 68/8
**division** [1] 101/16
**do** [101] 5/6 5/8 5/11 5/12 15/24 20/1 20/5 22/10 22/16 22/17 28/19 30/19 31/24 33/15 35/13 35/24 36/12 37/11 37/24 41/9 41/18 42/9 45/8 46/24 48/8 48/17 51/14 54/6 54/10 54/16 56/10 57/5 57/18 57/21 58/6 58/13 58/21 60/8 60/13 61/8 62/25 63/5 63/25 64/8 65/15 66/6 66/15 66/22 67/1 67/7 67/18 70/7 70/22 70/25 72/5 74/5 75/16 75/19 76/22 77/9 77/12 78/11 79/11 80/22 81/15 81/17 81/19 82/16 82/24 82/25 84/5 86/22 87/7 87/10 89/5 90/11 91/24 92/5 96/14 98/21 100/9 102/8 104/24 106/7 106/9 116/22 117/2 117/11 117/16 117/24 118/6 121/24 123/18 124/24 126/6 126/18 130/12 131/3 131/4 132/22 133/9
**dock** [1] 56/20
**docks** [1] 57/1
**document** [69] 8/5 8/13 8/16 10/16 13/14 13/18 14/6 14/18 18/14 18/22 24/17 30/19 39/19 40/4 52/3 52/10

52/16 52/18 52/22 52/24 60/13 60/21 61/7 61/15 61/19 73/6 75/14 78/9 78/12 80/11 86/8 86/9 88/17 88/19 88/21 89/3 89/4 89/9 89/10 90/3 90/4 91/7 91/12 91/19 92/6 92/9 92/13 94/8 94/10 94/20 103/11 103/13 107/24 108/3 108/5 109/13 109/16 109/16 109/18 110/4 110/7 110/8 113/7 113/7 113/8 119/10 120/5 120/23 122/24
**documentation** [25] 12/7 36/19 51/16 51/25 52/21 62/22 62/24 63/1 63/3 66/18 74/7 75/11 75/15 75/16 75/20 75/21 75/25 76/5 76/16 76/22 77/13 78/8 109/1 131/13 131/14
**documents** [29] 3/11 3/14 3/21 3/23 3/24 4/4 4/11 4/12 4/16 8/7 12/2 21/9 24/2 25/1 51/7 60/22 61/21 61/22 61/22 65/17 74/8 86/23 88/6 90/14 91/17 110/13 115/2 117/24 131/9
**does** [8] 6/9 10/23 14/9 20/10 27/2 73/18 109/1 119/18
**doesn't** [17] 18/6 26/24 28/5 33/14 47/14 70/20 70/20 70/24 75/2 86/25 92/2 92/5 102/6 103/19 108/14 108/22 108/25
**doing** [25] 5/22 14/8 15/10 17/25 39/3 42/4 50/3 51/8 53/8 53/11 53/15 79/8 80/15 80/18 80/20 81/4 81/6 81/10 81/12 94/15 117/9 117/10 117/13 129/20 131/7
**dollar** [1] 68/5
**dollars** [2] 59/13 77/24
**domain** [4] 15/18 17/15 17/16 115/1
**don't** [69] 3/17 3/20

5/16 6/5 6/14 10/10 12/9 13/1 16/24 23/22 27/9 27/17 32/19 35/20 45/21 51/9 51/11 51/13 57/4 59/21 61/1 61/9 62/8 63/1 63/15 64/10 64/13 65/13 65/22 66/15 67/6 67/23 69/12 70/16 72/12 74/16 74/17 75/3 75/9 75/15 75/21 75/25 76/5 76/7 76/19 76/20 77/3 77/21 78/1 78/8 79/10 83/6 83/22 90/10 93/18 94/4 97/7 97/16 101/18 102/24 103/21 109/20 115/5 119/1 120/14 122/10 123/6 123/15 131/8
**done** [12] 28/24 41/20 54/15 59/22 66/2 67/1 67/19 67/24 71/14 93/20 106/21 130/23
**Donuts** [1] 13/16
**door** [1] 56/18
**doubt** [2] 75/3 107/20
**down** [32] 3/4 3/9 5/18 6/21 13/19 14/5 20/7 38/20 38/20 54/18 56/11 71/18 77/8 77/22 78/11 87/21 87/23 90/1 94/23 97/9 99/9 102/6 102/19 105/9 105/19 106/7 110/20 110/21 118/19 124/1 124/10 126/24
**downloading** [1] 16/3
**downstairs** [1] 6/7
**draft** [6] 85/22 86/3 108/5 110/7 118/20 119/1
**drafted** [6] 84/12 84/20 84/20 117/18 121/8 121/13
**drafting** [1] 82/8
**drafts** [3] 83/12 83/14 113/24
**drawings** [2] 29/22 29/23
**drive** [1] 3/25
**drop** [1] 65/17
**due** [5] 23/2 23/13 23/14 59/22 98/11
**duly** [1] 7/8
**Dunkin'** [1] 13/16

**duplicates** [1] 15/7
**during** [5] 8/8 51/7 51/18 74/10 124/6

## E

**E-mail** [55] 4/16 5/2 12/3 14/19 15/12 16/7 16/9 16/12 16/13 16/20 17/4 33/8 33/17 33/21 33/23 33/25 34/9 45/20 82/7 82/14 83/17 84/5 87/14 87/19 92/18 93/6 94/19 97/8 97/14 98/23 99/1 99/2 99/3 99/23 99/23 100/16 101/3 102/17 104/23 105/19 105/23 106/1 106/6 108/10 109/19 111/4 111/24 114/10 118/6 118/15 120/19 125/14 131/10 131/19 133/1
**E-mails** [12] 3/16 4/1 16/10 16/15 16/18 81/8 86/6 88/4 104/21 112/6 116/3 126/8
**each** [5] 30/24 47/13 100/21 101/4 120/2
**earlier** [5] 27/4 73/6 80/1 81/9 125/19
**early** [2] 45/3 111/8
**EASTERN** [1] 1/1
**easy** [2] 50/23 101/21
**edit** [1] 16/3
**edits** [1] 119/4
**effort** [5] 25/18 97/3 101/10 101/18 104/16
**eight** [2] 86/14 116/21
**Eighty** [1] 123/21
**Eighty-four** [1] 123/21
**either** [4] 4/3 45/13 46/7 46/17
**electrical** [1] 56/17
**electronic** [2] 92/1 106/24
**electronically** [2] 2/13 6/9
**else** [8] 32/20 41/14 81/8 87/7 87/8 107/19 110/25 115/4
**else's** [1] 83/22
**employed** [1] 9/5
**employees** [2] 48/1 116/19

## E

**encompasses [1]** 56/17
**end [5]** 41/6 84/10 85/7 96/6 112/15
**enforced [1]** 72/20
**engaging [1]** 97/4
**enjoy [1]** 133/10
**entered [2]** 7/9 72/22
**entire [3]** 55/7 56/16 56/16
**entirely [1]** 101/18
**entirety [1]** 125/15
**entities [3]** 35/20 50/13 110/1
**entitled [5]** 37/6 40/12 40/20 41/3 161/13
**entity [16]** 10/10 23/21 29/18 88/4 89/17 106/20 106/23 107/6 107/21 108/11 108/16 108/18 108/24 111/1 112/8 130/20
**envelope [1]** 82/10
**equal [7]** 85/11 86/11 98/5 102/2 107/18 120/12 125/12
**equally [1]** 120/9
**equity [14]** 85/1 102/13 113/17 118/21 119/12 120/2 120/9 124/21 125/3 125/4 125/5 125/6 125/22 126/10
**erected [1]** 54/9
**error [3]** 70/17 70/18 70/18
**ESQUIRE [3]** 1/15 1/16 1/20
**essentially [2]** 19/18 21/16
**Establish [1]** 96/11
**estimate [6]** 67/19 67/25 68/3 68/5 68/16 68/16
**estimated [4]** 25/15 26/20 26/20 30/11
**estimates [6]** 14/9 14/10 14/10 65/25 67/24 117/10
**estimating [1]** 14/8
**estimation [2]** 8/14 25/22
**et [1]** 96/8
**evaluate [3]** 43/24 44/1 44/2
**evaluated [1]** 44/2

**evaluating [1]** 84/10
**even [22]** 2/16 3/17 6/18 44/22 45/10 46/1 59/21 78/16 84/11 86/13 89/1 89/16 89/17 98/10 108/10 110/5 113/19 113/25 115/25 126/9 127/19 132/16
**event [1]** 63/17
**Eventually [1]** 122/8
**ever [5]** 8/3 13/17 34/13 74/11 97/14
**every [5]** 16/13 16/13 47/13 60/21 79/18
**everybody [3]** 9/24 35/1 35/2
**everyone [2]** 34/20 104/17
**everything [6]** 16/12 25/11 55/5 67/3 81/8 103/17
**evidence [5]** 51/18 63/2 74/5 77/13 77/20
**exactly [3]** 53/8 53/11 53/15
**examination [5]** 7/14 7/21 42/12 72/24 87/3
**examine [1]** 42/9
**example [1]** 5/2
**examples [1]** 3/11
**exceeding [1]** 96/10
**exception [2]** 35/7 131/10
**Excuse [1]** 44/16
**execute [1]** 118/20
**executed [8]** 27/16 27/18 28/10 85/24 112/18 112/22 113/8 122/9
**executing [3]** 113/4 113/7 113/11
**execution [2]** 124/21 125/22
**exhibit [36]** 7/25 8/2 10/14 12/11 13/4 13/12 14/15 14/16 18/17 18/19 18/23 18/24 20/21 20/22 21/2 24/3 24/16 30/16 39/20 39/21 40/4 40/5 53/3 73/2 80/4 92/15 98/17 98/18 100/12 100/13 104/22 106/23 118/3 118/7 120/17 129/3
**Exhibit 106 [3]**

18/17 18/19 18/24
**Exhibit 25 [1]** 80/4
**Exhibit 38 [1]** 20/21
**Exhibit 40 [2]** 20/22 21/2
**Exhibit 41 [2]** 7/25 8/2
**Exhibit 53 [1]** 100/13
**Exhibit 59 [1]** 104/22
**Exhibit 73 [1]** 10/14
**Exhibit 74 [1]** 118/3
**Exhibit 78 [2]** 14/15 14/16
**Exhibit 80 [1]** 24/16
**Exhibit 84 [2]** 120/17 129/3
**exhibit also [1]** 24/3
**Exhibit in [1]** 118/7
**exhibit is [2]** 12/11 100/12
**Exhibit number [1]** 53/3
**exhibit that [1]** 106/23
**exhibits [3]** 4/2 4/3 38/18
**exist [5]** 4/18 12/5 52/7 52/19 75/2
**existed [1]** 52/9
**existing [4]** 15/23 16/2 29/13 54/8
**exited [2]** 70/14 133/16
**expansion [2]** 29/13 54/8
**expected [3]** 16/20 73/22 73/24
**expense [1]** 96/10
**experience [1]** 121/5
**explain [9]** 21/6 24/25 29/24 38/10 40/16 80/14 90/10 95/17 116/9
**explained [3]** 17/1 47/5 109/16
**explore [3]** 95/2 95/7 97/19
**extensive [1]** 117/1
**extent [5]** 32/15 41/16 44/20 127/19 131/8
**extremely [2]** 124/2 127/10

## F

**face [1]** 47/20
**facility [1]** 29/14
**fact [10]** 4/1 6/12

10/9 45/9 48/15 51/11 76/9 82/16 113/15 131/5
**facts [1]** 54/3
**failed [1]** 69/10
**Fair [1]** 40/4
**fairly [3]** 15/17 107/17 108/14
**fake [1]** 12/16
**familiar [4]** 73/5 80/11 89/9 94/20
**far [4]** 6/12 13/22 53/12 127/19
**fax [2]** 14/1 14/2
**February [4]** 96/13 103/10 104/1 120/1
**federal [3]** 2/9 2/24 6/10
**fee [1]** 90/15
**fees [2]** 78/24 78/25
**fence [5]** 54/23 54/24 55/1 55/20 57/17
**fencing [2]** 54/19 54/21
**few [5]** 4/17 64/20 80/10 94/12 111/23
**fiber [1]** 65/24
**Fifty [1]** 120/11
**figure [4]** 19/13 27/17 27/25 28/3
**figures [2]** 25/17 31/25
**file [15]** 2/7 2/7 6/3 6/9 65/17 66/19 67/2 89/4 92/3 94/10 110/10 127/18 127/25 128/16 128/17
**filed [19]** 2/13 9/18 36/21 43/13 57/25 59/24 62/20 62/22 63/16 65/9 66/9 67/15 67/17 89/10 90/4 90/7 91/5 93/10 108/3
**filing [5]** 2/11 43/17 63/11 66/13 130/22
**final [1]** 118/19
**finalize [5]** 84/18 84/21 84/23 85/3 112/19
**finalized [2]** 112/17 122/11
**finally [1]** 128/9
**financially [1]** 101/14
**financials [1]** 47/12
**financing [2]** 29/1 76/2
**find [12]** 2/16 16/9 19/16 19/20 96/1

115/4 115/8 116/2 117/19 120/16 124/2 127/19
**fine [1]** 93/23
**finish [3]** 93/22 109/2 117/16
**finished [2]** 57/10 93/21
**finishing [1]** 51/5
**firm [1]** 34/6
**first [16]** 10/19 10/21 11/21 24/2 22/1 24/6 26/12 29/8 61/14 73/15 86/11 89/8 91/2 92/16 97/10 126/4 129/8
**five [3]** 30/12 61/23 69/22
**flash [1]** 3/25
**flip [3]** 9/21 12/10 96/24
**flip-flops [1]** 96/24
**flipped [1]** 30/18
**floor [1]** 5/18
**flops [1]** 96/24
**flow [1]** 101/13
**focus [2]** 8/25 41/25
**follow [3]** 7/4 71/11 118/12
**follow-up [1]** 118/12
**following [8]** 25/2 25/9 25/10 96/6 96/18 124/23 125/18 127/15
**Foods [1]** 51/4
**for [186]**
**foreclosure [1]** 66/21
**foregoing [1]** 161/11
**forgery [1]** 52/17
**forget [2]** 4/19 75/17
**forging [1]** 52/20
**form [7]** 21/8 70/19 83/1 88/1 90/15 106/22 110/25
**forma [1]** 125/2
**formed [8]** 50/12 57/2 88/4 107/6 107/22 108/11 108/17 108/18
**former [1]** 43/1
**forms [1]** 90/14
**forth [10]** 14/14 83/12 84/6 84/21 85/5 96/24 97/22 113/25 114/20 122/24
**forum [1]** 107/18
**forward [6]** 25/21

{CASENUM}  {WITNESSNAME}  {DATE}

**F**

**forward... [5]** 62/23 107/18 116/15 116/16 132/21
**found [14]** 3/2 4/21 16/19 47/15 65/5 113/20 113/25 114/22 114/25 115/20 115/25 116/4 124/7 126/9
**four [6]** 13/4 13/9 59/2 61/23 123/21 126/1
**frame [4]** 25/8 32/12 32/13 124/6
**free [1]** 107/2
**frequent [1]** 101/19
**Friday [3]** 105/12 105/20 123/22
**friends [1]** 34/20
**from [85]** 2/11 2/25 3/5 3/11 3/17 4/11 4/13 5/2 5/12 7/4 9/10 12/7 13/7 14/19 14/20 15/7 15/16 16/1 16/5 16/10 21/12 21/14 24/21 26/7 27/12 32/4 32/14 33/21 34/1 34/3 35/9 35/10 36/12 37/18 40/15 41/13 41/13 44/3 45/18 47/25 50/9 58/22 63/2 78/15 88/13 92/6 92/8 92/24 98/23 99/1 99/2 99/4 99/11 99/15 99/17 100/3 101/3 102/10 102/11 103/5 105/2 105/9 105/19 107/16 108/22 112/3 112/4 112/9 113/20 114/1 114/6 114/24 115/21 116/5 116/11 118/6 126/9 128/13 131/11 131/13 133/1 161/12
**front [7]** 30/22 34/9 54/20 70/23 98/21 118/7 120/14
**fruition [4]** 62/7 62/19 69/10 76/13
**fulfill [1]** 28/10
**full [5]** 124/21 125/2 125/22 126/5 129/8
**fully [1]** 113/8
**funding [1]** 27/13
**funds [3]** 36/10 37/16 78/20
**funny [1]** 127/9

**G**

**Gary [2]** 3/17 3/18
**gather [2]** 18/7 25/5
**gave [15]** 20/1 30/24 47/12 58/13 87/13 90/15 90/15 90/16 90/17 91/10 91/13 92/3 94/4 94/10 106/13
**Geiger [5]** 14/20 14/24 15/3 16/23 17/8
**general [3]** 41/23 57/3 118/13
**generally [1]** 96/7
**generating [1]** 100/22
**gentleman [3]** 50/9 52/21 130/9
**gentlemen [6]** 7/12 53/25 61/18 70/10 133/4 133/10
**get [37]** 2/10 5/14 20/23 26/1 26/7 27/13 33/18 33/18 35/7 36/12 40/24 41/5 45/8 53/4 53/6 53/16 55/9 55/11 66/3 74/11 77/3 87/21 91/9 91/13 92/9 92/11 92/13 93/15 107/7 110/10 114/13 116/16 116/22 116/22 117/18 126/21 128/10
**gets [3]** 86/12 87/23 103/11
**getting [7]** 12/6 19/6 78/14 85/3 117/11 125/24 125/25
**give [16]** 6/13 15/9 17/6 21/11 25/6 25/8 25/14 25/15 32/12 57/23 80/23 111/16 112/3 121/24 127/20 127/23
**given [2]** 3/24 65/7
**gives [6]** 17/20 96/14 96/19 119/12 119/12 119/13
**giving [5]** 15/10 59/11 67/8 114/8 127/22
**Gloucester [25]** 8/22 21/4 27/11

28/18 28/23 31/15 36/10 63/24 64/1 64/2 64/14 64/22 65/16 66/23 67/15 68/20 69/5 69/9 72/9 72/12 72/15 75/8 76/10 76/12 78/21 80/3 10/14 14/13 19/23 22/22 24/16 26/15 29/20 34/25 38/21 38/22 40/7 40/8 40/23 48/9 61/5 63/4 63/23 65/19 69/10 70/6 70/12 72/17 73/15 76/13 77/8 77/8 80/4 84/22 85/1 87/24 88/24 89/6 90/1 92/16 93/22 94/8 94/23 95/19 95/24 98/18 99/9 102/19 104/21 105/9 105/19 106/10 110/20 110/21 110/21 116/22 117/24 120/17 120/18 120/25 124/1 124/4 124/10 124/15 126/25 130/10 130/12
**goals [1]** 96/6
**goes [5]** 6/12 61/21 95/18 102/9 107/20
**going [59]** 8/18 12/10 16/25 17/4 23/25 26/8 26/9 27/13 27/15 30/10 30/25 32/16 39/1 40/3 40/7 42/3 53/10 54/21 56/8 56/9 56/18 70/23 72/4 73/2 78/4 78/7 80/4 82/10 83/12 83/18 84/6 85/1 85/9 85/11 86/9 86/10 88/22 90/13 97/18 100/8 102/24 103/9 106/10 107/7 114/20 115/10 119/24 120/18 122/21 122/24 126/7 126/23 126/23 126/24 127/18 127/20 128/21 131/18 133/6
**gone [1]** 84/20
**good [6]** 3/6 3/7 7/23 67/4 67/7 117/5
**got [15]** 16/10 23/18 26/12 47/12 55/4 85/7 85/7 85/15 85/23 91/10 98/8 107/12 116/2 125/24

131/12
**gotten [3]** 13/7 32/5 37/10
**GP [3]** 73/17 74/24 74/25
**grab [1]** 70/11
**grand [1]** 31/20
**grants [2]** 30/11 77/1
**great [1]** 43/25
**GREGG [2]** 1/24 161/16
**grid [1]** 117/20
**gross [14]** 31/5 31/7 31/22 31/23 38/12 39/16 40/14 73/19 73/22 75/1 75/12 75/17 78/3 101/4
**group [2]** 30/9 34/19
**grouping [1]** 79/14
**growing [1]** 12/4
**grown [1]** 30/14
**guaranteed [2]** 96/23 100/24
**guess [6]** 15/8 29/4 40/6 86/13 117/1 117/19
**guy [3]** 114/6 114/9 126/12
**guys [3]** 55/7 102/8 105/7

**H**

**H2 [1]** 80/6
**had [123]** 3/1 3/12 4/5 4/6 5/15 6/6 6/18 6/24 7/25 8/8 9/2 12/4 13/17 13/19 13/20 14/7 15/4 16/11 16/13 17/1 19/16 20/19 22/18 25/3 25/3 25/19 25/24 26/13 27/14 28/13 28/22 29/9 29/19 29/22 30/6 30/22 32/13 33/3 33/4 33/5 36/4 37/9 37/13 37/14 37/19 38/1 38/15 39/2 39/11 42/18 42/25 43/7 43/21 44/3 44/3 44/24 45/16 49/1 49/7 49/11 51/25 52/2 55/10 56/13 61/15 62/3 62/10 62/22 66/2 69/14 71/23 79/13 79/17 80/24 81/1 81/3 81/15 81/19 81/23 82/1 82/5 82/24 84/20 84/20 84/24

86/7 87/7 88/10 88/14 88/17 89/2 89/21 90/6 90/20 90/23 91/16 91/16 95/6 96/3 98/2 98/5 101/24 103/22 112/14 114/20 114/22 115/9 116/14 116/19 117/16 117/25 120/2 123/18 124/7 125/25 128/1 128/6 128/8 130/24 131/8 131/11 131/16 132/24
**hadn't [2]** 27/11 62/24
**hallway [3]** 71/6 71/16 71/19
**hand [4]** 19/24 20/2 46/16 60/8
**handed [4]** 25/13 45/15 45/17 52/7
**handled [1]** 64/5
**hands [1]** 119/2
**handwriting [1]** 31/1
**happen [8]** 6/10 62/9 74/25 76/17 77/3 78/5 78/7 124/6
**happened [11]** 47/5 69/19 74/2 74/19 74/24 75/6 75/18 77/24 78/2 78/17 86/1
**happening [1]** 34/18
**happens [1]** 70/22
**Hard [1]** 31/11
**has [35]** 6/16 8/23 10/9 10/22 13/22 13/23 15/20 17/23 19/21 20/3 26/22 27/22 33/14 36/2 36/23 38/20 41/20 41/22 43/25 46/12 58/22 58/25 59/24 64/11 66/19 69/5 69/21 77/6 83/16 91/20 106/21 113/2 119/2 122/13 125/6
**have [146]**
**haven't [9]** 22/15 35/4 36/19 57/21 58/24 59/21 62/8 69/7 78/16
**having [3]** 58/8 83/2 101/16
**he [273]**
**he'd [2]** 25/5
**he's [25]** 14/24 14/25 15/14 20/11 22/4 22/11 23/18

**H**

he's... **[18]** 35/22 39/3 39/4 39/22 56/1 60/24 65/24 69/7 86/16 93/13 95/14 95/17 96/22 96/25 97/4 97/17 99/6 112/7
head **[1]** 66/5
hear **[6]** 3/5 4/10 39/6 72/8 72/19 72/19
heard **[7]** 37/23 44/3 59/17 67/23 75/3 76/8 95/16
hears **[1]** 35/2
hearsay **[4]** 32/16 33/12 35/5 41/11
HEENAN **[116]** 1/7 1/7 3/2 3/15 3/17 3/18 8/23 11/12 13/2 14/20 14/23 15/20 18/9 20/3 20/11 20/13 24/3 25/3 28/16 28/19 29/19 30/6 31/7 32/7 33/21 35/11 36/2 40/15 41/19 44/21 44/25 45/10 45/15 46/2 46/14 46/16 47/1 47/2 47/16 47/19 47/23 48/8 48/19 48/21 48/22 48/24 49/2 49/6 49/12 49/16 53/16 58/23 59/16 62/25 64/23 65/7 73/8 74/23 81/1 82/5 82/18 82/23 83/15 84/7 84/13 85/19 86/1 86/15 88/11 88/14 89/21 92/24 94/18 96/2 98/23 99/18 100/17 101/8 104/19 105/4 108/20 112/5 112/22 113/15 113/20 113/23 114/1 115/13 115/16 116/10 117/1 117/25 118/10 120/21 121/20 122/9 122/18 123/8 123/24 124/19 125/22 127/6 128/6 129/20 129/23 131/1 131/3 131/6 131/25 132/3 132/4 132/5 132/9 132/12 132/14 132/15
Heenan's **[13]** 9/23 9/25 10/12 45/20 45/23 64/25 65/3 67/23 76/1 76/8

held **[2]** 71/2 133/17
help **[4]** 14/8 40/5 43/25 100/11
helped **[2]** 15/4 36/16
her **[9]** 69/16 90/14 90/15 90/16 90/17 94/4 94/7 94/9 94/10
here **[27]** 2/12 3/19 3/22 13/24 14/23 23/5 30/15 49/4 57/20 62/17 65/14 70/5 74/17 74/22 76/4 77/12 78/16 78/16 83/20 91/18 94/22 105/3 106/7 119/6 119/17 119/18 125/11
here's **[3]** 6/2 83/24 109/17
Hessert **[20]** 33/5 47/11 47/16 47/19 47/22 47/23 47/24 48/6 48/10 48/14 49/2 49/12 49/15 64/11 65/4 65/6 95/12 95/22 96/1 128/21
Hessert's **[2]** 49/14 64/13
hide **[1]** 81/21
high **[3]** 88/14 97/10 115/1
high-jacked **[1]** 115/1
high-level **[1]** 88/14
highlight **[1]** 6/14
highly **[1]** 73/20
him **[83]** 12/18 15/4 16/11 16/24 17/1 20/18 24/9 33/15 37/9 37/23 42/5 43/16 43/20 43/24 44/22 45/1 45/3 45/24 46/2 48/12 48/14 53/9 56/24 58/8 63/3 68/1 82/19 84/1 85/3 86/6 92/12 93/17 97/3 98/11 98/13 98/14 103/6 103/11 103/11 104/4 104/20 109/4 112/7 113/18 114/2 114/7 114/8 114/9 114/12 114/13 114/16 114/17 114/21 116/6 116/11 116/14 116/16 116/17 116/21 116/24 121/22 122/24 123/4 123/17 126/10

88/25 105/25 128/18
127/16 127/17 127/19 127/20 127/20 127/22 127/23 127/25 128/3 128/13 128/17 128/21 129/4 131/13 132/19 132/21 132/25 133/13
himself **[3]** 19/16 41/10 109/14
hire **[1]** 87/10
hired **[7]** 45/24 86/22 87/11 88/16 89/5 115/6 115/8
his **[50]** 3/3 13/3 16/12 22/9 22/12 24/13 25/22 30/6 31/1 33/5 34/8 35/24 38/5 39/24 41/9 41/23 43/1 43/20 43/22 45/11 45/13 45/23 46/6 46/8 46/8 47/4 47/25 48/7 49/18 62/11 70/2 71/6 71/7 72/9 75/3 76/15 81/1 82/14 82/15 82/18 95/11 95/24 95/25 98/13 106/1 115/3 116/3 117/1 117/20 133/11
history **[2]** 45/14 45/23
hit **[1]** 19/18
HOLDINGS **[14]** 1/8 82/18 129/20 129/24 131/2 131/6 131/25 132/3 132/4 132/5 132/9 132/12 132/12 132/14 132/15
home **[1]** 90/17
Honish **[1]** 66/2
Honor **[31]** 3/6 4/14 5/9 7/2 7/19 20/24 32/16 38/14 38/17 38/24 39/2 39/7 39/18 42/7 42/10 53/2 53/19 57/9 60/24 72/2 86/24 87/2 92/21 93/13 95/14 100/13 104/24 112/25 113/13 128/24 133/2
HONORABLE **[1]** 1/11
hope **[2]** 63/8 63/10
hoping **[1]** 100/11
host **[1]** 96/19
hours **[4]** 64/20 66/8 68/4 68/6
housekeeping **[1]** 118/13
how **[20]** 16/9 22/25

41/22 43/7 47/6 55/11 58/3 64/8 66/6 78/2 82/23 83/15 83/17 85/9 86/9 90/11 96/20 97/7 102/8 121/13
However **[6]** 4/15 101/7 125/16 125/16 127/13 129/12
hundreds **[1]** 66/7
HVAC **[1]** 56/17

**I**

I'd **[7]** 45/6 52/24 74/7 95/2 95/7 96/5 97/19
I'll **[8]** 3/2 3/5 4/10 5/17 6/13 53/6 93/10 98/17
I'm **[49]** 6/13 6/22 7/16 10/20 12/10 18/23 23/6 33/9 38/14 39/1 48/11 52/18 57/24 58/15 63/6 63/18 65/8 65/21 66/17 67/6 69/21 70/4 70/23 72/18 73/2 74/4 80/7 80/14 80/25 81/3 83/2 83/5 83/7 86/10 87/21 90/4 93/19 99/25 100/11 102/5 102/25 106/22 110/21 117/4 120/6 120/7 120/9 124/15 126/15
I've **[11]** 3/4 10/21 15/16 16/1 21/23 59/17 71/5 93/23 95/16 99/19 103/21
idea **[4]** 26/13 66/7 88/14 97/4
ideas **[1]** 96/22
identified **[6]** 27/14 28/8 34/4 38/12 78/20 128/7
identifies **[1]** 20/8
identify **[5]** 8/2 10/5 21/2 24/17 26/24
if **[79]** 2/16 6/22 9/21 10/5 15/22 15/24 18/1 18/1 19/23 22/22 27/21 28/9 30/16 32/3 38/22 43/24 45/6 51/15 51/25 52/3 52/25 55/24 56/7 59/15 61/9 61/17 61/22 66/11 68/7 70/1 70/5 70/22 72/19 75/8 76/20 77/3 77/22 78/2 79/6

80/13 80/25 81/3 82/8 82/9 82/25 83/3 83/6 97/9 100/10 100/23 101/1 102/5 103/19 104/15 105/9 105/19 106/22 110/1 111/19 113/9 116/9 117/4 118/23 119/23 120/6 121/8 121/16 124/1 124/10 125/14 125/15 127/17 127/22 127/24 128/8 128/11 128/12 131/21 132/20
II **[6]** 26/16 29/4 29/23 31/4 62/9 62/18
III **[6]** 29/3 29/23 31/19 62/18 62/19 77/10
immediately **[2]** 78/11 129/19
impact **[4]** 34/17 34/19 35/15 35/17
impacted **[1]** 41/22
impeachment **[2]** 4/12 4/22
important **[11]** 43/15 43/16 49/21 52/19 52/22 59/12 59/14 91/7 112/16 112/17 116/10
importantly **[1]** 54/6
impression **[1]** 122/19
improper **[6]** 53/24 63/17 63/21 67/15 69/6 69/10
in **[205]**
inaccurate **[2]** 14/6 68/17
INC **[48]** 1/3 1/4 7/13 9/12 11/7 11/8 15/17 15/24 17/10 19/1 19/21 20/5 20/8 23/16 23/17 23/22 23/24 24/1 29/9 36/15 37/3 42/15 42/21 46/3 50/4 50/7 50/11 50/15 58/24 58/25 80/19 80/20 81/1 81/5 81/6 81/11 81/17 81/20 81/24 82/2 83/21 89/16 90/23 109/5 110/11 110/11 111/20 122/20
Inc.'s **[1]** 15/25
incident **[1]** 127/4
include **[4]** 87/8 88/25 89/1 124/22

**I**

included [7] 15/5 25/16 108/23 108/25 109/2 114/14 131/14
includes [2] 6/16 17/22
income [1] 129/12
Incorporation [1] 91/21
incorporators [1] 91/20
incorrect [21] 45/12 46/4 47/18 48/22 49/10 50/2 56/5 57/19 60/4 60/5 67/20 68/18 68/21 80/17 86/5 86/18 86/22 107/10 109/12 114/2 130/22
incurred [1] 78/25
incurring [2] 79/1 79/3
independent [1] 102/7
individual [1] 2/21
individually [1] 63/25
individuals [4] 3/17 4/7 5/10 13/8
industry [1] 35/2 35/2 104/15
information [30] 3/19 13/21 17/22 18/7 18/13 19/15 19/22 25/4 25/6 28/22 36/20 45/15 45/17 47/10 47/15 56/13 67/20 87/13 87/14 88/17 90/6 90/16 91/4 94/3 94/5 94/7 94/9 94/11 96/19 115/3
infringement [1] 78/22
initial [2] 101/15 120/24
ins [3] 84/9 97/22 97/25
inside [1] 61/19
insolvent [5] 33/11 34/4 34/11 34/13 34/15
install [1] 55/5
instead [1] 40/2
instructions [1] 7/4
intelligent [1] 57/22
intent [1] 109/24
intentional [2] 35/25 36/1
interchangeably [1] 50/7

interest [1] 101/16
interested [1] 18/7
interesting [4] 6/17 9/9 9/16 13/24
interfered [1] 62/20
interim [2] 118/23 119/22
interior [2] 54/9 54/11
interns [1] 117/16
interrupt [1] 93/18
interrupting [1] 93/17
into [10] 3/9 48/9 55/4 71/22 94/8 95/24 103/6 116/3 131/22 132/18
investment [1] 119/17
invoice [3] 21/10 21/16 123/15
invoiced [1] 123/9
invoices [3] 13/7 35/10 58/22
involve [2] 4/11 43/20
involved [5] 7/17 37/1 45/4 73/9 79/14
IRS [3] 88/1 90/14 110/9
is [331]
isn't [14] 45/19 46/3 48/21 49/2 51/17 55/22 59/11 62/21 90/21 91/7 103/16 104/14 111/9 121/10
issue [12] 5/11 6/8 10/8 14/9 22/15 23/14 27/19 56/12 83/19 83/20 130/19 131/5
issued [5] 2/11 2/15 2/23 5/19 6/21
issues [6] 7/24 25/3 95/11 95/13 96/3 107/2
it [405]
it's [95] 3/20 4/22 5/19 6/17 8/19 8/22 9/9 9/10 9/13 10/6 10/7 10/7 11/5 11/14 12/17 12/18 13/13 15/17 16/1 17/3 17/15 17/18 17/19 18/1 18/3 18/6 19/4 21/8 21/9 21/9 21/10 23/5 27/24 28/8 28/23 29/10 29/13 30/13 30/13 33/13 35/19 38/19 38/20 39/21 39/23 40/4 40/7 46/10 50/23

51/16 56/2 56/3 56/25 59/12 59/14 60/16 61/4 61/13 61/14 61/17 61/22 64/19 66/21 68/13 68/14 70/17 70/18 76/20 77/16 77/22 78/4 79/15 79/15 80/1 80/12 81/16 87/3 90/4 90/4 91/23 92/11 93/11 97/18 99/11 103/17 105/4 107/19 118/9 118/13 119/15 121/13 121/16 121/18 125/15 128/3
item [1] 126/5
items [8] 114/10 125/20 126/2 126/3 128/11 129/7 129/8 132/20
its [2] 7/15 125/14
itself [2] 2/20 32/17

**J**

jacked [1] 115/1
January [4] 1/11 9/4 9/16 96/12
January 31st [1] 9/4
Jersey [27] 1/21 9/19 10/17 12/15 12/17 28/16 29/3 29/4 29/10 29/10 29/16 29/16 29/17 29/18 31/19 54/5 62/3 62/11 62/14 62/18 63/7 63/9 63/19 77/9 81/22 130/11 131/12
job [16] 14/12 26/17 54/5 54/10 54/15 57/3 57/22 65/23 68/9 69/18 75/6 75/19 75/24 107/8 116/22 116/24
jobs [7] 32/4 40/13 77/16 78/15 79/9 79/23 109/6
John [58] 12/4 14/9 28/13 41/8 42/3 42/14 42/22 44/3 44/5 44/14 44/16 44/19 45/18 45/19 46/10 48/20 48/25 49/1 51/23 56/12 64/4 65/15 65/18 68/19 71/19 73/7 87/15 89/2 90/19 92/24 100/2 100/17 101/9 101/15 105/2 105/15 106/17 107/5

107/16 107/21 107/22 107/25 108/2 108/10 110/2 111/8 111/11 111/18 117/18 117/22 118/10 118/17 120/13 122/24 123/24 125/18 127/14 129/10
John's [3] 44/8 90/16 106/3
join [1] 85/19
joined [4] 42/18 43/15 43/23 44/20
joining [5] 33/4 42/21 42/23 44/21 50/23
joint [3] 20/22 38/18 39/19
judge [11] 43/1 43/1 43/4 43/5 43/8 43/9 43/9 43/11 43/12 44/21 54/14
JULIE [1] 1/20
jumping [1] 14/13
jurisdiction [1] 2/22
jurors [1] 87/22
jury [24] 1/12 7/9 12/10 21/6 23/4 24/25 28/1 38/15 40/3 40/7 43/7 45/22 47/20 54/14 57/23 70/8 70/14 70/23 72/22 73/3 79/7 79/22 126/18 133/16
just [53] 5/21 6/13 6/13 7/24 10/5 10/20 12/10 14/8 15/5 16/25 17/15 17/24 18/6 23/3 24/25 27/4 27/25 28/23 29/6 29/13 29/18 30/14 30/18 30/23 32/4 32/9 39/4 50/21 54/21 63/8 70/20 77/6 78/19 83/5 88/10 94/14 95/23 97/10 97/24 98/17 100/3 102/13 106/23 110/24 111/23 121/14 123/3 126/2 126/21 128/1 128/24 132/5 133/5

**K**

K1s [1] 110/10
KATHRYN [1] 1/16
KEARNEY [1] 1/11
keep [7] 61/21 119/24 126/7 126/22 126/22 126/23 126/24

keeps [1] 102/4
kept [4] 12/7 85/10 86/10 132/18
KEVIN [1] 1/15
kind [2] 19/15 35/19
knew [5] 52/14 52/18 53/8 53/11 53/14
know [53] 3/16 3/17 3/20 3/20 5/1 6/14 6/15 16/4 16/24 26/6 27/8 27/23 28/14 28/21 30/7 30/19 31/24 41/13 52/9 53/14 53/18 54/14 59/19 59/21 60/13 61/8 61/9 62/8 64/8 64/13 65/22 67/1 69/12 72/12 74/17 75/9 76/19 76/20 77/3 82/23 83/16 83/18 97/7 102/1 102/4 103/16 104/18 104/18 115/5 119/8 122/10 126/15 131/8
knowledge [3] 22/12 41/13 132/24
known [1] 130/5
KURMAN [1] 1/15

**L**

label [4] 13/13 60/17 61/17 61/19
labeled [3] 61/7 61/23 88/14
labels [1] 60/9
laborer [1] 47/11
lacks [1] 2/22
ladies [6] 7/11 53/24 61/18 70/10 133/3 133/9
language [3] 87/2 102/21 118/14
large [2] 27/24 35/2
larger [1] 30/8
last [9] 25/18 30/17 60/21 66/23 67/25 67/25 86/14 116/21 131/23
last-ditch [1] 25/18
late [2] 12/3 45/2
later [5] 25/13 51/23 52/23 85/17 102/12
LAVAN [10] 1/19 1/20 4/10 6/2 42/9 70/7 71/20 72/5 72/25 161/5
law [2] 1/19 67/10
lawsuit [2] 2/18 63/4
lawsuits [1] 107/2

**L**

**lawyers [2]** 6/14
61/21
**lead [2]** 32/16 95/5
**leads [2]** 42/2 42/2
**least [4]** 13/2 16/21
49/17 62/19
**leave [1]** 41/8
**led [6]** 84/1 86/1
104/19 108/17 109/3
122/23
**left [3]** 33/5 38/11
71/22
**legal [27]** 23/21
63/22 66/17 67/8
69/8 78/24 78/25
84/15 84/15 86/19
88/4 90/3 90/4 91/7
91/18 94/8 103/18
104/13 107/2 108/3
109/18 110/1 110/25
115/6 119/10 125/5
127/12
**legally [1]** 43/14
**Lemus [3]** 27/10
27/10 68/1
**less [2]** 40/25
100/23
**let [7]** 16/4 56/24
72/17 87/20 109/2
117/1 133/4
**let's [21]** 4/19 4/20
10/3 16/5 20/4 22/21
26/1 26/15 34/10
36/9 39/6 45/8 50/21
63/24 70/7 70/8
73/15 84/4 104/21
133/9 133/10
**letter [4]** 82/8 84/12
109/24 109/24
**letterhead [2]**
81/25 82/9
**level [2]** 88/14
97/10
**liabilities [2]** 12/5
19/14
**liability [1]** 58/25
**liable [2]** 59/5 59/6
**Liberty [1]** 107/3
**license [1]** 18/1
**lien [31]** 8/18 36/21
57/25 58/3 59/12
62/20 62/22 63/11
63/14 63/17 63/20
65/9 65/12 66/9
66/11 66/13 66/17
66/19 66/19 66/25
67/2 67/15 67/17
68/25 69/3 69/6
69/11 70/2 76/3
76/13 107/3

**Liens [5]** 8/15 8/17
8/21 9/10 10/6
**light [1]** 41/8
**like [19]** 3/17 14/23
16/17 28/25 30/13
32/1 54/2 68/3 70/5
77/1 95/2 95/7 96/5
97/19 101/1 102/7
107/17 122/10
122/12
**liked [1]** 22/18
**limited [10]** 20/19
56/15 79/15 117/21
117/21 124/13
124/18 125/15
125/21 126/2
**line [9]** 10/10 23/5
23/5 23/9 23/11
47/14 82/15 122/17
126/5
**Line 7 [1]** 23/5
**Line 8 [1]** 23/11
**lined [1]** 122/10
**lingering [1]** 69/21
**LinkedIn [4]** 45/16
46/9 47/4 96/8
**list [9]** 17/19 46/6
46/8 46/13 46/14
46/21 46/25 96/14
132/20
**listed [9]** 8/23 11/14
14/1 14/2 75/13
77/17 77/23 78/16
86/21
**listing [2]** 12/18
12/18
**lists [3]** 17/24 119/8
125/19
**literally [1]** 3/23
**litigation [17]** 8/8
23/22 49/5 51/8
51/18 52/11 52/15
52/20 60/2 61/20
65/5 74/10 95/25
125/17 127/13
127/18 128/8
**little [10]** 4/25
24/14 90/10 94/23
99/9 102/19 110/20
110/22 124/10
124/15
**LLC [7]** 1/8 21/5
81/22 82/18 129/20
129/24 131/6
**loaded [1]** 55/4
**loading [2]** 56/20
57/1
**loan [1]** 63/15
**local [1]** 66/1
**locations [1]** 75/10
**logged [1]** 16/12
**logo [15]** 15/7 49/24

50/1 50/5 50/6 50/21
50/21 51/13 82/6
82/13 83/16 99/7
116/1 116/2 117/25
**long [4]** 32/25 64/8
97/7 106/6
**longer [1]** 84/25
**look [11]** 4/6 16/4
45/6 47/20 52/24
53/13 61/10 74/7
100/10 102/6 131/21
**looked [1]** 13/21
**looking [6]** 19/25
30/9 30/13 35/19
96/21 96/25
**looks [7]** 14/23 32/1
53/21 54/2 101/1
101/2 122/12
**Lopardo [2]** 89/10
90/12
**Lopresti [1]** 51/4
**lost [8]** 41/21 73/12
93/23 116/17
**lot [6]** 4/25 30/15
97/1 97/3 116/16
117/3
**lower [1]** 105/19
**lump [1]** 68/10
**lunch [2]** 70/12
133/10
**luncheon [1]** 133/17

**M**

**ma'am [6]** 40/4 54/3
56/24 58/18 61/1
100/12
**made [8]** 52/10
63/17 71/5 71/13
71/20 72/7 99/23
107/15
**mail [56]** 4/16 5/2
12/3 14/19 15/12
16/7 16/9 16/12
16/13 16/20 17/4
33/8 33/17 33/21
33/23 33/25 34/9
45/20 82/7 82/10
82/14 83/17 84/5
87/14 87/19 92/18
93/6 94/19 97/8
97/14 98/23 99/1
99/2 99/3 99/23
99/23 100/16 101/3
102/17 104/23
105/19 105/23 106/1
106/6 108/10 109/19
111/4 111/24 114/10
118/6 118/15 120/19
125/14 131/10
131/19 133/1
**mails [12]** 3/16 4/1
16/10 16/15 16/18

81/8 86/6 88/4
104/21 112/6 116/3
126/8
**Main [1]** 1/20
**mainly [1]** 13/20
**maintain [1]** 17/5
**majority [1]** 118/18
**make [9]** 12/10 49/5
56/9 64/9 64/20 71/7
87/22 103/18 126/18
**making [5]** 53/9
67/11 94/14 112/7
132/18
**manage [1]** 57/4
**management [1]**
57/4
**manager [2]** 65/15
65/20
**many [2]** 130/7
130/7
**March [6]** 9/18
96/13 98/24 99/12
99/18 103/10
**March 10th [2]**
99/12 99/18
**March 11th [2]** 9/18
98/24
**mark [183]**
**Mark Heenan [38]**
14/20 18/9 20/3
20/11 20/13 25/3
28/16 29/19 33/21
36/2 40/15 41/19
44/25 45/15 47/1
47/2 47/16 47/19
48/19 48/22 49/12
49/16 58/23 64/23
73/8 74/23 92/24
98/23 99/18 100/17
105/4 112/22 118/10
120/21 122/9 123/24
124/19 125/22
**Mark Heenan
represented [1]**
48/24
**Mark Heenan's [3]**
64/25 65/3 88/25
**Mark's [9]** 13/25
14/1 17/2 17/11
17/12 76/25 85/6
108/2 118/25
**marked [1]** 4/2
**market [2]** 1/24
50/14
**marketing [4]** 18/2
18/3 50/16 81/19
**markets [1]** 51/6
**Marriott [2]** 51/5
51/8
**master [1]** 14/24
**materials [1]** 55/4
**matter [8]** 33/14

48/17 70/20 70/21
70/24 103/19 118/20
161/13
**maxed [1]** 28/9
**may [17]** 7/11 7/18
13/9 13/10 38/23
56/6 57/12 61/5
61/25 72/25 91/3
105/3 117/21 120/21
122/7 128/24 129/11
**May 1st [1]** 105/3
**May 23rd [2]**
120/21 122/7
**maybe [7]** 44/11
53/2 80/14 101/12
117/22 128/10 133/8
**me [42]** 5/16 16/4
17/6 25/8 32/12
33/17 34/9 38/22
43/14 43/20 43/25
44/16 46/16 47/5
47/24 47/24 51/20
70/5 72/8 72/9
80/13 80/23 80/25
81/3 82/12 88/21
90/12 90/13 90/15
91/16 92/4 92/8 99/1
101/4 102/10 106/22
108/13 109/2 117/1
117/4 120/15 133/4
**mean [7]** 15/4 22/11
27/2 73/18 80/23
108/13 126/7
**Meaning [1]** 36/14
**meet [3]** 45/1 45/1
128/11
**meeting [11]** 12/2
19/17 25/2 25/9
25/10 104/11 104/13
104/16 115/7 115/11
125/19
**meetings [5]** 54/19
64/16 64/17 64/22
79/17
**member [2]** 20/11
116/12
**members [2]** 7/15
90/13
**memorialized [2]**
12/3 104/1
**mentor [4]** 43/3
43/4 43/6 43/24
**mere [2]** 63/8 63/10
**message [2]** 73/7
75/14
**messages [1]** 80/12
**met [7]** 13/19 44/22
44/24 45/3 79/17
127/23 127/24
**MH [1]** 120/23
**Microsoft [1]** 16/14
**mid [1]** 70/8

**M**

**mid-morning [1]** 70/8

**middle [1]** 100/19

**might [1]** 76/21

**million [14]** 30/12 31/9 31/13 31/21 40/13 40/23 75/19 77/1 78/10 78/14 79/2 79/5 79/8 79/23

**mind [1]** 101/22

**minds [3]** 104/11 104/13 104/16

**mine [1]** 18/5

**minimum [4]** 28/11 100/22 102/25 123/20

**minor [1]** 118/18

**minus [1]** 79/3

**minute [3]** 6/13 53/18 60/6

**minutes [4]** 70/9 70/11 94/12 133/8

**misappropriated [3]** 36/10 37/16 78/20

**mischaracterizing [1]** 108/6

**misleading [2]** 114/13 114/16

**missing [2]** 78/25 116/4

**moment [2]** 16/4 128/25

**Monday [3]** 79/18 105/17 111/7

**money [27]** 22/25 24/10 24/11 26/18 27/25 35/13 35/22 36/17 36/20 37/6 41/3 53/17 56/9 103/5 109/7 113/20 114/1 114/14 115/21 116/11 117/4 117/5 123/14 124/7 125/25 128/12 128/14

**month [2]** 9/19 96/12

**months [7]** 68/2 86/15 106/14 116/21 119/3 129/10 129/16

**Moorestown [1]** 1/21

**more [23]** 2/8 3/8 4/25 17/19 20/23 28/22 38/1 54/6 57/13 62/3 68/23 68/24 68/24 69/3 97/20 101/19 102/19 110/21 117/23 118/23 119/1 124/11 132/16

**morning [4]** 3/6 3/7 7/23 70/8

**most [8]** 49/17 59/15 59/19 64/5 78/15 101/17 111/12 121/14

**mostly [2]** 26/7 78/21

**motion [2]** 5/10 6/23

**move [4]** 25/21 62/23 107/17 132/21

**moving [3]** 26/9 116/15 116/16

**Mr [4]** 14/23 115/12 130/21 161/5

**Mr. [132]** 3/2 3/2 3/5 4/15 5/12 5/15 6/25 7/18 7/23 10/12 13/2 14/18 15/3 15/20 20/1 24/3 28/19 30/6 31/7 32/7 40/6 42/14 44/21 45/10 45/20 45/23 46/2 46/7 46/14 46/16 46/17 47/16 47/22 47/23 47/23 47/24 48/6 48/8 48/10 48/14 48/21 49/2 49/6 49/11 49/14 49/15 51/14 53/9 53/16 55/22 58/10 59/16 62/25 64/11 64/13 65/6 65/7 67/23 68/1 71/6 71/21 73/5 76/1 76/8 80/2 81/1 82/5 82/23 83/15 83/25 84/7 84/13 85/8 85/19 85/25 86/1 86/15 88/7 88/11 88/14 89/8 89/21 92/2 92/18 94/6 94/18 96/1 96/2 98/21 100/4 102/14 103/16 103/23 104/14 104/19 105/25 106/8 108/4 108/8 108/19 108/20 109/3 109/9 112/5 112/9 112/20 113/15 113/20 113/23 114/1 114/15 115/5 115/16 116/10 116/23 117/1 117/25 121/20 122/18 123/8 123/19 126/6 126/12 127/16 128/4 128/6 128/18 128/21 129/23 131/3 133/4 **Mr. Aloia [42]** 7/23 14/18 20/1 42/14 46/7 51/14 53/9

55/22 58/10 71/6 73/5 80/2 83/25 85/8 85/25 88/7 89/8 92/2 92/18 94/6 98/21 100/4 102/14 103/16 103/23 104/14 106/8 108/4 108/8 108/19 109/3 109/9 112/9 112/20 114/15 115/5 116/23 123/19 126/6 126/12 126/12 127/16 128/18 128/6 128/21 129/23 131/3 **Mr. Geiger [1]** 15/3

**Mr. Heenan [54]** 3/2 13/2 15/20 24/3 28/19 30/6 31/7 32/7 44/21 45/10 46/2 46/14 46/16 47/23 48/8 48/21 49/2 49/6 49/25 53/16 59/16 62/25 65/7 81/1 82/5 82/23 83/15 84/7 84/13 85/19 86/1 86/15 88/11 88/14 89/21 94/18 96/2 104/19 108/20 112/5 113/15 113/20 113/23 114/1 115/16 116/10 117/1 117/25 121/20 122/18 123/8 127/6 128/6 129/23 131/3 **Mr. Heenan's [8]** 10/12 45/20 45/23 67/23 76/1 76/8 105/25 128/18

**Mr. Hessert [12]** 47/16 47/22 47/23 47/24 48/6 48/10 48/14 49/15 64/11 65/6 96/1 128/21

**Mr. Hessert's [2]** 49/14 64/13

**Mr. Lemus [1]** 68/1

**Mr. Sciotto [2]** 46/17 49/11

**Mr. Watson [10]** 3/2 3/5 4/15 5/12 5/15 6/25 7/18 40/6 71/21 133/4

**Ms [1]** 161/5

**Ms. [7]** 4/10 6/2 42/9 70/7 71/20 72/5 72/25

**Ms. Lavan [7]** 4/10 6/2 42/9 70/7 71/20 72/5 72/25

**much [14]** 3/8 10/3 22/25 26/10 27/11 28/25 51/19 51/22 52/23 55/11 58/3 66/6 70/13 133/15

**multimillion [1]** 68/5

**multimillion-dollar [1]** 68/5

**multiple [2]** 21/23 74/13

**my [43]** 3/14 3/22 3/22 4/9 4/24 5/10 5/16 5/21 6/7 7/4 10/25 34/5 47/25 52/1 52/2 54/24 55/4 60/14 63/23 64/3 66/5 71/12 71/18 80/6 83/3 83/8 90/17 91/23 91/23 93/11 93/11 93/23 97/11 99/14 101/15 101/22 104/15 105/7 105/16 110/16 116/24 130/9 130/11

**myself [2]** 80/12 101/9

**N**

**name [24]** 11/11 15/18 17/15 17/16 41/5 80/15 80/19 81/2 81/5 81/21 81/23 88/17 88/25 89/16 91/23 93/11 108/2 108/18 110/5 115/1 127/12 130/3 130/9 161/3

**names [1]** 107/23

**necessary [1]** 49/22

**Neco [1]** 10/18

**need [15]** 2/18 12/9 17/15 28/1 33/18 66/15 66/22 86/15 86/25 102/23 107/18 118/23 119/1 119/5 126/17

**needed [10]** 50/4 55/5 66/18 82/13 90/14 90/14 114/7 114/10 126/2 126/3

**needs [1]** 67/1

**negotiation [4]** 123/1 123/3 123/7 123/7

**negotiations [1]** 103/15

**neither [1]** 107/22

**net [7]** 40/25 40/25 85/4 85/13 98/9 103/11 121/16

**net-net [1]** 40/25

**never [29]** 3/15 5/19 35/14 44/22 44/24 51/22 60/6 60/18 62/6 62/19 69/19 74/2 74/3 74/24 75/1 75/6 75/24 77/24 78/2

79/24 85/15 96/1 103/13 103/14 112/18 117/15 117/17 131/9 131/12

**new [18]** 1/21 6/17 9/19 26/16 29/9 33/4 50/21 56/18 81/22 106/20 106/23 107/1 107/6 108/11 108/18 112/8 116/22 131/12

**next [20]** 20/8 20/9 26/15 27/5 28/12 28/17 30/5 30/16 31/12 31/14 31/16 31/18 38/22 57/14 61/11 62/1 70/22 87/5 88/15 106/7

**nine [1]** 126/3

**no [94]** 1/7 2/10 2/14 2/23 5/17 6/20 11/17 23/10 25/3 29/1 30/3 30/14 33/13 34/12 34/14 34/16 42/6 44/13 46/8 48/4 48/23 48/25 50/16 51/21 52/12 54/12 56/2 56/3 59/9 60/1 60/3 60/25 61/4 61/8 62/22 63/6 64/21 66/7 67/3 67/6 68/6 68/13 72/16 74/21 75/11 75/15 75/21 75/25 77/15 77/20 77/21 78/8 82/20 82/22 83/8 83/17 83/19 84/8 84/25 86/11 86/13 87/19 88/3 91/2 91/2 92/14 93/15 93/17 95/23 103/14 104/9 107/13 107/14 107/20 109/20 110/18 111/3 112/11 113/3 113/12 114/16 114/22 115/7 119/15 119/20 120/3 121/17 121/21 126/17 126/17 128/1 128/23 131/17 132/9

**nobody [1]** 6/5

**non [6]** 4/13 59/25 102/13 107/8 113/17 126/4

**non-compete [1]** 126/4

**non-equity [2]** 102/13 113/17

**non-parties [1]** 4/13

**non-payment [1]** 59/25

**non-performance [1]** 107/8

**N**

none [1] 97/1
nor [1] 36/20
North [1] 130/11
not [150]
notarized [1] 52/16
note [6] 25/16 25/24
30/21 39/24 40/2
40/9
noted [1] 12/11
nothing [23] 6/24
53/17 53/18 55/22
78/4 78/6 79/8 79/10
79/15 80/2 84/11
85/6 85/7 85/23
85/23 85/25 92/8
97/23 98/8 104/10
108/20 109/25
123/18
notice [2] 3/10
100/10
notion [1] 4/4
November [10]
26/22 26/23 34/24
45/3 88/8 91/21 93/3
111/21 121/21
131/22
November 24th [1]
93/3
November 27th [2]
88/8 111/21
now [10] 12/9 30/13
35/3 35/17 86/15
92/12 97/18 103/17
110/24 133/11
Nowhere [1] 108/25
nullity [1] 2/20
number [21] 14/1
14/1 14/2 14/2 20/2
23/7 34/18 36/11
38/5 38/9 40/23
47/25 53/3 61/20
61/20 77/5 90/16
90/17 96/6 124/13
125/21
numbers [4] 31/24
38/12 77/23 119/20

**O**

oath [1] 62/12
object [3] 4/5 39/5
39/18
objection [21]
32/15 33/12 35/5
39/1 41/11 41/11
48/3 53/19 56/23
57/9 58/17 61/3
67/12 86/24 93/13
95/14 109/11 112/25
117/6 117/7 126/16
objections [3]
38/21 66/20 67/8

obviously [2] 15/15
32/19
occur [1] 76/14
occurred [7] 75/2
75/19 75/24 76/6
76/23 77/14 79/24
October [10] 19/3
19/4 19/7 19/8 33/24
34/24 44/24 45/1
45/2 131/22
October 19th [1]
19/4
of [303]
off [4] 17/2 33/3
66/4 117/20
offered [1] 126/10
offering [2] 121/19
121/22
office [8] 5/10 5/16
5/22 6/8 6/21 10/25
13/25 35/4
officer [2] 12/1
65/21
OFFIT [1] 1/15
Oftentimes [1] 6/14
Oh [2] 19/8 20/6
okay [53] 4/10 4/24
5/7 5/7 5/21 5/23 6/1
9/21 11/13 12/22
14/23 15/14 17/14
19/8 19/20 21/24
22/2 23/3 24/2 24/6
26/1 26/11 31/5
31/12 32/24 34/25
36/17 38/8 40/22
41/15 46/22 55/19
56/6 58/5 65/22
72/17 79/6 82/1
82/23 89/12 89/25
94/14 94/22 97/9
99/5 100/2 100/14
102/25 103/25
106/17 110/19 114/4
133/9
old [2] 50/1 95/22
on [206]
once [1] 37/14
one [46] 5/2 5/20
6/13 6/13 7/14 8/7
12/16 16/18 20/23
22/20 23/15 24/21
25/3 27/17 29/22
30/2 30/2 30/16 34/6
38/18 47/13 47/25
61/23 66/25 67/25
73/15 96/6 100/7
102/1 105/2 107/17
107/22 108/14
109/13 110/25
111/11 113/9 116/4
117/14 119/25 120/7
121/8 126/4 129/4

129/8 131/23
one-sided [2]
107/17 108/14
ones [3] 79/3 100/1
105/23
only [27] 4/17 11/23
20/11 30/14 39/4
41/12 45/19 46/19
46/20 50/16 69/24
78/25 85/14 86/12
86/21 88/17 88/25
91/13 108/18 111/24
113/9 117/21 120/3
122/19 123/4 128/7
129/4
onset [1] 32/14
open [4] 28/25
106/19 106/20
107/18
operate [1] 107/19
operated [1] 130/4
operating [6] 65/21
129/24 130/2 131/24
132/11 132/14
operations [3] 64/4
65/14 65/20
opinion [4] 48/20
49/1 70/19 70/20
opportunities [1]
89/23
opportunity [6]
3/13 4/6 4/7 62/10
106/12 114/8
opposed [1] 18/17
option [1] 128/7
or [66] 4/20 14/15
16/2 16/21 19/3
23/17 29/23 30/12
30/19 31/10 35/10
35/25 43/1 47/18
48/14 48/23 48/25
49/17 50/6 51/12
56/2 56/3 56/9 58/8
58/24 59/25 61/4
61/8 62/12 62/18
63/1 66/14 70/8 70/9
70/11 70/19 74/11
74/18 75/4 75/17
76/20 77/4 80/14
81/10 81/20 83/9
84/20 88/16 90/13
92/1 92/3 101/12
101/15 101/20
104/11 105/22
107/19 107/22 108/2
109/24 112/12
116/12 118/14 119/4
120/4 131/22
oral [1] 85/14
order [1] 56/19
oriented [1] 17/19
original [4] 85/2

103/8 116/7 116/8
originally [6] 27/9
30/12 102/15 103/6
121/19 121/21
originate [1] 3/11
other [22] 5/4 5/9
6/4 6/25 33/9 34/8
35/15 49/15 57/23
58/6 87/21 89/1
96/17 96/22 97/17
104/21 109/14 126/3
127/16 129/6 129/11
129/12
our [59] 2/18 5/12
12/2 12/6 13/18
13/22 13/25 13/25
15/7 17/7 19/14
19/16 19/21 23/21
25/2 25/9 27/18 35/3
35/20 35/21 35/22
38/18 41/4 41/5 41/5
41/25 42/1 51/16
57/3 58/23 66/18
72/10 81/21 81/25
82/11 82/13 83/20
90/17 91/2 103/8
109/9 110/8 110/10
114/23 114/24 115/1
115/3 115/7 116/7
116/7 116/15 116/18
124/3 125/19 125/24
127/12 127/12
127/23 133/10
ours [1] 115/2
out [46] 5/23 5/25
16/22 19/10 19/13
19/14 19/16 22/19
23/3 28/9 36/21 38/4
39/14 39/16 44/14
46/24 47/22 47/24
54/1 57/2 57/6 65/5
71/6 81/7 81/7 82/9
82/25 96/2 96/2
113/20 113/25
114/14 114/22
114/25 115/8 115/20
115/25 116/2 116/4
116/22 122/21 124/2
124/7 126/9 127/11
131/17
outlet [1] 18/7
over [8] 2/22 3/23
35/22 52/7 60/2
64/12 101/25 119/4
overall [4] 15/6
15/8 25/14 55/18
overbill [1] 22/16
overruled [6] 39/25
57/11 86/25 93/15
95/16 113/1
oversee [1] 55/8
oversees [2] 14/10

14/10
oversight [1] 35/24
overstated [2]
63/14 63/15
owe [3] 98/14
100/21 101/4
owed [1] 43/19
owes [1] 41/19
own [8] 5/20 9/17
41/13 83/23 108/7
109/5 110/5 130/2
owner [31] 8/18
9/11 9/13 12/17
12/18 20/12 20/13
20/14 21/13 22/16
24/7 27/10 28/5 28/9
29/10 29/17 36/16
37/8 47/14 54/19
62/11 63/2 64/16
66/14 69/5 74/11
76/1 76/9 86/16
86/16 86/21
owner's [1] 62/21
owners [7] 21/17
27/1 32/14 32/24
47/6 55/9 74/13
ownership [5]
90/21 121/17 121/19
125/6 130/6

**P**

P.A [1] 1/15
p.m [2] 133/12
133/16
pad [1] 54/20
page [23] 10/15
11/10 12/12 13/2
13/4 14/15 18/18
19/5 19/23 20/2 20/8
22/21 22/21 24/21
24/22 30/17 45/20
46/9 47/4 80/5 80/7
102/6 106/7
Page 1150 [1]
24/22
Page 15 [1] 10/15
Page 625 [1] 22/21
Page 78 [1] 14/15
Page 819 [1] 11/10
Page 826 [1] 12/12
Page 830 [1] 13/2
Page 834 [1] 13/4
pages [1] 46/20
paid [22] 21/15
22/25 25/17 27/11
35/4 36/21 37/8
37/12 37/13 37/19
37/20 38/1 47/13
58/24 59/16 59/18
59/19 60/3 70/2
98/13 107/12 117/11
pantone [1] 15/7

**P**

**paper [2]** 85/15 129/13
**paperwork [6]** 9/18 46/12 60/4 60/7 69/8 92/4
**Pappano [3]** 64/17 72/3 72/12
**Pappano's [1]** 69/13
**paragraph [2]** 94/24 106/7
**parenthesis [1]** 76/19
**Parkway [1]** 1/16
**part [12]** 2/12 35/25 42/25 49/3 53/21 108/17 108/21 111/8 111/12 122/1 128/15 132/15
**parted [1]** 116/17
**partial [4]** 8/15 8/21 9/9 10/6
**particular [8]** 26/2 56/11 58/1 65/23 73/9 76/23 77/5 89/16
**parties [7]** 3/11 4/11 4/13 4/15 32/8 120/10 120/12
**partner [34]** 50/25 53/10 65/23 84/2 85/1 86/2 86/6 86/7 86/11 88/11 89/1 89/2 100/21 100/24 106/17 107/25 109/2 109/4 109/14 110/2 112/7 112/10 113/19 114/6 116/12 122/19 122/21 123/2 125/3 125/4 130/9
**partner's [1]** 110/5
**partner-guaranteed [1]** 100/24
**partnering [5]** 49/23 50/20 50/24 51/1 51/13
**partners [12]** 44/8 85/11 87/15 90/13 96/18 96/23 96/24 98/6 100/17 107/23 121/11 121/24
**partnership [45]** 48/9 49/8 82/21 82/22 83/9 84/6 84/19 85/22 86/3 89/21 89/24 95/2 95/6 95/8 96/3 96/20 97/4 97/20 97/21 101/8 101/10 102/7 102/17 103/14 104/8

104/9 104/11 104/12 106/12 106/13 108/12 110/9 111/24 112/18 113/16 113/24 114/21 115/12 116/6 124/13 124/18 125/15 125/21 126/2 132/25
**partnerships [1]** 84/9
**party [13]** 2/5 2/10 2/12 2/21 6/5 6/6 6/16 6/19 9/8 24/1 52/15 113/9 120/2
**passed [1]** 97/21
**past [3]** 68/2 129/10 129/16
**Patel [1]** 72/3
**pay [14]** 22/4 22/23 24/3 28/11 35/13 35/20 36/18 43/18 56/8 85/19 86/15 98/11 127/17 128/12
**payee [1]** 28/14
**paying [1]** 55/24
**payment [19]** 8/17 8/20 10/11 21/4 21/7 21/8 21/17 23/2 23/6 23/15 23/25 24/4 35/11 35/19 55/9 55/11 55/13 55/16 59/25
**payments [4]** 24/14 59/5 124/22 125/23
**payout [5]** 9/7 21/19 21/21 23/5 23/6
**pending [1]** 76/24
**PENNSYLVANIA [5]** 1/1 1/10 1/17 1/25 59/3
**people [7]** 6/19 33/9 34/19 57/24 72/11 120/4 120/4
**percent [35]** 36/23 38/13 39/17 40/21 40/22 40/24 40/25 85/2 85/4 85/13 86/12 98/2 98/8 98/9 101/8 101/17 101/17 101/22 102/1 103/11 107/12 110/13 110/14 119/18 119/23 119/24 120/2 123/4 123/15 125/2 125/13 126/10 127/21 127/22 127/23
**percentage [1]** 125/1
**percentages [1]** 101/11

**perfect [1]** 96/5
**perform [1]** 109/8
**performance [1]** 107/8
**performed [6]** 36/23 36/25 74/3 74/6 74/9 109/6
**performing [2]** 50/15 50/22
**period [3]** 10/7 16/17 34/22
**permanently [1]** 16/16
**permits [2]** 17/24 26/8
**permitted [2]** 2/14 18/11
**person [1]** 90/7
**personal [3]** 34/5 43/17 115/3
**personally [5]** 45/10 54/17 54/24 56/15 58/11
**pertains [1]** 34/6
**PETTIT [1]** 1/16
**phase [17]** 24/19 26/4 26/5 26/16 29/3 29/4 29/8 29/8 29/22 29/23 29/23 31/4 31/4 31/19 38/9 62/9 77/10
**Phase I [5]** 26/4 26/5 29/4 31/4 38/9
**Phase II [4]** 26/16 29/23 31/4 62/9
**phases [8]** 29/6 29/21 29/24 62/4 62/6 62/12 62/18 62/23
**PHILADELPHIA [2]** 1/10 1/25
**phone [3]** 13/25 47/25 48/7
**photograph [1]** 30/20
**physically [1]** 57/5
**pick [2]** 54/21 54/23
**picked [6]** 47/3 51/17 54/19 54/24 55/1 55/20
**picking [1]** 57/17
**picks [1]** 17/23
**pickup [1]** 54/24
**picture [2]** 30/21 128/18
**pictures [3]** 15/9 15/11 17/21
**pieces [1]** 26/7
**pipeline [1]** 96/12
**place [6]** 8/18 30/14 39/1 43/20 43/22 82/21

**plaintiff [2]** 1/15 7/13
**plaintiff's [1]** 7/12
**pleading [1]** 6/4
**please [12]** 7/20 21/3 28/17 30/5 30/16 42/11 70/25 92/16 116/9 118/4 119/3 128/25
**pledged [2]** 124/21 125/23
**Plenty [1]** 126/18
**plumbing [1]** 56/17
**plus [1]** 98/9
**pocket [1]** 38/5
**point [25]** 9/5 15/25 15/25 17/7 19/13 20/19 22/4 23/1 23/3 27/11 30/13 34/19 34/22 44/10 48/18 59/4 71/20 86/19 102/1 103/9 116/13 116/14 117/20 128/20 132/13
**pointless [1]** 107/19
**points [2]** 114/17 114/19
**pop [1]** 88/22
**portion [3]** 17/25 79/25 80/9
**position [3]** 3/3 12/1 101/20
**possession [1]** 61/16
**possible [2]** 60/15 60/16
**possibly [2]** 16/16 35/7
**post [7]** 17/21 20/16 30/21 39/12 39/24 40/1 40/8
**Post-it [5]** 30/21 39/12 39/24 40/1 40/8
**posted [1]** 13/18
**potentially [1]** 101/14
**poured [2]** 54/21 57/2
**Power [1]** 27/2
**PPAs [1]** 27/1
**practice [1]** 6/15
**preconstruction [5]** 64/4 68/13 68/14 77/2 77/19
**precursor [1]** 2/19
**prejudice [1]** 4/9
**preliminary [4]** 28/24 66/20 67/8 120/23
**prepare [1]** 133/10
**prepared [1]** 64/2

**presented [2]** 107/16 108/14
**pretty [3]** 67/4 67/7 106/19
**prevailing [1]** 30/10
**prevent [2]** 92/5 92/8
**previous [2]** 23/15 44/8
**previously [4]** 49/2 73/3 95/10 131/15
**pricing [1]** 68/10
**prime [1]** 66/14
**principal [2]** 8/23 11/14 11/15
**principals [1]** 5/3
**printed [1]** 19/10
**printout [3]** 18/25 19/4 19/21
**prior [18]** 8/16 22/19 23/22 42/21 42/23 44/21 46/2 49/23 50/20 50/23 51/13 52/6 52/19 66/13 90/19 90/23 91/1 94/18
**pro [1]** 125/2
**probably [12]** 16/14 27/3 30/10 38/15 63/8 65/19 68/3 68/19 77/2 97/6 117/23 131/9
**problem [3]** 22/11 38/17 85/5
**proceed [2]** 2/24 7/18
**proceedings [3]** 2/1 71/3 161/12
**process [1]** 16/2
**produce [9]** 3/22 51/7 51/18 52/2 52/13 52/22 87/17 87/19 110/15
**produce the [1]** 87/19
**produced [18]** 4/1 4/17 4/20 39/19 51/10 51/22 52/4 52/5 52/6 52/25 52/25 53/1 60/13 74/8 87/18 88/3 88/5 88/6
**production [3]** 52/14 52/24 61/15
**profile [2]** 45/16 96/7
**profit [32]** 25/23 31/5 31/7 31/22 31/23 38/8 40/13 75/1 75/12 75/17 78/3 92/25 96/22 96/25 98/2 98/9

(WITNESSNAME)

**P**

**profit... [16]** 101/5
102/13 103/12 114/2
114/4 115/14 115/15
115/16 116/7 116/12
119/14 119/19 121/6
121/10 123/13
123/18
**profit-sharing [2]**
96/22 121/10
**profitable [1]** 25/20
**profits [22]** 30/25
38/12 39/11 39/16
40/14 41/21 69/19
69/23 73/12 73/19
73/23 75/4 78/19
79/23 85/4 85/13
86/12 96/9 121/15
121/16 121/16 125/1
**progress [1]** 27/1
**progressed [1]** 33/6
**project [84]** 9/11
12/19 12/20 13/21
13/22 24/4 24/18
24/19 24/22 25/15
26/2 26/3 26/15 27/2
27/5 27/5 27/8 27/9
27/14 28/12 28/17
28/21 28/22 29/2
30/5 30/7 30/8 31/12
31/14 31/16 31/18
36/11 37/16 45/13
45/23 46/6 46/8
46/12 46/14 46/20
46/25 50/19 54/6
54/7 54/8 54/17
54/18 56/10 56/11
56/16 56/16 58/1
63/4 63/8 63/11
63/24 64/1 64/2 64/7
65/3 65/5 65/16
65/25 66/9 66/23
67/25 69/9 69/21
70/3 74/3 74/12
74/14 74/24 76/10
76/23 76/24 76/25
77/2 77/3 77/10
77/13 78/21 78/21
101/12
**project's [1]** 30/24
**projected [1]** 64/7
**projects [39]** 21/10
25/4 25/17 25/20
25/21 25/23 26/9
26/14 30/4 32/14
38/11 40/14 41/6
42/1 46/24 47/3 47/5
47/7 47/8 47/13
48/15 48/19 49/6
49/17 50/22 53/17
62/25 73/23 76/13

78/19 79/14 79/18
96/12 114/25 116/18
116/22 129/13
129/14 129/15
**promise [1]** 20/23
**promising [1]** 12/7
**Proof [1]** 131/1
**proofs [1]** 82/12
**properly [1]** 121/9
**property [7]** 8/19
28/23 36/22 59/13
62/21 65/9 66/21
**proposal [8]** 13/15
30/14 80/25 97/5
107/16 108/13
125/18 127/15
**proposals [4]** 14/11
14/11 81/7 81/24
**propose [1]** 96/18
**proposed [3]** 92/25
119/4 124/23
**proposing [1]**
125/12
**proprietor [1]** 58/15
**prosecution [7]**
125/17 127/14
127/14 127/18
127/25 128/16 129/5
**provide [4]** 9/7 9/8
46/14 70/19
**provided [12]** 46/11
46/12 47/10 66/18
82/5 86/23 88/16
90/6 91/4 94/2 94/7
94/9
**provision [1]**
102/16
**pull [1]** 98/18
**pulled [2]** 13/19
38/4
**purchased [2]**
15/18 15/20
**purposes [1]** 52/10
**pursuant [1]** 52/20
**put [17]** 36/6 51/15
54/10 65/18 69/24
70/4 70/5 78/9
101/13 107/23 108/2
110/5 110/8 115/3
116/15 116/18 132/9
**putting [1]** 35/19

**Q**

**quantify [1]** 36/4
**quarterly [1]** 101/12
**Quarters [2]** 13/5
13/9
**question [38]** 4/24
28/13 32/9 32/17
39/5 39/6 40/5 48/2
50/23 51/1 55/2
55/25 56/25 57/12

57/13 57/14 59/7
59/8 59/9 59/12
60/23 61/4 61/11
62/1 71/19 76/20
78/18 83/5 83/7 83/8
87/5 93/14 95/18
113/2 113/10 126/13
126/17 126/19
**questioned [1]**
16/24
**questioning [1]**
133/11
**questions [2]** 42/6
54/3
**quick [1]** 118/21
**quickly [2]** 9/22
84/25
**quite [1]** 97/6
**quote [1]** 5/16

**R**

**R.P.R [1]** 161/16
**ramp [1]** 56/19
**ran [1]** 35/22
**rate [1]** 30/10
**rates [1]** 17/20
**rather [1]** 102/7
**re [1]** 49/15
**re-deposition [1]**
49/15
**reach [1]** 47/22
**reached [1]** 47/24
**read [6]** 15/17 16/1
30/18 49/19 69/16
125/14
**ready [1]** 6/25
**real [1]** 82/20
**realize [4]** 60/8 67/7
91/24 92/5
**really [10]** 26/9
64/3 74/17 77/22
77/23 82/23 84/14
111/1 112/13 112/16
**reason [3]** 4/8 37/11
92/9
**recall [8]** 28/19
44/17 45/21 65/13
72/23 84/5 94/4
97/16
**receipt [2]** 124/22
125/23
**receive [7]** 16/7
26/18 29/23 33/21
33/23 36/20 123/4
**received [14]** 29/2
35/9 35/14 36/17
36/20 45/18 46/5
46/21 46/25 47/25
48/7 58/22 91/14
131/15
**receiving [3]** 40/15
56/13 123/14

recently [1] 101/17
**recess [2]** 71/2
133/17
**record [7]** 6/3 8/3
10/5 12/11 21/2
24/17 161/12
**records [3]** 3/2 3/3
45/6
**recovery [1]** 28/7
**RECROSS [1]** 161/3
**red [6]** 105/23
105/23 110/21 111/5
122/10 122/17
**red-line [1]** 122/17
**redact [1]** 131/19
**redirect [5]** 53/4
93/16 133/6 133/14
161/3
**reduced [2]** 85/15
100/24
**refer [3]** 40/1 92/15
104/22
**reference [2]** 53/2
54/1
**referenced [1]** 73/6
**references [1]**
44/12
**referencing [1]**
39/22
**referred [1]** 106/25
**referring [5]** 59/15
86/6 107/21 120/7
126/15
**regarding [6]** 7/5
51/8 63/4 71/19
76/16 79/13
**Regardless [1]**
112/12
**registered [4]** 86/20
88/7 89/16 93/8
**registering [1]**
88/20
**related [1]** 72/12
**relationship [2]**
48/13 114/12
**relationships [1]**
129/11
**Release [5]** 8/15
8/17 8/21 9/10 10/6
**relevance [4]** 3/21
51/9 51/11 51/16
**relevant [3]** 51/14
51/19 73/20
**relied [8]** 45/23
48/20 48/25 49/5
116/14 116/20
116/21 116/24
**rely [1]** 48/18
**relying [2]** 41/25
42/5
**remain [1]** 133/13
**remainder [1]** 101/9

**remember [5]** 7/11
37/24 52/1 66/5
78/11
**rephrase [1]** 35/6
**report [4]** 24/18
25/14 26/15 27/5
**reporter [2]** 87/21
87/22
**reporting [1]** 66/2
**reports [6]** 24/23
25/6 25/7 29/3 30/22
66/3
**repossessing [1]**
16/3
**representation [1]**
41/19
**represented [2]**
48/22 48/24
**Request [1]** 13/15
**requested [3]** 53/1
68/1 88/6
**requesting [1]** 52/3
**requires [1]** 6/11
**respond [2]** 97/14
99/24
**response [4]** 17/3
59/11 97/16 119/3
**rest [2]** 24/2 40/24
**results [1]** 6/17
**resumed [1]** 71/3
**resumé [7]** 45/11
45/20 45/23 46/6
46/10 46/19 64/13
**retired [2]** 43/11
43/12
**retrieve [3]** 16/15
16/16 16/18
**returns [2]** 110/10
110/16
**revenue [2]** 122/2
123/5
**reversible [1]** 70/17
**reverted [1]** 102/12
**review [7]** 3/1 22/19
60/21 91/5 92/6
111/2 111/3
**reviewed [3]** 22/15
66/3 118/17
**reviewing [1]** 92/8
**revised [1]** 99/20
**revisit [1]** 7/24
**riding [2]** 33/7 34/8
**right [70]** 3/12 4/23
7/3 8/25 10/3 12/9
12/15 12/22 15/25
16/1 19/24 20/2
20/13 22/14 22/20
26/3 28/15 29/11
32/21 38/13 38/23
40/23 43/4 57/18
58/14 60/4 60/11
63/20 64/6 68/25

**R**

**right... [40]** 72/21
76/4 77/5 79/6 82/5
83/17 85/25 91/18
95/9 96/15 96/20
97/24 99/3 100/18
104/8 105/3 105/17
106/7 106/17 108/12
108/19 109/3 110/2
112/3 112/19 114/15
115/15 117/5 119/10
123/3 123/12 123/13
123/19 124/24 127/2
127/4 127/7 128/4
128/10 133/3
**right-hand [3]**
19/24 20/2 60/8
**risk [1]** 59/1
**role [3]** 7/16 43/5
47/9
**roles [1]** 102/9
**Rome [2]** 14/20
14/21
**Ron [1]** 3/12
**Room [1]** 1/24
**routes [1]** 79/14
**RPR [1]** 1/24
**Rule [1]** 2/6
**Rule 4 [1]** 2/6
**Rules [2]** 2/9 6/10
**ruling [1]** 2/25

**S**

**safe [10]** 61/13 63/7
64/19 77/16 77/22
80/1 89/15 101/24
105/22 122/18
**said [24]** 14/7 19/8
24/9 25/5 38/1 52/2
69/6 71/21 76/3 81/1
81/9 86/11 90/6 94/6
95/23 97/25 100/9
101/6 102/25 113/3
114/9 115/20 132/3
132/5
**salaries [1]** 96/23
**salary [4]** 102/25
123/17 123/20
124/23
**sales [1]** 102/8
**same [12]** 13/3
13/12 16/2 30/9
70/15 76/1 76/9
94/11 94/15 100/2
115/2 121/8
**satisfaction [1]**
59/4
**satisfied [1]** 59/1
**Saturday [1]** 55/6
**saw [9]** 8/10 11/23
22/1 22/9 24/6 60/6
60/18 61/15 131/9

**say [39]** 3/24 11/1
20/10 30/20 33/25
47/9 49/11 49/14
50/21 58/7 59/20
61/13 63/7 64/19
66/7 70/23 70/24
77/16 77/23 79/15
80/1 86/13 89/15
101/24 102/18
105/22 106/13
107/20 108/22
108/25 109/1 111/7
112/2 119/18 122/14
122/18 124/13
129/19 131/1
**saying [9]** 21/17
33/4 35/4 83/3 85/17
97/15 99/24 102/22
112/7
**says [45]** 15/16
20/5 27/1 36/11
39/24 60/16 73/17
78/4 78/6 91/19
91/24 91/25 94/22
95/2 96/5 96/7 96/9
96/17 97/10 99/11
99/14 99/17 99/19
100/16 100/21
100/23 101/4 105/7
105/9 105/15 105/20
106/19 107/4 108/13
108/24 110/13
118/12 118/17 119/1
119/17 119/20
119/21 120/22 124/1
127/10
**scale [1]** 125/1
**schedule [8]** 64/3
64/6 64/7 64/8 64/14
64/20 96/11 117/17
**schedules [1]**
117/18
**schemes [1]** 15/6
**Sciotto [28]** 42/15
42/22 44/4 44/5
44/15 44/16 44/19
45/18 45/19 46/11
46/17 49/1 49/11
51/23 64/4 65/15
73/8 87/15 89/3
90/19 92/24 100/18
105/2 105/15 110/2
118/10 122/25
123/24
**Sciotto's [2]** 48/20
48/25
**scope [3]** 29/25
56/8 56/15
**screen [6]** 60/19
69/24 73/3 81/1
88/23 131/15
**scroll [1]** 20/9

**scrolling [1]** 20/7
**second [3]** 5/18
94/24 106/6
**Secondly [1]** 3/1
**seconds [1]** 7/20
**secure [2]** 76/2 77/1
**Security [2]** 90/16
90/17
**see [28]** 5/18 8/6
8/9 10/19 19/15
19/24 20/1 20/5
21/21 21/24 23/4
30/5 38/16 38/22
40/3 45/6 49/18 51/9
51/11 51/13 51/16
73/3 76/15 83/24
92/19 99/14 106/8
129/12
**seeing [4]** 10/20
29/25 34/9 97/16
**seeking [1]** 35/11
**seem [1]** 102/7
**seen [17]** 3/16 8/3
8/5 10/21 11/25
12/25 13/6 13/10
13/17 21/19 21/23
36/19 44/3 61/25
62/22 62/24 69/8
**Selection [2]** 87/18
87/25
**send [4]** 12/8 82/12
119/3 119/21
**sending [4]** 22/19
82/9 112/6 113/24
**sense [1]** 83/21
**sent [24]** 3/14 3/15
4/13 5/15 13/10 27/3
45/19 68/1 81/7 81/7
84/12 87/14 91/16
98/23 103/11 105/3
114/2 117/25 118/22
119/25 120/6 120/8
122/5 131/10
**Sentry [1]** 1/16
**separate [2]** 30/3
109/18
**series [1]** 24/22
**served [1]** 6/17
**servers [1]** 17/7
**service [4]** 2/7 2/7
17/18 17/23
**services [2]** 68/13
68/14
**set [5]** 4/16 12/16
14/7 17/7 39/16
**seven [2]** 61/23
131/22
**several [13]** 3/4
25/13 51/5 54/18
54/18 55/9 64/18
65/25 67/24 68/2
68/3 68/6 84/5

**severed [1]** 16/11
**shall [1]** 100/24
**shape [1]** 70/19
**share [4]** 84/10
84/25 122/1 125/3
**shareholder [5]**
86/3 110/6 122/20
125/9 125/12
**shareholder's [2]**
83/9 122/22
**shareholders [12]**
84/19 109/22 109/23
112/13 119/2 120/1
120/8 120/22 121/2
121/5 122/16 122/17
**shareholders's [1]**
121/23
**shareholding [1]**
123/2
**shares [14]** 84/9
118/21 119/8 119/9
119/12 119/15
119/16 119/16
121/19 121/22
121/24 122/2 124/21
125/22
**sharing [17]** 92/25
96/22 97/1 102/13
114/2 114/4 115/14
115/15 115/16 116/7
116/12 119/19 121/6
121/10 121/14
123/13 123/18
**she [6]** 4/3 90/12
90/13 90/15 91/16
130/25
**she's [1]** 93/17
**sheet [2]** 70/4 78/15
**shop [1]** 105/17
**should [16]** 4/8
23/25 30/20 40/23
72/19 72/20 77/23
82/8 82/10 88/5
101/10 101/18
101/19 109/21
109/23 118/19
**shouldn't [1]** 38/16
**show [6]** 12/9 25/19
75/12 88/21 98/17
120/5
**showed [2]** 120/4
131/16
**showing [1]** 39/4
**shows [1]** 104/10
**side [3]** 56/18 64/3
85/6
**sided [2]** 107/17
108/14
**sign [8]** 84/13 85/9
86/9 104/2 106/24
113/15 113/16
113/22

**signature [13]** 9/23
10/1 10/12 13/3 22/9
82/15 91/22 91/23
92/1 92/2 93/7 93/11
106/25
**signatures [2]**
110/8 131/19
**signed [34]** 8/23
9/13 9/19 10/9 13/20
21/16 24/3 27/21
84/11 85/7 85/7
85/16 85/23 85/25
86/7 91/2 91/20
91/25 98/8 103/13
103/14 103/19
109/21 109/23
109/25 109/25 110/7
111/1 112/13 112/16
112/23 113/17
113/19 122/13
**significant [2]** 4/25
41/24
**significantly [1]** 2/8
**signing [5]** 22/4
112/24 113/4 113/6
113/11
**signs [4]** 8/17 13/2
97/12 113/9
**similar [2]** 17/18
41/9
**simple [2]** 15/17
84/22
**simply [1]** 70/24
**since [3]** 27/15
91/16 117/22
**single [1]** 65/22
**sir [23]** 7/4 7/16 8/3
9/21 10/3 10/16
13/14 14/13 18/16
18/22 19/3 24/16
30/17 32/19 35/6
41/12 48/2 53/5 61/5
61/8 70/15 87/4
93/22
**sit [8]** 53/13 57/20
62/17 65/14 74/17
76/4 77/12 118/19
**site [8]** 15/17 15/23
15/23 16/2 18/4 19/1
66/4 117/10
**sits [1]** 66/20
**sitting [2]** 74/22
105/3
**situation [1]** 37/14
**six [4]** 61/23 86/14
129/16 131/21
**size [1]** 13/23
**sizes [1]** 47/6
**SJCMR's [1]** 63/16
**slew [1]** 34/5
**sliding [1]** 125/1
**slightly [1]** 32/1

## S

**slow [1]** 24/14
**smaller [1]** 51/6
**smart [1]** 126/12
**smarter [1]** 67/9
**so [133]** 2/7 2/18 4/3 4/5 4/19 5/1 6/12 6/18 6/25 8/9 8/18 10/3 11/1 11/21 13/10 17/4 17/6 17/11 20/7 22/18 23/4 23/13 23/24 25/12 26/24 28/9 29/6 29/20 30/18 31/3 32/3 35/6 35/15 35/17 35/22 36/21 37/20 40/12 40/22 40/25 43/15 44/5 45/9 50/16 50/24 51/19 51/19 52/22 53/13 53/16 54/22 55/1 55/19 56/3 56/22 57/3 57/4 58/16 58/24 59/4 60/18 60/19 61/13 61/21 63/7 63/20 64/6 64/19 66/18 67/1 67/20 68/15 69/3 69/23 70/5 70/9 70/11 70/12 70/25 71/14 73/3 73/20 74/2 76/4 77/16 77/22 79/6 79/15 79/22 81/16 82/12 82/14 82/23 83/8 84/4 84/14 84/17 89/15 90/25 91/12 92/11 93/6 98/8 99/25 100/8 100/16 100/23 100/23 102/23 103/4 104/4 110/1 110/20 111/20 112/15 114/5 114/11 114/13 116/4 116/9 116/9 116/10 116/18 117/20 119/15 123/15 125/11 126/24 127/19 131/5 131/23 132/15 133/10
**so-and-so [1]** 100/23
**Social [2]** 90/16 90/17
**solar [6]** 27/6 28/18 31/15 75/8 75/23 79/14
**sold [2]** 130/8 130/9
**sole [1]** 58/15
**solely [1]** 121/16
**solidified [1]** 97/23

**Solutions [1]** 87/12
**some [38]** 3/25 6/4 7/24 17/21 17/22 25/17 25/19 27/3 28/22 28/24 30/11 32/13 33/9 38/15 44/8 44/11 44/15 47/6 47/11 47/12 56/17 59/11 59/13 64/17 65/25 66/2 82/25 92/9 97/6 97/17 97/21 100/10 100/10 101/4 118/12 132/5 132/7 132/8
**somebody [14]** 6/11 32/19 33/15 41/14 44/14 54/2 55/24 87/7 87/8 88/16 95/5 109/13 110/25 125/5
**somehow [2]** 47/25 131/24
**someone [3]** 83/22 84/17 92/3
**something [11]** 6/22 11/25 26/13 53/16 55/22 60/9 80/2 82/9 109/25 112/15 121/23
**Sommerdale [1]** 13/16
**soon [3]** 101/13 102/11 131/5
**sorry [8]** 18/23 23/6 38/14 80/7 93/19 110/21 120/9 124/15
**sort [1]** 25/18
**sounds [3]** 56/22 58/16 77/1
**sources [1]** 129/12
**South [17]** 10/17 12/14 12/17 29/3 29/4 29/10 29/15 29/17 31/19 54/5 62/3 62/11 62/14 62/18 63/7 63/19 77/9
**southern [4]** 29/9 29/16 29/18 63/18
**speak [3]** 41/12 70/16 117/23
**Speakeasy [1]** 9/3
**speaking [3]** 7/5 71/12 98/10
**specific [1]** 21/10
**specifically [2]** 39/2 75/7
**spelled [1]** 82/25
**split [5]** 101/9 119/13 119/14 119/16 120/9
**spoke [1]** 90/12

**spoken [3]** 59/23 72/20 91/16
**spot [1]** 13/3
**spots [1]** 120/4
**spreading [1]** 35/18
**stab [1]** 97/10
**stamped [1]** 61/24
**stance [1]** 103/21
**stand [2]** 49/4 133/13
**standard [1]** 21/8
**start [7]** 16/5 20/4 26/9 26/22 34/10 125/16 133/12
**started [5]** 33/3 42/15 47/15 115/7 117/15
**starting [2]** 6/11 99/19
**starts [1]** 95/10
**state [10]** 9/18 59/2 90/5 90/15 92/14 93/8 97/19 108/3 110/4 131/12
**stated [11]** 2/5 34/7 34/7 37/13 42/3 81/3 85/21 89/2 89/4 110/24 131/11
**statement [2]** 33/19 71/13
**statements [1]** 132/17
**states [9]** 1/1 47/11 66/11 95/7 97/17 108/20 108/21 110/9 119/10
**stating [2]** 50/24 95/4
**status [7]** 24/18 24/22 27/5 29/2 30/22 125/3 125/4
**stay [1]** 25/19
**stayed [2]** 55/6 131/25
**stays [1]** 101/22
**steal [3]** 81/21 83/22 83/25
**stealing [7]** 83/24 113/20 114/1 115/21 116/5 116/11 126/9
**steals [1]** 114/6
**step [2]** 28/1 128/9
**steps [1]** 88/15
**Steven [2]** 130/10 130/12
**sticking [1]** 46/23
**still [30]** 4/18 5/19 6/16 6/20 9/5 13/12 15/14 57/20 57/21 59/1 59/5 66/20 76/24 77/19 78/13 85/13 98/14 101/22

103/10 114/5 115/12 115/15 116/5 125/11 126/10 129/23 130/2 131/8 131/24 132/24
**stipulated [1]** 126/1
**stipulations [1]** 66/25
**stolen [3]** 3/19 124/7 128/14
**story [4]** 35/17 35/19 41/7 103/18
**streamline [1]** 133/11
**street [3]** 1/20 1/24 4/21
**stricken [1]** 53/22
**strictly [1]** 72/20
**strike [1]** 73/16
**stringing [1]** 53/15
**structure [9]** 96/18 96/20 101/2 101/6 101/7 101/11 101/19 102/8 103/2
**Structures [1]** 92/25
**strung [1]** 53/9
**stuck [1]** 98/8
**studies [1]** 65/24
**studious [2]** 3/8 58/16
**stuff [1]** 115/8
**subcontract [3]** 10/18 12/14 57/5
**subcontracted [1]** 58/23
**subcontractor [2]** 21/12 59/24
**subcontractors [10]** 12/5 35/3 35/10 35/10 35/18 56/12 56/14 58/22 59/15 59/23
**Subject [1]** 120/22
**submitted [1]** 24/7
**substance [1]** 26/13
**subway [1]** 4/21
**sudden [3]** 85/18 103/4 103/19
**sued [1]** 107/7
**suggesting [1]** 101/7
**suggestions [1]** 107/15
**suggests [1]** 108/10
**Suite [1]** 1/16
**sum [2]** 27/25 68/10
**summarized [1]** 25/24
**summarizing [1]** 125/16
**summary [6]** 25/14 30/24 36/6 36/7

38/19 39/23
**summons [14]** 2/10 2/11 2/14 2/17 2/23 2/23 5/11 5/14 5/19 5/20 6/8 6/12 6/20 6/20
**summonses [1]** 6/17
**Sunday [1]** 105/3
**supplied [2]** 8/8 109/13
**suppliers [1]** 43/18
**supposed [8]** 25/4 81/10 81/12 83/20 94/8 102/2 104/7 112/5
**sure [9]** 12/11 33/10 53/23 82/8 83/5 87/22 88/22 90/4 94/14
**surprised [1]** 60/19
**surrounding [1]** 75/20
**survived [1]** 66/20
**suspect [1]** 133/6
**sustained [3]** 41/16 67/13 117/7
**sworn [1]** 7/8
**system [1]** 117/15

## T

**tables [2]** 33/7 103/4
**tactics [1]** 85/6
**take [18]** 14/5 16/3 16/5 39/14 41/7 41/10 54/1 68/6 68/7 70/8 70/11 97/7 103/17 114/10 114/11 114/17 128/5 133/11
**taken [3]** 38/20 38/20 103/21
**takes [1]** 68/3
**talk [9]** 26/1 37/23 44/5 57/12 63/24 72/14 84/4 95/11 116/5
**talked [16]** 29/3 29/11 29/15 30/6 30/23 33/5 39/11 44/8 75/7 75/8 94/12 97/22 97/24 97/25 98/2 98/5
**talking [13]** 48/11 61/19 70/4 71/6 72/8 72/11 87/22 96/22 97/17 108/16 114/5 115/12 115/16
**talks [3]** 35/1 96/25 97/1
**task [1]** 117/14

**T**

tasks [1] 68/11
tax [2] 110/10
110/16
team [4] 20/5 20/8
20/11 129/16
technically [1]
121/11
Technology [2]
14/21 14/21
telephone [1] 14/1
tell [13] 5/17 26/8
29/25 31/11 32/19
38/22 41/14 43/7
47/21 61/10 72/19
95/21 131/18
telling [1] 32/23
tells [1] 83/21
templates [1] 82/6
ten [9] 70/8 70/11
125/19 128/11 129/7
129/8 129/10 129/16
132/20
term [3] 43/9
104/13 125/5
terminate [3] 28/5
28/6 28/6
terminated [1]
114/12
termination [5]
27/16 27/24 28/2
28/4 32/3
termination-for-con
venience [1] 27/24
terms [14] 27/22
51/15 67/8 84/15
85/10 85/18 85/22
119/23 126/6 126/8
126/11 126/22
127/23 127/24
testified [19] 28/19
35/16 42/14 42/22
44/7 44/11 46/5
50/10 53/18 60/6
65/6 74/23 80/13
80/21 80/24 81/9
93/7 101/25 106/24
testify [4] 32/24
49/16 68/19 75/5
testimony [28] 30/6
40/7 42/3 46/22
50/13 58/19 59/13
60/18 61/14 62/12
67/23 71/7 71/13
71/21 72/15 74/11
75/3 76/1 76/8 76/15
76/25 81/16 82/20
91/19 91/25 92/11
121/18 128/3
text [9] 73/7 73/10
75/14 78/16 80/12

118/13 118/15 119/6
119/21
than [14] 3/9 5/3
6/25 35/15 67/9
68/23 68/24 68/24
69/3 87/21 101/20
109/14 121/6 124/24
thank [17] 7/19
10/3 17/14 18/20
39/9 40/10 42/8
70/13 71/1 71/9 73/1
92/22 94/23 100/14
113/13 122/11
133/15
thanks [1] 23/8
that [750]
that's [87] 8/20
8/25 10/24 10/25
12/14 12/15 12/17
12/17 15/10 17/1
18/17 22/20 23/13
23/14 27/18 30/21
31/4 31/13 32/4
36/13 37/18 38/5
38/9 38/18 45/6 46/1
46/6 46/22 47/18
48/22 49/9 49/10
50/12 51/20 52/17
53/24 56/9 59/20
60/4 60/15 60/19
63/12 64/15 64/25
65/2 66/25 67/11
68/8 71/10 73/14
73/24 75/13 76/24
77/6 79/2 79/25
84/17 85/2 93/23
95/4 96/16 98/25
99/3 99/15 100/20
102/14 104/18
105/10 105/12
106/25 107/16 111/9
111/18 112/17 114/2
117/3 117/5 118/25
119/9 120/3 122/4
125/9 127/9 130/4
130/22 132/2 133/2
the [778]
their [5] 4/17 18/1
29/13 54/8 107/23
them [43] 2/22 2/23
2/24 3/4 3/24 4/2 4/7
4/18 4/25 13/9 15/9
15/10 16/19 17/24
22/16 22/18 22/20
35/13 47/1 47/10
47/21 49/7 49/17
59/15 59/16 59/17
59/19 60/1 65/19
68/22 68/23 72/4
74/15 79/19 82/13
87/13 87/14 88/17
97/2 114/11 126/4

132/5 132/9
then [37] 5/7 6/8
9/7 9/13 9/19 15/24
16/3 20/8 35/21 38/4
40/24 52/13 56/2
61/5 80/1 81/18
85/18 86/11 86/13
95/10 96/14 96/17
97/9 99/11 99/22
101/1 101/16 102/1
102/2 102/11 102/12
105/21 119/23 129/6
130/11 133/12
133/15
there [77] 2/22 3/3
3/21 3/23 4/15 4/17
5/19 12/12 14/9
19/14 21/13 28/24
29/1 34/18 35/18
38/15 45/8 53/13
54/9 54/20 55/6
56/11 56/17 56/19
56/19 57/1 57/3
61/22 65/17 74/13
75/13 75/17 77/5
77/23 78/2 78/9
78/18 78/20 78/22
78/24 80/25 82/20
82/21 82/22 83/8
83/12 83/14 84/8
85/21 91/23 93/11
96/19 96/21 99/1
100/19 100/21 104/9
104/10 104/23
106/11 107/13
107/13 107/14
108/20 108/21 109/9
109/21 109/23
112/12 112/24 113/6
113/8 113/11 117/22
119/9 126/13 132/20
there's [23] 2/10
2/19 3/19 13/3 24/22
27/23 28/7 29/22
30/15 35/17 59/4
71/13 75/11 78/4
78/6 84/8 99/1
104/10 107/20
109/25 113/3 119/15
121/17
therefore [2] 50/12
76/4
these [41] 3/14 3/16
4/1 4/6 4/7 6/19 10/8
10/10 12/2 13/7
24/25 25/6 25/17
25/21 25/23 26/9
26/14 29/2 31/24
32/4 32/14 40/13
41/6 41/8 42/1 56/14
60/22 64/25 77/16
79/9 79/18 84/14

91/16 91/20 103/15
112/6 117/24 119/23
126/6 126/22 132/23
they [50] 2/5 2/7
3/15 4/1 4/8 4/18
4/20 5/18 8/18 13/9
16/15 23/4 24/7 27/4
28/6 28/6 28/10 30/3
30/10 31/25 33/10
34/20 35/4 47/4
55/10 60/3 61/19
62/8 66/19 69/24
70/1 73/24 74/16
75/4 76/2 76/14
76/17 76/18 77/17
77/19 78/16 82/12
90/11 102/10 102/11
105/25 121/8 121/8
131/24 131/25
they're [1] 4/13
they've [1] 74/20
thing [11] 5/9 13/24
22/16 22/17 78/25
83/24 86/20 94/15
100/2 109/17 116/4
things [12] 19/18
27/17 33/6 34/6
34/18 38/15 57/4
66/4 95/23 96/17
97/1 129/6
think [36] 3/20 4/8
5/7 15/23 16/17
16/25 17/18 19/24
23/22 30/12 32/2
34/6 35/24 37/11
40/12 44/7 51/5
51/15 58/7 66/6 67/9
67/24 70/2 74/22
83/6 83/19 96/25
101/19 101/25
103/21 104/16 112/5
112/7 123/1 123/9
123/15
thinking [1] 120/6
thinks [1] 86/16
third [11] 2/5 2/10
2/12 2/21 3/11 4/15
6/5 6/6 6/19 9/8 32/8
third-parties [1]
3/11
third-party [7] 2/5
2/10 2/12 2/21 6/5
6/6 6/19
this [246]
THOMAS [14] 7/8
16/24 87/16 92/25
98/24 99/11 99/19
100/18 105/4 105/9
105/20 106/21 118/6
123/21
those [52] 3/3 24/6
27/3 30/22 31/25

32/11 36/4 38/11
39/11 39/16 42/2
46/24 47/5 47/8
47/13 48/15 48/19
49/16 51/7 51/9
51/15 55/7 59/5 62/6
62/12 62/23 62/25
64/22 66/3 66/4
73/23 76/13 78/18
79/13 79/15 79/19
90/10 110/11 110/13
114/19 116/21
118/14 119/20
127/24 129/13
131/17 131/19
131/21 131/21
131/22 132/8 132/21
though [9] 3/10
17/25 64/19 72/18
94/2 117/3 121/14
123/3 130/14
thought [6] 19/8
23/23 51/19 93/19
93/21 93/24
thoughts [1] 97/11
thousands [1] 3/23
threat [1] 128/5
threaten [3] 127/6
128/3 129/4
threatened [5]
127/16 127/20
127/25 128/16
128/17
three [12] 29/21
29/24 30/3 46/20
61/23 93/6 94/18
96/11 96/12 100/17
101/16 120/5
three-way [1]
101/16
through [16] 12/10
17/4 21/9 29/6 34/5
36/9 63/5 65/19 70/6
73/15 74/7 75/9
88/24 117/24 124/4
126/7
throughout [1]
115/4
Thursday [1] 99/12
thus [1] 2/14
ties [1] 16/11
time [40] 10/21
24/6 25/8 25/21
26/12 32/12 32/13
34/23 38/22 45/14
46/25 50/15 52/3
52/6 61/13 61/14
66/6 66/23 68/8 68/9
70/22 89/20 97/3
97/6 98/13 101/25
102/2 105/2 112/5
112/6 118/23 119/1

**T**

**time... [8]** 121/14 124/6 125/14 126/8 126/8 126/18 129/24 133/17
**times [4]** 6/19 21/23 54/18 55/9
**to [589]**
**today [23]** 2/8 4/21 5/10 11/23 12/25 13/6 21/19 34/15 49/4 57/20 61/14 62/17 65/14 66/21 72/4 74/17 75/12 75/16 76/5 77/12 77/20 81/16 83/3
**together [4]** 35/20 36/6 65/18 107/15
**told [13]** 6/8 32/20 32/25 33/15 33/15 41/13 41/14 49/6 51/20 60/1 87/7 90/14 95/12
**too [3]** 93/21 100/2 101/13
**took [11]** 16/14 35/21 60/22 64/8 64/20 66/6 78/11 97/3 97/6 99/22 131/5
**top [14]** 3/12 19/4 66/5 73/17 89/6 92/16 98/19 99/3 105/5 120/25 125/16 126/3 126/24 126/25
**topic [1]** 72/9
**torn [1]** 57/2
**total [8]** 31/20 32/1 37/20 39/14 119/8 119/9 119/15 119/17
**touched [1]** 7/25
**toward [1]** 17/19
**towards [2]** 111/19 128/10
**Town [1]** 107/3
**Township [4]** 27/6 76/9 76/10 76/12
**Townshjp [4]** 31/13 75/8 75/22 76/6
**track [2]** 61/22 128/11
**trade [1]** 127/12
**trademark [4]** 10/24 11/3 11/5 78/22
**trail [1]** 129/13
**train [1]** 93/24
**traits [1]** 68/11
**transactions [1]** 129/20
**transcript [2]** 69/16

161/12
**transparencies [2]** 126/5 129/9
**Trenton [5]** 30/5 30/8 30/9 31/17 76/25
**trial [4]** 1/12 20/22 79/1 79/3
**tried [3]** 33/6 41/9 127/17
**Trish [1]** 69/13
**truck [3]** 3/19 54/25 55/4
**true [18]** 45/7 45/19 46/1 46/6 46/11 49/2 49/9 51/17 51/22 60/20 71/10 79/4 85/8 102/14 103/16 104/18 111/9 121/10
**Truing [1]** 101/12
**trust [1]** 116/16
**try [5]** 47/18 47/21 55/9 55/11 100/8
**trying [13]** 19/13 50/14 55/13 56/1 57/23 60/24 66/3 72/2 85/3 93/14 95/15 95/17 99/25
**turn [7]** 8/2 10/14 18/16 20/21 22/21 30/16 33/6
**turning [1]** 103/4
**turnkey [2]** 87/11 89/11
**two [22]** 2/21 7/19 16/15 27/17 31/24 45/20 50/12 57/1 61/23 71/19 71/24 71/25 87/15 90/20 96/9 96/12 110/8 117/22 119/3 120/4 120/4 129/19
**two-page [1]** 45/20
**type [1]** 6/4
**typed [2]** 91/23 93/11
**typically [2]** 28/5 122/1

**U**

**unable [2]** 28/9 84/23
**uncle [3]** 41/9 95/24 95/25
**under [28]** 2/6 27/10 40/17 62/12 72/18 78/23 81/4 81/6 81/11 81/12 81/14 81/15 81/17 81/21 82/15 98/11 103/1 103/10 104/4 104/7 122/18 127/12

128/5 128/6 129/20 129/24 131/24 132/1
**underbill [1]** 22/17
**underneath [1]** 13/24
**undersigned [1]** 10/8
**understand [13]** 5/5 29/7 32/11 40/6 60/10 101/1 101/6 102/23 102/24 106/11 106/11 126/6 129/11
**understanding [7]** 5/13 67/4 83/2 84/12 109/24 115/9 132/2
**underway [1]** 77/2
**unfortunately [4]** 82/12 82/17 100/7 114/9
**uniform [1]** 96/8
**unimportant [1]** 45/9
**unit [1]** 68/10
**UNITED [1]** 1/1
**unless [2]** 92/9 101/20
**unsigned [1]** 13/11
**until [18]** 9/17 16/25 41/6 45/2 51/22 52/22 58/25 59/4 61/13 86/7 89/17 89/18 91/9 115/8 116/2 125/24 125/25 133/12
**untimely [1]** 38/21
**untrue [1]** 71/22
**up [46]** 10/10 12/16 13/8 14/7 16/2 17/7 17/23 33/5 38/22 38/22 47/14 49/4 51/5 52/10 53/13 54/11 54/19 54/21 54/23 54/24 55/1 55/20 57/2 57/17 60/19 61/13 69/24 70/4 70/5 73/2 77/8 78/9 80/8 80/25 82/15 88/22 95/23 96/8 98/18 101/12 106/10 106/20 110/21 118/3 118/12 120/25
**update [2]** 27/6 27/6
**updated [3]** 24/19 25/12 119/5
**upon [5]** 7/25 8/19 101/11 122/2 125/2
**upper [2]** 19/23 20/2
**upset [1]** 69/7

**upwards [1]** 98/14
**us [39]** 8/8 12/8 13/10 18/6 18/8 25/6 25/13 25/14 25/15 25/19 25/19 25/20 26/8 27/3 29/6 30/24 32/19 35/19 41/14 47/12 50/25 82/4 86/15 91/10 96/18 110/8 111/16 111/17 111/17 112/3 112/8 114/7 116/16 116/20 123/9 123/15 128/2 131/10 132/21
**use [10]** 4/2 4/22 49/24 50/4 81/23 83/16 83/22 118/1 118/23 119/22
**used [8]** 8/16 10/9 43/9 50/1 50/7 50/20 82/17 115/3
**using [6]** 41/5 51/12 83/20 99/6 116/1 131/6
**usually [2]** 8/16 8/19

**V**

**various [1]** 102/8
**vendors [1]** 43/18
**venture [1]** 121/11
**verbal [5]** 103/22 104/5 104/7 104/9 112/14
**verbally [1]** 111/24
**verify [1]** 5/21
**very [17]** 3/3 9/22 20/19 27/12 30/17 41/6 52/13 70/13 71/1 91/18 98/19 99/3 105/5 106/6 117/21 120/19 133/15
**vet [8]** 4/7 45/9 46/1 46/24 47/23 48/6 48/8 48/9
**vetted [2]** 42/22 44/19
**vetting [3]** 42/25 96/2 111/12
**via [2]** 45/20 82/6
**viewers [1]** 15/8
**virtually [5]** 21/9 21/14 79/8 79/10 115/2
**void [1]** 116/18
**vs [1]** 1/6

**W**

**Wait [1]** 94/24
**Waiting [1]** 106/14
**waived [1]** 38/21

**waiver [1]** 5/12
**walk [7]** 25/17 27/17 27/25 28/3 29/6 31/25 36/9
**walk-away [5]** 25/17 27/17 27/25 28/3 31/25
**walked [3]** 32/4 71/18 71/22
**wall [1]** 19/18
**walls [2]** 54/9 54/11
**want [26]** 2/8 3/13 4/2 5/21 6/2 8/25 10/14 17/5 21/17 23/3 27/23 47/20 50/10 51/2 54/13 54/14 79/7 79/22 80/2 92/15 103/5 109/18 116/11 116/18 118/3 129/12
**wanted [27]** 2/25 3/24 7/24 28/14 51/18 53/17 55/19 55/21 55/22 57/8 57/12 57/16 71/7 104/4 109/7 114/14 114/17 116/19 116/20 118/12 123/4 128/8 128/13 130/12 130/23 132/20 132/21
**was [342]**
**Washington [6]** 27/6 31/13 75/7 75/22 76/6 76/9
**wasn't [27]** 9/17 41/6 43/16 43/20 49/21 49/22 50/13 52/4 52/6 52/25 57/10 81/10 82/25 89/16 89/17 103/25 104/7 111/8 112/16 113/10 115/5 115/8 116/24 117/13 122/23 125/24 125/25
**wasting [1]** 6/13
**WATSON [12]** 1/15 3/2 3/5 4/15 5/12 5/15 6/25 7/18 40/6 71/21 133/4 161/5
**way [9]** 5/4 16/10 34/8 40/17 70/19 86/3 101/16 106/7 107/19
**ways [1]** 116/17
**we [232]**
**we'll [10]** 26/1 40/8 45/8 70/10 70/12 119/24 120/16 133/11 133/12 133/13

**W**

**we're [18]** 5/7
13/12 18/24 32/23
58/8 59/1 59/5 59/5
60/1 68/13 72/3 79/1
80/4 88/22 92/21
100/8 106/10 120/18
**we've [5]** 3/15
30/17 30/23 59/23
78/24
**Web [1]** 19/15
**website [18]** 13/19
13/25 14/21 14/24
14/25 15/5 15/25
17/2 17/11 17/12
18/2 18/3 20/7 82/2
96/7 115/1 115/22
128/18
**Wednesday [1]**
118/9
**week [6]** 85/13
96/21 117/2 117/5
117/11 124/23
**weekend [3]** 55/7
55/20 57/17
**weeks [1]** 117/22
**well [42]** 5/23 9/9
9/16 16/5 17/2 17/9
19/21 22/20 23/6
23/21 29/8 32/17
34/10 35/6 38/19
45/2 52/17 62/10
64/18 65/4 68/19
75/5 75/7 78/2 79/11
80/24 84/17 100/3
102/4 104/18 105/8
113/8 113/10 116/2
116/14 122/5 127/9
128/20 131/22
132/11 132/13 133/4
**went [18]** 16/22
16/23 34/5 47/7
54/17 54/18 62/13
62/19 64/16 64/22
75/9 83/3 84/22 85/5
86/13 109/6 127/19
130/10
**were [115]** 2/16
3/14 3/15 3/23 3/25
4/1 4/17 4/20 7/17
8/9 8/10 12/2 12/5
14/11 16/17 19/13
19/14 19/14 24/7
25/4 25/17 26/9
26/14 26/18 27/4
27/12 28/24 29/24
30/8 30/11 30/25
34/8 34/18 39/11
40/15 41/24 42/2
42/2 42/4 43/17
45/22 47/4 47/6

50/14 51/3 51/3 51/4
51/5 51/12 53/8
53/11 53/15 53/15
54/9 54/9 55/13 57/1
57/2 59/16 60/19
64/23 64/25 69/13
71/21 72/2 72/7
72/11 73/9 73/24
74/8 74/22 75/4
76/13 77/17 79/19
83/12 83/14 84/8
85/3 85/11 88/15
89/23 90/13 96/2
96/21 97/2 102/16
107/7 107/7 107/22
110/24 112/18
113/24 114/8 114/13
114/16 114/19
114/24 115/11
115/15 115/17 119/9
125/11 127/17
128/20 129/23 130/2
131/15 131/17
131/22 132/11
132/13 132/16
132/16 132/21
**weren't [14]** 4/1
12/6 16/16 42/4 51/9
56/13 75/4 76/2
103/8 114/16 121/18
121/21 123/14
127/22
**West [1]** 1/20
**what [168]**
**what's [1]** 76/19
**whatever [4]** 16/15
51/2 66/14 70/24
**when [45]** 6/3 6/9
8/9 10/19 11/1 13/9
13/21 14/6 14/11
16/4 17/1 21/24 22/9
25/11 28/6 29/2
33/23 43/13 43/16
45/2 49/11 49/14
52/14 53/1 53/9 58/7
60/19 66/22 67/9
67/19 69/13 74/23
78/15 81/9 84/22
85/9 86/19 89/20
91/10 91/13 102/16
103/17 112/6 116/17
130/12
**where [21]** 5/14
12/3 14/11 17/23
19/6 28/5 36/12 41/6
76/25 78/14 84/6
99/6 102/24 103/5
109/13 110/10 120/1
121/23 123/8 128/16
132/23
**Where's [2]** 24/10
24/11

**whereof [2]** 91/19
91/25
**whether [12]** 4/19
48/14 51/12 56/9
62/12 71/11 72/3
74/18 88/3 88/16
92/1 112/12
**which [41]** 2/13
2/17 4/12 6/10 8/15
11/6 14/20 15/5 24/1
27/24 30/17 37/2
54/22 55/9 56/18
57/2 61/14 62/11
68/1 68/1 72/9 73/2
74/18 86/19 87/25
88/19 97/21 99/25
100/1 106/20 107/1
114/14 116/18
117/15 119/8 119/22
125/18 129/3 131/15
132/14 133/17
**while [6]** 51/3 55/7
96/2 109/5 117/3
129/9
**whited [1]** 131/17
**who [21]** 3/18 12/4
19/10 21/11 28/14
29/10 33/10 36/25
43/4 45/17 47/5 63/2
63/19 87/10 89/2
90/7 90/12 106/17
111/11 111/17 125/5
**whole [4]** 34/5
65/17 96/19 129/5
**whom [1]** 21/11
**Whose [2]** 11/11
118/24
**why [17]** 5/18 6/2
14/5 19/12 27/20
37/8 37/11 41/3
50/12 52/13 84/17
84/21 90/10 91/12
112/17 116/11 126/6
**wife [3]** 130/8
130/11 130/24
**will [17]** 9/21 10/5
28/8 30/17 72/17
77/3 77/3 83/6 96/23
100/11 100/16
100/21 101/4 101/13
119/4 124/22 133/12
**willing [1]** 6/23
**wire [1]** 66/1
**wish [1]** 42/9
**with [169]**
**withheld [1]** 4/4
**within [1]** 24/21
**without [4]** 29/25
34/9 83/15 119/3
**witness [12]** 7/1
38/24 39/4 40/6
53/21 58/19 61/2

70/20 70/25 133/7
133/12 161/3
**witnesses [3]** 71/20
71/24 72/1
**WOLFE [2]** 1/24
161/16
**wondering [1]**
15/22
**word [1]** 73/20
**words [1]** 127/16
**work [59]** 18/9
18/11 22/12 30/1
35/11 36/23 36/25
41/5 41/7 41/24 46/2
47/8 48/15 49/16
50/3 51/8 55/8 55/12
56/8 56/15 56/17
57/5 57/5 57/16
57/21 57/23 58/6
58/13 58/13 58/21
59/10 63/25 64/5
66/15 66/23 67/17
74/9 81/6 81/14
81/15 82/1 86/14
90/11 104/4 108/22
109/6 109/7 111/19
112/3 112/4 113/18
116/17 116/19
116/19 117/10
117/11 117/16
117/20 130/10
**worked [14]** 47/9
47/10 49/1 49/7
49/12 55/7 55/20
65/18 65/24 65/24
65/25 66/3 82/11
114/25
**working [15]** 5/16
11/21 15/15 24/15
30/11 48/19 51/3
51/3 51/4 107/15
113/23 116/20 117/9
122/21 129/9
**worse [1]** 22/17
**worst [1]** 22/16
**would [56]** 3/13 4/5
4/4 4/12 6/7 6/20
11/25 12/5 12/8
15/24 16/20 18/11
21/11 22/18 23/23
25/16 26/7 26/8
26/24 27/23 28/10
32/5 40/20 40/25
43/24 51/15 52/2
66/7 66/11 68/6 69/7
70/1 70/2 73/22 80/4
82/14 91/12 92/8
93/12 94/2 94/7 95/5
97/5 97/7 99/17
99/22 104/22 106/20
107/17 107/25
111/18 119/16

119/21 123/15
127/23 128/12
**wouldn't [2]** 34/7
128/5
**wrapping [1]** 95/23
**write [3]** 84/23 97/8
102/6
**writes [2]** 15/16
99/18
**writing [10]** 5/10
14/24 33/13 83/9
83/15 103/25 104/1
105/22 111/4 118/24
**written [3]** 5/1 5/4
92/1
**wrong [8]** 6/22 10/9
67/21 80/14 80/25
81/4 106/22 117/4
**wrote [7]** 33/8
33/17 94/18 96/16
100/20 107/5 114/9
**WTS [2]** 75/22 76/6

**Y**

**year [2]** 96/6 116/15
**years [4]** 59/2 64/12
69/22 130/7
**yes [106]** 5/6 5/8
9/6 10/13 11/22
12/13 12/21 16/23
17/10 17/10 17/13
18/19 20/6 22/24
23/6 23/8 24/5 24/12
28/20 29/17 32/10
33/1 33/2 33/22
35/12 36/3 36/6 36/8
36/24 37/25 38/25
39/23 40/15 41/21
42/10 42/20 48/23
48/25 49/13 55/3
56/2 56/3 60/12 61/4
61/8 61/17 62/5
63/16 66/25 72/13
73/7 75/23 76/11
77/11 79/21 80/20
81/6 81/25 82/4
82/17 83/14 83/17
84/8 85/22 89/10
91/9 93/2 94/9 94/13
94/16 94/21 95/4
97/13 98/22 99/13
99/21 99/25 101/3
102/23 104/25 105/6
105/11 106/9 106/18
107/5 110/3 110/17
111/6 111/10 112/4
114/7 115/19 118/2
118/8 118/16 121/17
122/7 122/17 123/14
123/20 127/3 129/7
130/1 131/4 132/15
133/1

**Y**

**yesterday [16]**  2/3
2/19 2/25 7/5 7/25
29/11 37/23 42/3
42/14 43/8 44/7
50/10 50/13 74/22
74/23 76/8
**yet [5]**  32/18 39/3
77/7 78/17 104/23
**you [749]**
**you strung [1]**  53/9
**you'd [1]**  70/5
**you'll [4]**  5/18 19/24
53/4 93/15
**you're [46]**  12/22
19/24 20/7 46/22
50/24 56/9 57/23
59/11 59/15 60/11
62/3 62/6 62/17
63/20 65/20 67/7
67/9 67/11 67/24
68/25 69/18 69/18
73/12 74/2 79/3 79/6
83/3 83/19 84/14
85/25 88/24 101/6
102/4 102/24 104/15
108/5 109/3 109/21
110/1 112/6 112/7
112/7 121/14 126/12
127/20 133/6
**you've [2]**  78/19
87/4
**your [141]**
**yourself [2]**  45/10
86/21

**Z**

**zero [3]**  77/24 77/24
84/25